IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civ. No. 1:16-CV-03180-ELH |
| v. | ) ) | |
| MANUFACTURERS AND TRADERS TRUST COMPANY, d/b/a M&T BANK, | ) ) ) | |
| Defendant. | ) | |

## PLAINTIFF EEOC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    STATEMENT OF FACTS ......................................................................... 1

II.   STANDARD OF REVIEW ...................................................................... 12

III.  SCHEMES OF PROOF ........................................................................... 13

IV.  ARGUMENT ......................................................................................... 14

    A.    McCollin is a Qualified Individual with a Disability............................. 14

           1.   McCollin's Actual and Record of a Disability ................................ 14

           2.   Defendant Had Notice of McCollin's Disability ............................. 17

           3.   McCollin Could Perform the Essential Functions of Her Edmonson Village Job, in Addition to the Jobs She Desired ........................... 17

    B.    Defendant Failed to Reasonably Accommodate McCollin .................................. 18

           1.   Defendant's Failure to Return McCollin to Work Rendered Her Leave "Accommodation" Ineffective .............................................. 19

           2.   Assuming, Arguendo, that Reassignment was the Only Reasonable Accommodation, McCollin Should Have Been Placed Into a Vacant Position Without Competition ........................................................ 20

                a.   The Plain Language of the ADA and Evidence of Congressional Intent Demonstrate that Reassignment Means Appointment, Not Simply the Opportunity to Compete with Everyone Else……………………………………………………..20

                b.   Supreme Court Precedent and Subsequent Decisions Are Clear – Reassignment is Reasonable in the Run of Cases ……………………………………………………..…..22

                c.   The ADA Regulations and the EEOC's Enforcement Guidance Should be Granted Deference ……………………………………………………....26

                d.   Reassignment was Reasonable Under the Circumstances of this Case ……………………………………………..27

                      i.   Defendant's Reasonable Accommodation Policies Compel Non-Competitive Reassignment ……………………………………………..…...27

ii. Defendant Regularly Reassigns and Promotes Non-Disabled Employees Without Competition …………………………………………………....28

iii. McCollin was More Qualified Than Selected Applicants ………………...………………..…28

C. Defendant Terminated McCollin Because of Her Disability................................. 30

D. Defendant Has Waived Undue Hardship as an Affirmative Defense.................. 31

1. Defendant Cannot Show That Holding Open the McCollin's Job Would Have Constituted an Undue Hardship................................. 32

a. Defendant Had Adequate Personnel .................................... 32

b. Defendant Had the Organizational Infrastructure to Accommodate McCollin ...................................................... 33

c. Defendant Had the Financial Capacity to Accommodate McCollin for an Additional Four Months........................... 33

2. Non-Competitive Reassignment Would Not Have Imposed an Undue Hardship on Defendant's Business Operations.................... 34

V. CONCLUSION........................................................................................ 34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 1:16-CV-03180-ELH |
| | ) | |
| v. | ) | |
| | ) | |
| MANUFACTURERS AND TRADERS TRUST COMPANY, d/b/a M&T BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF EEOC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Manufacturers and Traders Trust Company, d/b/a M&T Bank ("Defendant" or "M&T") failed to reasonably accommodate Candace McCollin ("McCollin") and discharged her because of her disability, in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act of 2008 ("ADA"), 42 U.S.C. § § 12112(a) and (b). Plaintiff Equal Employment Opportunity Commission ("EEOC" or the "Commission") hereby moves for summary judgment on all issues of liability because there are no issues of material fact with respect to the Commission's *prima facie* case, and Defendant is unable to offer evidence to establish an affirmative defense.

## I.   STATEMENT OF FACTS

### A.   McCollin's Employment History

McCollin began her career in retail banking as a bank teller in 2001.[1]  In 2002, Provident Bank hired her as a relationship banker, and she quickly ascended through its ranks, becoming an assistant branch manager in 2004, and ultimately, a branch manager in 2007.[2] In 2009, after

---

[1]  *See* Plaintiff's Exhibit ("PX") 1, Declaration of Candace McCollin ("McCollin Decl.") at ¶ 3.
[2]  *Id.*

Defendant M&T Bank acquired Provident Bank, McCollin retained her position as branch manager of Mondawmin Mall Shoppers, an in-store retail branch.[3]  As Branch Manager, McCollin was responsible for, *inter alia*, the overall profitability of her branch, operations and compliance, performance management, including employee development, employee engagement, and coaching; and sales and business development.[4]  McCollin satisfactorily performed her job duties throughout her tenure and was rewarded, on a quarterly basis, for her performance.[5]  After Defendant announced in or around July 2012 that it intended to close its Mondawmin Mall Shoppers branch, McCollin applied for a vacant branch manager position at Defendant's Edmonson Village branch, a traditional retail banking branch.[6]  On October 10, 2012, Regional Retail Sales Manager Anne Bartolotta (now Ciminelli) selected McCollin for the position.[7]

### B.    McCollin's Medical History

McCollin gave birth to her first child after an uncomplicated pregnancy in 1998.[8]  During a routine gynecological visit in 1999, however, her OB-GYN, Dr. Murray Pearlman, informed her that her pap smear revealed the presence of abnormal cells in her cervix.  *Id.*  He thereupon performed a loop electrosurgical excision procedure (LEEP) to remove the cells.  *Id.*  The year following her procedure, McCollin became pregnant but suffered a miscarriage during her first trimester.[9]  In 2008, McCollin learned she was pregnant.[10]  After experiencing abdominal cramping and vaginal

---

[3] *Id.*

[4] *See* PX1, McCollin Decl. at ¶ 2; *see generally* PX 2, M&T Job Descriptions – Branch Manager at M&T_0001269-1272; *see also* PX 3, Deposition Excerpts of McCollin ("McCollin Dep.") at 22:6-14.

[5] *See generally* PX 4, Candace McCollin Performance Appraisals ("McCollin Appraisals"); PX 5, McCollin Employee Profile Report; *see also* PX 6, Deposition Excerpts of James Prusak ("Prusak Dep.") at 36:6-37:1 (explaining the significance of incentive awards).

[6] *See* PX1, McCollin Decl. at ¶ 3; PX 3, McCollin Dep. at 23:22-24:9; 25:17-21; 28:19-29:3.

[7] *See* PX 3, McCollin Dep. at 24:18-22; PX 7, Deposition Excerpts of Anne Ciminelli ("Ciminelli Dep") at 49:25-50:4.

[8] *See* PX1, McCollin Decl. at ¶ 5; PX 8, Declaration of Dr. Murray Pearlman ("Pearlman Decl.") at ¶ 4.

[9] *Id.*; PX 9, McCollin Medical Records ("Medical Records") at EEOC000127 (explaining McCollin's obstetrical history, including her first trimester spontaneous abortion).

[10] *See* PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶ 4.

bleeding at or around 19 weeks' gestation, McCollin was hospitalized where her cervix dilated spontaneously causing the premature rupturing of her fetal membranes (i.e., miscarriage).[11]  Based on her medical history, Dr. Pearlman diagnosed McCollin with an incompetent cervix.[12]  In 2010, when she again became pregnant, Dr. Pearlman recommended and subsequently performed on McCollin a vaginal cerclage – a surgical procedure sewing the cervix closed during pregnancy to prevent it from opening prematurely.[13]  Despite this precaution, at or around 20 weeks' gestation, McCollin's cervix again dilated spontaneously causing her to miscarry for the third time.[14]

### C.    Defendant M&T Bank

Defendant M&T Bank provides a broad range of financial services, including personal, retail, and commercial banking throughout several states, including Maryland, and Canada.[15]  Headquartered in Buffalo, New York, Defendant has more than 17,000 employees staffed throughout 750 branches.[16]  With 1,058 employees in Baltimore City alone, it is one of the city's largest employers.[17]  Following the Provident acquisition, Defendant operated both traditional and in-store retail banking branches.[18]  By 2014, Defendant closed all in-store branches in the Greater Baltimore region.[19]

### 1.    Reasonable Accommodation and Related Policies

Defendant maintains an equal employment opportunity ("EEO") policy which "provide[s] equal employment opportunities to all employees and applicants without regard to . . . disability"

---

[11]  *See* PX 9, Medical Records at EEOC000120-122;PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶4.

[12]  *See* PX 9, Medical Records at EEOC000120-122;PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶5.

[13]  *See* PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶ 6, PX 9, Medical Records at EEOC000124.

[14]  *See* PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶ 6; *see generally* PX 9, Medical Records at EEOC000126-130.

[15]  *See also* https://newsroom.mtb.com/about-mtbank/, last visited April 4, 2018.

[16]  *Id.*

[17]  *See* http://commerce.maryland.gov/Documents/ResearchDocument/MajorEmployersInBaltimoreCity. pdf.

[18]  In-store branches were housed within large retail outlets (*e.g.,* supermarkets).

[19]   *See* PX 10, Deposition Excerpts of Dan Fulmer, McCollin's former supervisor at Mondawmin Mall Shoppers branch ("Fulmer Dep") 44:4-45:9; PX 11, 30 (b)(6) Deposition Excerpts of Philip Mosco, M&T

and provides for "reasonable accommodation to qualified individuals with disabilities."[20] Defendant further provides leave and job reassignment as reasonable accommodations.[21] Defendant's Employee Relations Department (ERD) is responsible for enforcing its EEO policy, including reasonable accommodation requests.[22]   Melissa Thompson, Employee Relations Corporate Programs Manager, is responsible for Defendant's EEO program, including reasonable accommodation, company-wide.[23]

Defendant administers its disability and Family Medical Leave Act (FMLA) programs through Unum Group, a third-party provider.[24]  Pursuant to company policy, employees must notify their managers prior to taking FMLA and/or short term disability (STD) leave. In so doing, they must submit to their managers the dates of their anticipated leave.[25]  Employees unable to return to work 26 weeks after commencing STD are eligible for long-term disability (LTD) benefits.[26]  Prior to returning to work, employees must submit medical release forms indicating their restrictions, if any.[27]  Defendant allows up to 24 months' LTD leave before terminating employees unable to return to work.[28]

### 2.      Employee Replacement Processes and Procedures

To ensure adequate staffing during an employee's extended leave of absence, Defendant utilizes several methods of branch coverage, including using existing employees to provide staff

---

Regional Retail Sales Manager ("30(b)(6) Mosco Dep.") 22:1-5.
[20]  PX 12, M&T Policies – EEO Policy at M&T_0000458.
[21]  *See e.g.*, PX 1, McCollin Decl. ¶ 6; PX 13, Deposition Excerpts of Melissa Thompson ("Thompson Dep.") 67:24-69:4.
[22]  *See generally*, PX 12, M&T Policies – STD and LTD Guidelines at M&T_0000458-61.
[23]  *See* PX 13, Thompson Dep. 62:16-63:13, 67:5-10.
[24]  *See* PX 12, M&T Policies – STD and LTD Guidelines at M&T_0000469.
[25]  *Id.,* STD Checklist at EEOC000687.
[26]  *Id.*, STD and LTD Guidelines at.M&T_0000470.
[27]  *Id.*, STD and LTD Guidelines at M&T_0000470 and STD Checklist at EEOC000687.
[28]  *Id.*, STD and LTD Guidelines at M&T_0000470.

support.[29]  For instance, Defendant employs a cadre of individuals, called the regional "float staff," who provide additional coverage and/or support for retail branches, as needed.[30]  Other methods include providing employees flex and/or overtime, and hiring temporary staff or contract employees to fill gaps in coverage.[31]  Should a manager decide, after 16 weeks, to replace an employee on leave, he/she must complete and submit a Replacement Request Form to his/her assigned Employee Relations Specialist or to Employee Relations Corporate Manager Thompson, justifying the need for replacement, including coverage methods employed.[32]  If submitted and approved, Defendant sends a letter to the employee on leave informing her that her job can no longer be held open and that she will be replaced.[33]  The letter further instructs the employee to return an enclosed accommodations request form within 10 business days of receipt if able to return to work, or alternatively, continue submitting medical documentation to Unum in support of continued leave.[34]

### 3.    Non-Competitive Reassignment Policies and Practices

Defendant maintains non-competitive reassignment policies and practices. Pursuant to its EEO policy, it reassigns employees with disability-related work restrictions to vacant positions *without* competition.[35]  In accordance with its replacement process, Defendant reassigns displaced employees to comparable vacant positions[36] *without* competition, upon return to work.[37]

---

[29]  *Id.*, Replacement Request Form at M&T_0001810.

[30]  *See* PX 3, McCollin Dep. 83:19-22; PX 14, Declaration of Kandee Smith, former M&T Regional Float Staff Manager/Teller Manager, ("Smith Decl.") ¶ 3.

[31]  *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001810; PX 13, Thompson Dep. 107:19-109:11; PX 15, 30(b)(6) Deposition Excerpts of Arthur Salman ("30(b)(6) Salman Dep.") 94:10-25.

[32]  *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001810-11; PX 13, Thompson Dep. 75:2-76:3, 76:19-77:6; PX 15, 30(b)(6) Salman Dep. 86:15-23.

[33]  *See* PX 13, Thompson Dep. 76:4-9; PX 12, M&T Policies – Employee Replacement Letter at M&T_0001768-69.

[34]  PX 12, M&T Policies at M&T_0001768-69.

[35] *See e.g.,* PX 13, Thompson Dep. 67:24-69:4 (providing example of an employee who was reassigned to a vacant position without competition as a reasonable accommodation).

[36] *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001810 (defining "comparable vacant positions" as positions within the same division/department that are similar in scope of responsibilities, job duties, and compensation.  (*i.e,* the same or similar job title and job grade)); PX 13, Thompson 116:14-117:4 (explaining "comparable vacant positions").

Defendant's Employee Relations Department is charged with identifying comparable positions that are or will become available within 90 days of an employee's replacement or return to work.[37]  If no comparable positions are available or the employee is released 90 days *after* replacement, Defendant exercises its discretion to refer the employee to its third-party outplacement vendor for 90 days' redeployment assistance.[38]  Additionally, Defendant routinely transfers employees seeking development or promotional opportunities to vacant positions without competition.[40]

### 4.    Redeployment Assistance Program

Defendant provided redeployment assistance, an internal job placement service, to displaced employees returning from extended leaves of absence.[41]  Eligible employees[42] received career

---

[37]  *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001811; PX 13, Thompson Dep 114:17-115:25 (explaining that M&T's replacement process provides that employees are "simply slotted into [] [vacant] role[s]" without competition).

[38]  *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001811 (similarly providing that employees who are released to work within 24 months of their first day of disability should be reassigned to vacant positions without competition when such positions are available); PX 13, Thompson Dep. 113:6-115:18; PX 15, 30(b)(6) Salman Dep. 91:19-93:2.

[39]  *See* PX 12, M&T Policies – Redeployment Policy at M&T_0001770-71; PX 13, Thompson Dep. 125:8-126:4.

[40]  *See* PX 15, 30(b)(6) Salman Dep. 66:2-70:22 (explaining that there are exceptions to Defendant's job posting policy whereby hiring manager pre-select candidates without competition, prior to posting/advertising vacant positions); 95:25-97:16 (explaining that employees are transferred from one position to another, where the bank has decided, in consultation with the employee, that the employee is better suited for a different position); PX 16, 30(b)(6) Deposition Excerpts of Stephanie Williams ("30 (b)(6) Williams Dep.") 28:5-29:13 (explaining that employees who transfer laterally and/or for development purposes, may forgo M&T's job posting/application process); PX 6, Prusak Dep. 68:7-72:6 (testifying that during his employment with at M&T, he transferred several employees within and between branches for development and promotional purposes); PX 17, Declaration of Duane Carr, former M&T branch manager, ("Carr Decl.") ¶ 7 (stating that he was transferred to vacant positions without competition); PX 11, 30(b)(6) Mosco Dep. 39:19-41:19 (explaining that he transferred a branch manager from one branch to another); PX 18, Deposition Excerpts of Jackie Jackson, former M&T branch manager, ("Jackson Dep.") 42:2-19 (testifying that she was transferred from branch to branch); *see also* PX 19, M&T Job Applications, Saunders at M&T_0000730 (explaining that Defendant "swapped" her and another assistant branch manager).

[41]  As of 2015, Defendant no longer offers redeployment assistance.

[42]  Eligible employees were defined as those (1) returning to work within 24 months of medical leave of absence; (2) medical clearance to return to work; (3) notification of interest in redeployment services within five business days of medical clearance; (4) performance rating of "3" for non-officers, or "Successful Performance" for officers; (5) no documented disciplinary actions for 6 months' period prior to the commencement of the first day of leave. *See* PX 12, M&T Policies – Redeployment Policy at M&T_0001770.

counseling and job search assistance from a third-party representative, and preferred consideration[43]

when applying for positions for which they met the qualifications.   Employees receiving

redeployment assistance were required to proactively search and apply for vacant positions using

Defendant's online job bank.[44] While the process provided that Defendant would terminate

participants unable to secure positions within 30 days of commencing redeployment, Employee

Relations Corporate Programs Manager Thompson had the ability to extend redeployment thereby

postponing the termination of an employee.[45]   After termination, participants remained eligible to

receive redeployment assistance with preferred consideration for an additional 60 days.[46]

### 5.      Hiring Processes and Practices

Defendant posts and advertises vacant retail branch positions online through its internal and

external job boards.[47][48] Once posted and/or advertised, Defendant's Talent Acquisition Department

(TAD) recruiters review applications, screen for qualifications, conduct screening interviews, and

forward candidates to the appropriate hiring managers for interview.[49]   TAD recruiters are required

to prioritize their review by the designations assigned by Defendant. Such designations include: (1)

workforce restructure applicants and redeployment candidates;[50] (2) internal applicants; (3)

---

[43] Preferred or preferential consideration means that Defendant guarantees interviews to applicants who meet the minimum qualifications. *See* PX 20, 30(b)(6) Deposition Excerpts of Kristin Lucia, M&T Talent Acquisition Team Manager ("30(b)(6) Lucia Dep.") 17:22-18:10; PX 13, Thompson Dep 136:2-9.

[44] *See* PX 12, M&T Policies – Redeployment Policy at M&T_0001771; PX 13, Thompson Dep 125:8-12.

[45] *See* PX 13, Thompson Dep. 139:13-18.

[46] *See* PX 12, M&T Policies – Job Search Aide at M&T_0000067, and Employee Replacement Letter at M&T_0001768.

[47] *See e.g.,* PX 21, M&T Job Posting Compliance Excerpt.

[48]    Defendant advertises vacant positions internally before externally in order to reduce the competition faced by internal applicants. *See* PX 15, 30 (b)(6) Salman Dep. 65:1-14.

[49]    *See e.g.,* PX 20, 30(b)(6) Lucia Dep 39:1-23; PX 22, 30(b)(6) Deposition Excerpts of David Arcara, M&T Talent Acquisition Team Manager, ("30(b)(6) Arcara Dep.") 68:17-69:8; PX 6, Prusak Dep. 73:11-74:4.

[50]    Workforce restructure applicants are internal employees who have been displaced as the result of branch closures. Redeployment participants are similarly designated workforce restructure, and are afforded preferred consideration, including guaranteed interviews, for positions for which the participant meets the minimum qualifications. *See* PX 13, Thompson Dep. 135:23-136:9; *see also* PX 23, Thompson Workforce Restructure Email, at M&T_0000064 (designating McCollin, a redeployment participant, a "workforce

executive referral applicants; (4) employee referral applicants, and (5) external applicants.[51]

## E.    McCollin's Medical Condition in 2012 and 2013

In November 2012, McCollin learned she was pregnant.[52]  Dr. Pearlman advised her that as a high-risk patient, she would need to undergo an abdominal cerclage to reduce the risk of miscarriage.[53]  McCollin informed her supervisor, Bartolotta, of her pregnancy, and explained the need for surgery due to her history of miscarriages as well as her need to take leave to recover from her surgery.[54]  Bartolotta instructed her to contact Unum to initiate an STD claim.[55]  Following Bartolotta's instructions, on November 29, 2012, McCollin initiated a claim with Unum.[56]  The following day, Unum received information relating to McCollin's diagnosis (cervical incompetence/insufficiency) and her July 1, 2013 expected delivery date.[57]  On December 10, 2012, McCollin underwent surgery, performed by Dr. Stephen Contag, an OB-GYN and Maternal Fetal Medicine Specialist.[58]  Dr. Contag subsequently instructed her to remain on bedrest until her July 2013 due date.[59]  McCollin apprised Bartolotta of her status during her leave and further advised her that she would be unable to return until after the birth of her baby in July 2013.[60]  In her absence, Defendant ensured Edmonson Village remained adequately staffed by using existing staff to

---

[51]  *See* PX 20, (30(b)(6) Lucia Dep. 17:8-21; PX 24, Deposition Excerpts of Angela Skowronski ("Skowronski Dep.") 61:1-64:5, 74:6-24.
[52]  *See* PX 1, McCollin Decl. at ¶ 6; PX 8, Pearlman Decl. at ¶ 7.
[53]  *See* PX 1, McCollin Decl. at ¶ 6; PX 8, Pearlman Decl. at ¶ 6
[54]  *See* PX 3, McCollin Dep. at 32:3-13; PX 7, Ciminelli Dep. 72:4-73:22; PX 25, McCollin Notice of Disability Leave ("Notice of Leave") Email.
[55]  *See* PX 7, Ciminelli Dep. 73:17-22.
[56]  *See* PX 26, McCollin Unum Leave Records – Notice of Claim at EEOC000052; PX 25, Notice of Leave.
[57]  *See* PX 26, McCollin Unum Leave Records – STD Claim Form at EEOC000050.
[58]  She began FMLA leave on a continuous basis the same day, and was later was approved for STD. *See e.g.*, PX 12, M&T Policies – STD and LTD Guidelines at M&T_0000469-70 (explaining that FMLA and STD leave run concurrently).
[59]  *See* PX 1, McCollin Decl. at ¶ 6.
[60]  *See* PX 1, McCollin Decl. at ¶ 6; PX 3, McCollin Dep. 47:1-48:13; PX 27, Ciminelli Notice of Return to Work Email.

perform McCollin's job duties.[61]

On or around March 20, 2013, Bartolotta contacted John Burke, Employee Relations Specialist for M&T's Greater Baltimore region, about replacing McCollin.[62]  Approximately two weeks later, on or around April 4, 2013, Burke sent McCollin a letter informing her that Defendant could no longer hold open her position, and that it would proceed with replacing her unless she could return to work in some capacity.[63]  The letter further explained that she would be eligible for redeployment assistance through Career Partners International (CPI).[64]  Per the Defendant's instructions and because McCollin was unable to return to work until July 2013, she continued submitting documents to Unum in support of her LTD claim.[65]  On or around April 15, 2013, Defendant posted McCollin's Edmonson Village position.[66]  Approximately one month later, on May 20, 2013, Bartolotta selected Laveda Sears, the assistant branch manager of the Belvedere branch, as McCollin's replacement.[67]

###   F.      McCollin's Attempt to Return to Work

McCollin successfully gave birth by cesarean section on June 10, 2013.[68]  Eager to return to work, on June 19, 2013, she informed Burke that she would be released to work on August 5, 2013, and inquired what steps, if any, she needed to take to secure her return.[69]  On June 25, 2013, Burke reassured McCollin that Defendant would assist her with finding vacant positions as her release date

---

[61] *See e.g.*, PX 28, Edmonson Village Coverage Documents (including, at M&T_0000024, demonstrating Bartolotta had the ability to provide overtime for purposes of Edmonson Village coverage); PX 14, Smith Decl. ¶ 5.
[62]    *See* PX 29, McCollin Replacement Records ("Replacement Records") – Bartolotta Request at M&T_0001905-06. On or around March 29, 2013, Burke confirmed, from an unknown source, that McCollin's due date was in or around August 2013. *Id.*, Burke Notes at M&T_0001902.
[63]    *Id.*, Replacement Letter at M&T_0001894.
[64]    *Id.*
[65]    *See* PX 3, McCollin Dep. 49:3-50:9.
[66]    *See* PX 29, Replacement Records – Job Posting at M&T_0001978.
[67]    *Id.* at M&T_0001977-78.
[68]    *See* PX 1, McCollin Decl. at ¶ 8; PX 3, McCollin Dep. 47:20-48:4.
[69]    *See* PX 30, McCollin Return to Work Records ("RTW Records") – Burke Notes at M&T_0001888.

neared.[70]  Approximately one month later, on July 22, 2013, McCollin faxed her return to work form to Defendant, confirming her August 5, 2013 release date without restrictions.[71]  Consistent with Defendant's protocols, Burke thereupon contacted Retail Regional Sales Managers, with vacant branch and assistant branch manager positions in their regions, about reassigning McCollin to any of their vacancies without competition.[72]  At that time, Defendant had at least eight vacant positions in the Greater Baltimore region:[73]

| VACANCY | LOCATION | MANAGER |
|---|---|---|
| Assistant Branch Manager | Ingleside | Anne Bartolotta |
| Branch Manager | Regester | Michelle Denoncourt |
| Assistant Branch Manager | Belvedere | Michelle Denoncourt |
| Assistant Branch Manager | White Marsh | James "Jim" Prusack |
| Branch Manager | Hillendale | Philip Mosco |
| Branch Manager | Highlandtown | Philip Mosco |
| Branch Manager | West St | James "Jim" Falletta |
| Branch Manager | Riviera Beach | James "Jim" Falletta |

Burke contacted only four of the five managers.[74]  Notwithstanding its non-competitive reassignment policies and practices, Defendant failed to reassign McCollin to *any* of these eight vacant positions.[75]  Instead, on August 9, 2013, five days after McCollin was released to work, Defendant referred her to CPI for redeployment assistance.[76]  In accordance with Defendant's redeployment policy, between July and October 201, McCollin applied for or expressed interest in

---

[70]  *Id.* at M&T_0001885.

[71]  *Id.* at M&T_0001884 and McCollin RTW Note at M&T_0001883.

[72]  *Id.* at M&T_0001886, Burke Email at M&T_0001882, Burke Emails at M&T_0001877-79.

[73]  *Id.*, Burke Notes at M&T_0001881.

[74]  Although manager Jim Falletta had two vacancies in his region, there is no evidence in the record that Burke contacted him about his vacancies. *Cf.* PX 30, RTW Records – Burke 7/25/2013 Emails at M&T_0001877-79 *with id.*, Burke Notes at M&T_0001881.

[75]  *Id.*, Burke 7/25/2013 Emails at M&T_0001874.

[76]  *Id.*, Thompson 8/9/2013 Email at M&T_0000066.

10 vacant positions that were at or below her grade level (i.e., Grade 10)[77] – i.e., positions for which she met or exceeded the requisite qualifications.[78]  The positions include: 3COFM (Branch Manager - Ingleside); 3CO8D (Branch Manager); 3CO6D (Enhance Due Diligence Investigator); 3COV6 (Branch Manager – Brooklyn Park Shoppers); 3COSK (M&T at Work Specialist); 3CNFX (Assistant Branch Manager – Belvedere); 3COT4 (Assistant Branch Manager – Highlandtown); 3CPS7 (Branch Manager – Calvert & Fayette); 3CPP4 (Assistant Branch Manager – Fells Point); and 3CQ6Q (Assistant Branch Manager – Nottingham Square at White Marsh).  Despite Defendant's preferred consideration policy for redeployment participants, it failed to interview McCollin for six of her ten applications, and failed to reassign her to any of the vacant positions. Instead, Defendant deviated from its Application Review Process and selected less qualified applicants, including:

- **Amanda Clark**, an external applicant hired under Requisition No. 3CPS7 (Branch Manager, Calvert & Fayette).  Clark, a former waitress, had only one year of retail bank management, one year of management experience at a fast-food restaurant, and no more than two and a half years of financial sales experience.[79]

- **Daryl Blackwell**, an external applicant selected under Requisition No. 3CNFX (Assistant Branch Manager, Belvedere).[80]  Blackwell, who expressed to the TAD recruiter that he was not looking for a management role, had less than four years of retail banking experience.[81]

---

[77]  *See* PX 12, M&T Policies – Redeployment Policy at M&T_0001771; PX 29, Replacement Records – Replacement Letter at M&T_0001894; PX 3, McCollin Dep. 56:15-22.

[78]  Defendant concedes that McCollin was qualified for these positions.  *See generally* PX 31, M&T Request for Information Response; PX 22, 30(b)(6) Arcara Dep. 76:21-79:7; *see also* PX 30, Return to Work Records at M&T_0001881 (identifying Ingleside branch, a position for which McCollin expressed interest, as a comparable position).

[79]  *See* Pl. Exh 19, M&T Job Applications, Clark at M&T 0001123-24.

[80]  Notably, this is the same position to which Defendant failed to reassign McCollin in or around July 25, 2013.  *See* PX 30, RTW Records – Burke Notes at M&T_0001881 (listing vacant Belvedere assistant branch manager position). It is also the same lower grade position held by Laveda Sears prior to replacing McCollin in or around May 2013.  *See* PX 33, M&T Requisition Spreadsheet Excerpts taken from M&T_0000757-759 ("Spreadsheets") at p. 6 (listing Laveda Sears as an applicant for Requisition No. 3CIZ4, the 2012 requisition number for Edmonson Village branch) and at p. 5 (stating that McCollin was hired under Requisition No. 3CIZ4 as branch manager of Edmonson Village branch in September 2012).

[81] *Id.*, Blackwell at M&T_0000507, 512-13.

- • **James Daly Hassett**, an internal applicant hired under Requisition No. 3CPP4 (Assistant Branch Manager, Fells Point).  Hassett had approximately two years of sales experience as a relationship banker, and no management experience.[82]

- • **Jackie Jackson,** an internal employee who neither applied nor competed for Requisition No. 3COV6 (Branch Manager, Brooklyn Park Shoppers).[83][84]

In addition to the positions for which McCollin applied, Defendant had at least 20 additional Grade 10 branch manager and EDD investigator positions into which she could have been placed without competition, between August 2013 and March 2014.[85]  Despite meeting the qualifications for each, Defendant failed to reassign McCollin to any of these positions.   Instead, on September 9, 2013, Defendant terminated McCollin's employment for a "failure to return from [her] leave of absence."[86]

## II.   STANDARD OF REVIEW

Summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

---

[82] *Id.*, Hassett at M&T_0000640-642, 645-47; PX 33, Spreadsheets at p. 2 (stating that Daly was selected, in part, because he had over three years of sales experience; *but see* PX 32, 30(b)(6) Deposition Excerpts of Angela Skowronski ("30(b)(6) Skowronski Dep.") 33:17-34:19 (admitting that nothing in Hassett's application indicates three years of sales experience); *see also* PX 2, Job Descriptions – Assistant Branch Manager at M&T_0000755.

[83] *See* PX 34, M&T Interrogatories Response ("Def. Interrog. Resp.") at p.7 subpart (d) (stating that Defendant cancelled the requisition and as a result no employee was selected; *see also* PX 33, Spreadsheets at p. 6 (listing all applicants, other than McCollin, who posted for Requisition No. 3COV6; Jackson not listed); PX 18, Jackson Dep. 42:16-19 (explaining that she was selected for the Glen Burnie ("Brooklyn Park Shoppers") position without application).

[84] Defendant later reassigned Jackson to its Regester Ave. Branch without competition. *See* PX 18, Jackson Dep. 38:5-39:17.  This too was a vacant position to which Defendant refused to reassign McCollin in or around July 2013. *See* PX 30, RTW Records at M&T_0001881 (listing vacant Regester branch manager position).

[85] *See* PX 33, Spreadsheets at p. 7; *see also* PX 35, 2013 Open Requisition Reports Excerpts ("Open Requisitions") (listing addition Grade 10 vacant positions). There were approximately 61 vacant positions in its Retail Banking Department, including assistant branch manager, relationship banker, and teller manager. *See generally* PX 35, Open Requisitions.

[86] *See* PX 36, Letter of Termination.

interrogatories, and admissions on file, together with the affidavits, if any which it believes will demonstrate the absence of any genuine issue of material facts." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In considering a Rule 56 motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

## III.   SCHEMES OF PROOF

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . ."  42 U.S.C. § 12112(a).  Under the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]"  *Id*. §12112(b)(5)(A).[87]   The term "reasonable accommodation" may include reassignment to a vacant position. §12111(9)(A)-(B). The reasonable accommodation requirement is intended as a vehicle to remove or alleviate barriers to equal employment opportunities for individuals with disabilities, such as physical or structural obstacles that inhibit or prevent an individual with a disability access to job sites, facilities, or equipment; rigid work schedules which permit no flexibility as to when work is performed or breaks taken; or inflexible job procedures that unduly restrict modes or the manner in which particular tasks are accomplished.

To establish a *prima facie* case for failure to accommodate, a plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the ADA; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [she] could

---

[87] This particular statutory scheme requires no proof of discriminatory animus. This is no surprise since "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect."  *Alexander v. Choate*,

perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citation and internal quotation marks omitted).  "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 Fed. Appx. 399, 400 (4th Cir. 2005) (citing 29 C.F.R. § App. §1630.2(o)(3)).  To establish a *prima facie* case of wrongful termination under the ADA, "a plaintiff must show that (1) she was a qualified individual with a disability; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination."  *EEOC v. Denny's, Inc.*, WDQ-06-2527, 2010 U.S. Dist. LEXIS 71415, *11-12 (D. Md. 2010) (citing *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004)).  Once the *prima facie* cases are established, the burden of production shifts to the employer to establish that it did not discriminate on the basis of disability or that one of the defenses set forth in the ADA applies.  *See Champ v. Baltimore County*, 884 F. Supp. 991, 999 (D.Md. 1995), *aff'd on other grounds*, 91 F.3d 129 (4th Cir. 1996).

## IV.  ARGUMENT

### A.  MCCOLLIN IS A QUALIFIED INDIVIDUAL WITH A DISABILITY

#### 1.  McCollin's Actual and Record of a Disability

"Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of an individual . . . ."[88] 42 U.S.C. § 12102(1).  Under the statute, an

---

469 U.S. 287, 295 (1985) (Rehabilitation Act).
[88]  "The definition of disability . . . shall be construed in favor of broad coverage . . . to the maximum extent permitted by the terms of [the ADA]."  42 U.S.C. § 12102(4)(A); *see also Summers v. Altarum Inst., Corp*., 740 F.3d 325, 329 (4th Cir. 2014) (describing Congressional intent behind and impact of ADA); *Johnson v. Balt. City Police Dep't*, Civ. No. ELH-12-2519, 2014 U.S. Dist. LEXIS 41669, *44-46 (D. Md. 2014) (Hollander, J) (same).

impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be substantially limiting.   29 C.F.R. § 1630.2(j)(1)(ii) (abrogating *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)).   Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending. . . working" and "reproductive functions" *Id.* at §12102(2)(A)-(B).   An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," will still be considered to have a disability.   *Id.* §§ 12102(1)(B)-(C).   To establish a disability within the meaning of section 12102(1)(B), a plaintiff must show that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)).

Although pregnancy itself is not an impairment within the meaning of the ADA, pregnancy-related impairments, including complications related to the reproductive system, fall squarely within its ambit.   *See* 29 C.F.R. § 1630 (stating that a "pregnancy-related impairment that substantially limits a major life activity is a disability").   As explained in the EEOC's guidance, "some impairments of the reproductive system may make a pregnancy more difficult and thus necessitate certain physical restrictions to enable a full term pregnancy . . . . Disorders of the uterus and cervix may be causes of these complications." Enforcement Guidance: Pregnancy Discrimination and Related Issues (Pregnancy Guidance) (June 25, 2015) (citations omitted)(explaining that someone with cervical incompetence may require bedrest during pregnancy).   Following the EEOC's lead, several courts have recognized that reproductive impairments are covered by the ADA. *See e.g., Spencer v. James Marine, Inc., et al.*, 617 F.3d 380, 398-399 (6th Cir. 2010) (deferring to EEOC's interpretive guidelines; finding that an incompetent cervix meets the pre-amended ADA definition of disability); *Price v. UTi, U.S., Inc.*, No. 4:11-CV-1428 CAS, 2013 U.S. Dist. LEXIS 30342, at **9-11 (E.D. Mo. Mar. 5, 2013), *reconsideration denied in Price v. UTi, U.S., Inc.*, 2013 U.S. Dist.

15

LEXIS 50144 (E.D. Mo., Apr. 8, 2013) (deferring to EEOC's regulations; denying summary judgment to employer who terminated the plaintiff who suffered from multiple pregnancy-related physiological disorders and conditions that affected her reproductive system); *Appel v. Inspire Pharmaceutical, Inc.*, 712 F.Supp. 2d 538, 548 (N.D. Tex. 2010) (recognizing the likelihood of ADA coverage where plaintiff alleged incompetent cervix significantly limited her reproductive ability to carry a normal pregnancy).

In the instant case, the evidence overwhelmingly demonstrates that McCollin has both an actual and record of disability. Her medical records and testimony from her physician reveal that she has suffered from cervical incompetence since at least 2008.[89] With each pregnancy since 2008, McCollin has been substantially limited in the major life activities of walking, standing, lifting, bending, working, and reproductive functions.[90] This is because such activities increase the pressure on the cervix, which can cause the premature dilation and rupturing of the fetal membranes, resulting in miscarriage.[91] McCollin had not one, but three miscarriages, between 1999 and 2010, all attributed to her disability (cervical incompetence).[92] Given her history of miscarriages, her 2012 pregnancy was deemed high-risk.[93] Pursuant to her doctor's order, she was resigned to strict bedrest for the duration of her pregnancy, avoiding or reducing most physical activities, including walking, standing, lifting, and bending.[94] Indeed, Dr. Contag prohibited her

---

[89] *See* PX 9, Medical Records at EEOC000120-122; PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶¶ 4- 5.

[90] *See* PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶¶ 5-6.

[91] *See* PX 8, Pearlman Decl. at ¶ 5. Even pre-ADA amendment courts deemed the susceptibility of miscarriage a condition covered by the ADA. *See e.g., Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996) (adopting the American Medical Association's Council on Scientific Affairs' conclusion that a "threatened . . . miscarriage" is a substantial complication" not part of an "entirely normal, healthy pregnancy"); *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95 C 3834, 1997 U.S. Dist. LEXIS 1495,**18-19 (N.D. Ill. Feb. 10, 1997) (holding that the inability or significantly impaired ability to carry a viable fetus to term is . . . a "substantial impairment" under the ADA).

[92] *See generally* PX 9, Medical Records; PX 1, McCollin Decl. at ¶ 5; PX 8, Pearlman Decl. at ¶¶ 4, 6.

[93] *See* PX 8, Pearlman Decl. at ¶ 6.

[94] *See* PX 1, McCollin Decl. at ¶ 6; PX 8, Pearlman Decl. at ¶ 6.

from returning to work until after the birth of her baby.[95]

### 2.    Defendant Had Notice of McCollin's Disability

Defendant had notice of McCollin's disability.  There is no dispute that in November 2012,McCollin notified her supervisor, Bartolotta, of her pregnancy and her history of miscarriages stemming from her pregnancy-related impairment.[96]  There is likewise no dispute that McCollin informed Bartolotta that she would need surgery to prevent another miscarriage.[97]  It is of no moment that McCollin did not identify her disability by name.  As recognized by this Circuit, to trigger an employer's obligations under the ADA, "[a defendant-employer] need only know the underlying facts, not the legal significance of those facts." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562 (4th Cir. 2015) (quoting *Schmidt v. Safeway Inc*., 864 F. Supp. 991, 997 (D. Or. 1994).  Here, McCollin provided her supervisor with enough facts to conclude that she suffered from a pregnancy-related impairment that adversely affected her reproductive system and prevented her from working.  Defendant also had notice through its third-party STD/LTD provider, Unum.[98] *See Schmidt*, at 997 ("[A]n employer knows an employee has a disability when . . . the employer [] becomes aware of the condition . . . through a third party . . . ").

### 3.    McCollin Could Perform the Essential Functions of Her Edmonson Village Job, in Addition to the Jobs She Desired

A "qualified individual with a disability" is one "who, *with* or *without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (emphasis added).  Consistent with the approach embodied in 29 C.F.R. § 1630.2(m), courts have generally engaged in a two-step analysis to determine whether one is a "qualified" individual with a disability under the ADA.  First, the court

---

[95]  *See* PX 3, McCollin Dep. at 42:1-2.
[96] *See supra* n.54; *see also* PX 34, Def. Interrog. Resp. No. 17 at p.13; ECF No. 14, Am. Answer ¶ 23.
[97]  *Id.*
[98]   *See* ECF No. 14, Am. Answer ¶ 24.

must determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, and the like. Second, the court must determine whether the individual can perform the essential functions of the position, with or without reasonable accommodation. *See Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994). "Essential functions" are those "fundamental job duties of the employment position the [disabled] individual holds or desires." 29 C.F.R. § 1630.2(n)(1).

There can be no dispute that McCollin could perform the essential functions of her Edmonson Village branch manager position prior to taking leave on December 10, 2012. Indeed, she was hired approximately one month before her leave commenced.[99] It is further undisputed that McCollin possessed the prerequisites for the branch manager, assistant branch manager, M&T at Work Specialist, and EDD Investigator positions for which she applied.[100] Beginning on August 5, 2013, McCollin was capable of performing all functions of the Branch Manager, Assistant Branch Manager, M&T at Work Specialist, and EDD Investigator positions, without any accommodation.[101]

## B.  DEFENDANT FAILED TO REASONABLY ACCOMMODATE MCCOLLIN

The ADA requires employers to provide effective accommodations for individuals with disabilities.[102] An effective accommodation addresses the job-related difficulties presented by the employee's disability that would allow her to attain an "equal" level of achievement as a non-disabled individual in the same position could achieve. *See* 29 C.F.R. § 1630.2(o)(1)(i)-(iii); *Schlapia v. Daley*, 975 F. Supp. 785, 789 (D. Md. 1997). Here, Defendant failed to reasonably accommodate McCollin by failing to hold her job open while she was on leave, and by forcing her to compete for vacant positions for which she was qualified.

---

[99] *See* PX 7, Ciminelli Dep. 6:18-24; 67:15-17.
[100] *See supra* n.78.
[101] *See* PX 30, RTW Note at M&T_0001883 (releasing McCollin to work without restrictions).
[102] This is so because "[a]n ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations." *U.S. Airways Inc. v. Barnett*, 535 U.S. 391, 400 (2002). By definition, "the word

### 1. Defendant's Failure to Hold Open McCollin's Original Position Rendered Her Leave "Accommodation" Ineffective

After years of recurrent miscarriages, in December 2012, McCollin requested and Defendant granted, leave to accommodate her pregnancy-related disability.[103] Despite knowing that McCollin's return to work was contingent on her delivery date in July 2013, Bartolotta nevertheless directed John Burke to send McCollin a letter threatening to replace her if she failed to return to work.[104] In so doing, Defendant skirted its own policies requiring managers to assess whether replacement is necessary, or if less drastic measures can be taken to ensure employees, like McCollin, remain employed. Indeed, the record is devoid of any evidence showing that Bartolotta exhausted coverage options or otherwise submitted a Replacement Request Form.[105] Defendant will be hard-pressed to argue that it was unware if and when McCollin intended to return to work. There is ample evidence that Defendant was aware she intended to return to work after the birth of her baby in or around July 2013.[106] Still, Defendant failed to hold open McCollin's original position rendering her leave accommodation ineffective.[107]

---

'accommodation' . . . conveys the need for effectiveness." *Id.*

[103] *See* PX 1, McCollin Decl. at ¶ 6.

[104] *See supra* n. 60; *see also* PX 29, Replacement Records – Bartolotta Request at M&T_0001905-06. Defendant's April 4, 2013 letter fell short of an invitation to engage in an interactive process.

[105] *See e.g.*, PX 13, Thompson Dep. 127:18-25; PX 29, Replacement Records – Deposition Excerpt of John Burke 58:20-59:20; PX 7, Ciminelli Dep. 93:10-13.

[106] *See e.g., supra* nn. 57, 60; *see also* PX 29, Replacement Records – 4/13/2013 Bartolotta Email at M&T_0001893 (Prior to replacing McCollin's job, Bartolotta acknowledging that McCollin planned to return after the birth of her baby).

[107] It is well established that permitting the use of leave is a form of reasonable accommodation when necessitated by an employee's disability. 29 C.F.R. § 1630.2(o) ("other accommodations could include . . . providing additional unpaid leave for necessary treatment.") The goal of granting leave as an accommodation is to enable the employee to return to work and perform the essential functions of her job, with or without reasonable accommodations. *See Moore v. Md. Dep't of Pub. Safety*, No. CCB-11-0553, 2013 U.S. Dist. LEXIS 19471, at *11(D. Md. 2013) (Leave that is "finite and . . . reasonably likely to enable [an] employee to *return to work*" is a reasonable accommodation) (quoting *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 596 (S.D.W.Va. 2008)) (emphasis added). For this reason, an employer that has granted leave as an accommodation has a duty to hold open an employee's job

2.    **Assuming, Arguendo, that Reassignment was the Only Reasonable Accommodation, McCollin Should Have Been Placed Into a Vacant Position Without Competition**

Even were Defendant to successfully argue that it could not have held open her position, it is still liable for failing to reassign her as a reasonable accommodation.  The ADA mandates that Defendant reassign McCollin to a vacant position for which she was qualified without competition. *Allen v. Balt. Cty.*, 91 F. Supp. 3d 722, 734 (D. Md. 2015) (citing *Reyazuddin v. Montgomery Cnty., Md.*, 7 F. Supp. 3d 526, 550 (D. Md. 2014).  "'Reassignment . . . has traditionally been seen as an 'accommodation of last resort[.]'"); *see also Bryant v. Better Bus. Bureau of Greater Md., Inc*., 923 F. Supp. 720, 742 (D. Md. 1996) ("[I]t is clear from the statutes and the regulations that accommodation by transfer is to be considered as a last resort.").

a.    **The Plain Language of the ADA and Evidence of Congressional Intent Demonstrate that Reassignment Means Appointment, Not Simply the Opportunity to Compete with Everyone Else**

Because the Fourth Circuit has yet to define the contours of an employer's reassignment obligation, the "starting point" for interpreting the ADA "is [examining] the language employed by Congress" and "assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose."  *Park 'N Fly v. Dollar Park & Fly*, 469 U.S. 189, 194 (1985) (citation omitted); *cf. Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (citation omitted).  "Absent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980); *see also U.S. v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 11 (2008) (stating that the "strong presumption that the

_____

to allow for the employee's return to work unless doing so would constitute an undue hardship.  *See* Reasonable Accommodation Guidance, at Q&A 21, Example B.

plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances") (citations omitted).

As explained above, the ADA prohibits employers like Defendant from "discriminating" against a "qualified individual with a disability" because of the individual's disability. 42 U.S.C. §12112(a). The statute includes, as part of the definition of "discrimination," not making reasonable accommodations for an otherwise qualified individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A). It likewise includes "reassignment to a vacant position" as a form of reasonable accommodation. *Id.* § 12111(9)(B). A requested accommodation is reasonable if it "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett*, at 402-03 (citing cases); *accord Wehner v. Best Buy Stores, L.P.*, MJG-15-2163, 2017 U.S. Dist. LEXIS 34349, *20 (D. Md. March 10, 2017). The mere opportunity to compete for a job cannot satisfy this standard. The statutory language makes little sense if forcing an employee with a disability to compete for a job qualifies as a reasonable accommodation. As the D.C. Circuit explained:

> An employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been 'reassigned'; the core word 'assign' implies some active effort on the part of the employer. Indeed, the ADA's reference to reassignment would be redundant if permission to apply were all it meant; the ADA already prohibits discrimination 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures.'

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1304 (D.C. Cir. 1998) (*en banc*) (citing 42 U.S.C. § 12112(a)); *see also Corley v. U.S.*, 556 U.S. 303, 315 (2009) (statutes should be construed so that no part is rendered meaningless, superfluous, or redundant).

The purpose of the reassignment provision confirms that Congress intended to invoke the ordinary meaning of the term "reassignment to a vacant position." Congress recognized that persons with disabilities as a group "occupy an inferior status in our society and are severely disadvantaged socially [and] economically." 42 U.S.C. § 12101(a)(6). Consistent with this

21

Congressional finding, the reassignment provision is aimed at enabling employees who would otherwise lose their jobs due to disability to remain in the workforce as long as there is a vacancy for which they are qualified. H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 63 (1990), *reprinted at* 1990 U.S.C.C.A.N. 303, 345 ("If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, *a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker."*) (emphasis added); *accord* S.Rep. No. 116, 101st Cong., 1st Sess. 31-32 (1989) ("Senate Report") (adding that reassignment is "not available to applicants for employment"). Nothing in the statute or legislative history suggests that Congress intended that employees needing reassignment as a reasonable accommodation should be required to apply for and compete against other applicants, who, importantly, do not require such an accommodation. This is so because such a requirement simply cannot be viewed as an accommodation at all.

> **b.    Supreme Court Precedent and Subsequent Decisions Are Clear – Reassignment is Reasonable in the Run of Cases**

The Supreme Court has acknowledged the general rule that employers using reassignment as a reasonable accommodation may not require qualified employees with disabilities to compete for vacant jobs. In *Barnett*, an employee who was otherwise qualified, sought "assignment to a particular position" as a reasonable accommodation for his disability, even though the placement would violate a disability-neutral policy – there, a seniority system. 535 U.S. at 393-95. U.S. Airways argued that a seniority system or other disability-neutral workplace policy "virtually always trumps a conflicting accommodation request" because violating such a policy would constitute a "preference," and the ADA "does not . . . require an employer to grant preferential treatment" but "only 'equal' treatment for those with disabilities.'" *Id.* at 396-97.

The *Barnett* Court disagreed. It reasoned, "By definition, any special 'accommodation'

requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach." *Id.* at 397. To the contrary, the Court reasoned, "[m]any employers will have neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability," citing examples from the non-exclusive list of accommodations in the ADA's text. *Id.* at 398 (citing 42 U.S.C. § 12111(9), which includes reassignment). Yet, the Court continued, Congress "said nothing suggesting that the presence of such neutral rules would create an automatic exemption." *Id.*; *cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) (accommodation for religious practices under Title VII requires affirmative modification of neutral rules).

Notably, the Court assumed that a request for reassignment would be reasonable "in the run of cases" because the ADA lists "reassignment to a vacant position" as one type of reasonable accommodation. *Barnett*, 535 U.S. at 402-03 (citing § 12111(9)). However, it concluded that it would likely not be reasonable in Barnett's case because of "one circumstance, namely, that the assignment would violate the rules of a seniority system." *Id.* at 403. The Court based this exception for seniority systems on the special status that seniority systems hold in American labor law and on their importance in labor-management relations. *Id.* at 403-04 (noting that without such an exception, "employees' expectations of consistent, uniform treatment . . . upon which the seniority system's benefits depend" would be undermined).

The courts of appeals that have grappled most seriously with this issue agree with the EEOC. The Seventh Circuit held that "the ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer." *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012). The Court went on to explain that, unlike the seniority system at issue in *Barnett*, a policy of hiring the best qualified

applicant would not exempt employers from reassigning qualified employees to a vacant position. "While employers may prefer to hire the best qualified applicant," the Court said, "the violation of a best-qualified selection policy does not involve the property-rights and administrative concerns (and resulting burdens) presented by the violation of a seniority policy." *Id.* at 764.

The Tenth Circuit also holds that reassignment means appointment to a vacant position without competition. In *Smith v. Midland Brake, Inc.*, the Court rejected a definition of reassignment that would impose "no more than a duty merely to consider without discrimination a disabled employee's request for reassignment along with all other applications the employer may receive from other employees or job applicants for a vacant position." 180 F.3d 1154, 1164 (10th Cir. 1999). The Court explained, "[T]he ADA defines the term 'reasonable accommodation' to include 'reassignment to a vacant position.' The statute does not say 'consideration of a reassignment to a vacant position.'" *Id.* Additionally, the Court noted that the ADA lists reassignment as one of several possible reasonable accommodations, including modified work schedules and the provision of qualified readers or interpreters. "There is nothing about a reassignment that transforms it into a lesser accommodation than the others listed, which an employer must not only consider but must also implement if appropriate." *Id.* at 1167. Likewise, the D.C. Circuit holds that reassignment must be without competition. In *Aka*, the Court relied not only on the plain meaning of the word "reassign" but also on legislative history noting that reassignment does not require employers to "bump" other employees out of a position to create a vacancy. 156 F.3d at 1304. "Had Congress intended that disabled employees be treated exactly like other job applicants," the Court said, "there would have been no danger that an employee would be 'bumped.'" *Id.*

The only Circuits holding to the contrary are the Fifth, Sixth, and Eighth. The Fifth Circuit case, which pre-dates *Barnett*, refuses to "read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in

24

hiring or reassignment over those who are not disabled." *Daugherty v. City of El Paso,* 56 F.3d 695, 709 (5th Cir. 1995). The Sixth Circuit case, which was decided after *Barnett* but does not cite it, says that even when an employer has an obligation to reassign a disabled employee to a vacant position, "the ADA does not mandate that she be afforded preferential treatment." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 459 (6th Cir. 2004). *Barnett*, of course, clarified that the ADA does, indeed, require preferential treatment in the provision of reasonable accommodations. *Barnett*, 535 U.S. at 397. The Eighth Circuit case, *Huber v. Wal-Mart Stores*, relies on now-overruled Seventh Circuit law and erroneously reads *Barnett*'s exclusion for seniority systems as extending to all neutral policies, which it expressly does not. 486 F.3d 480, 483-84 (8th Cir. 2007), *cert. granted in part*, 552 U.S. 1074 (2007), *cert. dismissed on stipulation of the parties*, 552 U.S. 1136 (2008). Moreover, contrary to *Barnett* (and like the Fifth and Sixth Circuits), *Huber* disagrees that the ADA requires "affirmative action." *Id.* at 483.

In addition to these *en banc* Circuit Court decisions, this Court has plainly stated that "[i]f the employee can be accommodated by reassignment to a vacant position, the employer *must* offer the employee the vacant position." *Reyazuddin*, 7 F. Supp. 3d at 550, *aff'd in part, rev'd in part on other grounds and remanded sub nom. Reyazuddin v. Montgomery Cty., Maryland*, 789 F.3d 407 (4th Cir. 2015) (emphasis added); *see also Wehner*, *supra* at **16-27 (denying defendant summary judgment in failure to accommodate reassignment case; finding evidence that plaintiff could perform the essential functions of vacant positions, but was nevertheless not reassigned to the same, sufficient to defeat summary judgment). So too have other federal courts held that reasonable accommodation requires assignment to an available position. *Michilin Tire Corp.,* 860 F. Supp. 1488, 1492 (M.D. Ala. 1994); *see Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) (If an employer knows that a position for which the disabled applicant is qualified will become vacant in

a short period of time, the employer may be required to offer the position to the employee.);

*Ransom v. State of Arizona Board of Regents*, 983 F. Supp. 895, 902 (D. Ariz. 1997) ("T[his Court

rejects defendants' contention that disabled employees are entitled to reassignment

accommodations under the ADA only in the same way as an employer provides for reassignment of

nondisabled employees."). As the three Circuit Courts, and several district courts, including this

one, have recognized, "reassign" means something more than to allow to compete.

### c.     The ADA Regulations and the EEOC's Enforcement Guidance Should be Granted Deference

Although it is EEOC's position that the plain language of the statute supports its reading of

the ADA, to the extent the Court finds that some ambiguity remains, it should defer to the EEOC's

Enforcement Guidance interpreting its regulations.  *See e.g., Jacobs*, 780 F.3d at 572-573 (deferring

to the EEOC regulations interpreting the ADA) (citing *Jones v. Am. Postal Workers Union*, 192

F.3d 417, 427 (4th Cir. 1999) (affording *Chevron* deference to the EEOC's interpretation of a Title

VII provision expressly adopted by the ADA).  In the Commission's view, the statutory language,

coupled with the legislative history, conclusively establishes that "reassignment" does not mean

"permission to compete."  *See* Enforcement Guidance: *Reasonable Accommodation & Undue*

*Hardship Under the [ADA]*, No. 915.002 at 46 (Q/A 29) (Oct. 17, 2002) ("Does reassignment mean

that the employee is permitted to compete for a vacant position?  No.  Reassignment means that the

employee gets the vacant position if s/he is qualified for it.  Otherwise, reassignment would be of

little value and would not be implemented as Congress intended.") ("Guidance"), also available at

www.eeoc.gov/policy/docs/accommodation.html.  The Guidance further states that, as long as the

disabled employee is qualified for the vacant position, he or she "does not need to be the best

qualified individual for the position in order to obtain it as a reassignment."  *Id.*  Indeed,

"Reassignment means that the employee gets the vacant position if s/he is qualified for it.

Otherwise, reassignment would be of little value and would not be implemented as Congress intended." *Id*.

> ### d.      Reassignment was Reasonable Under the Circumstances of this Case

Were this Court to find that the ADA does not compel noncompetitive reassignment as a matter of law, the EEOC may still prevail by showing that special circumstances warrant a finding that reassignment is reasonable under the particular circumstances of the case. *Wehner*, 2017 U.S. Dist. LEXIS 34349, *21 (citations omitted).   As the Supreme Court explained in *Barnett*:

> [A] plaintiff . . . remains free to show that special circumstances warrant a finding that . . . [a] requested "accommodation" is "reasonable" on the particular facts. That is because special circumstances might alter the important expectations described above . . . The plaintiff might show, for example, that the employer, having retained the right to change [a neutral policy] unilaterally, exercises that right fairly frequently, reducing employee expectations that the [policy] will be followed – to the point where one more departure, needed to accommodate an individual a disability, will not likely make a difference. The plaintiff might show that the [policy] already contains exceptions such that, in the circumstances, one further exception is unlikely to matter.

*Barnett*, 535 U.S. at 405-406.[108] Where, as here, the EEOC can show that reassignment was reasonable under the circumstances, summary judgment should be granted in its favor.

> ### i.      Defendant's Reasonable Accommodation Policies Compel Non-Competitive Reassignment

Not only do Defendant's policies permit non-competitive reassignment, they require it.

By way of example, Defendant's Replacement Request Form provides:

> Should [an] employee be medically released to work *after* the replacement process has been completed, [the Employee Relations Department] will begin the interactive process to identify an alternate M&T Bank position. Please describe below those *comparable positions in [the respective] division/department in which this employee will be placed*, if he/she is released within the next ninety (90) days.

---

[108] The Supreme Court made clear that the examples it provides are by no means exhaustive. *Barnett*, at 525 U.S. 405.

`

> NOTE: If the employee is medically released to return to work within 24 months of his/her first day of disability and there is *no available position within your division/department in which he/she can be placed*, the employee will be terminated 30 days after release and a redeployment expense may be charged to [the manager's] cost center.[109]

Under Defendant's policy, displaced employees need not compete for vacant positions for which they are qualified. Additionally, Defendant's reasonable accommodation policy permits non-competitive reassignment.[110]

### ii.      Defendant Regularly Reassigns and Promotes Non-Disabled Employees Without Competition

In addition to reassignment as an accommodation, Defendant routinely reassigns and/or transfers, and promotes non-disabled employees to vacant positions without competition.[111] Despite its liberal practice of non-competitive reassignment, Defendant failed to afford McCollin this benefit.

### iii.      McCollin Was More Qualified Than Selected Applicants

The EEOC's Guidance is clear – an employee need not be the best qualified individual for a vacant position to obtain reassignment. *See* Guidance (citing 29 C.F.R. pt. 1630, App. § 1630.2(o)(2)(ii)). Insofar as she "satisfies the requisite skill, experience, education, and other job-related requirements of the position" and "can perform the essential functions" of the same, with or without reasonable accommodation, the employer *must* assign the employee. *Id.* (emphasis added); *Reyazuddin*, *supra* at 550. Furthermore, "[i]n reasonably accommodating an

---

[109] *See* PX 12, M&T Policies – Replacement Request Form at M&T_0001811 (emphasis added).
[110] *Id.* at 67:24-69:4 (providing example of an employee who was reassigned to a vacant position without competition as a reasonable accommodation); 68:7-69:4 (providing example of an employee with lifting restriction who was permitted to be placed in another position without competition).

28

`

employee under the ADA, '[an] employer should first consider lateral moves to positions that are regarded as equivalent,' and 'may only consider lesser jobs that constitute a demotion if there are no such equivalent positions available.'" (citation omitted)).  *Allen*, *supra* at 735.

Notwithstanding the fact that McCollin was to be afforded preferred consideration over *most* applicants, she was objectively more qualified than those against whom she competed, and who were ultimately selected.  At the time of her applications, McCollin had 12 years of retail banking experience, including three years as an assistant branch manager, and seven years as a branch manager.[112]  Of that experience, four years were spent as a branch manager for Defendant, and the other six with its predecessor, Provident Bank. Still, Defendant ignored its Application Review Process by failing to give her preferred consideration, refused to interview her for the majority of her applications, and instead selected applicants with inferior qualifications.  For instance, as detailed above, Amanda Clark, an external applicant hired under Req. No. 3CPS7 (Branch Manager – Calvert & Fayette), lacked the requisite sales experience, and possessed only the minimum management experience.[113]  Clark ultimately declined the offer by failing to show for her first day of work.[114]  Defendant was then forced to re-post the vacancy.[115]  Still yet, it failed to select McCollin for either vacancy.

Defendant likewise refused to reassign McCollin to vacant positions which were lower in grade.  An as an initial matter, Defendant's policy and/or practice of reassigning displaced employees to positions *below* their existing grade level (i.e., positions tantamount to demotions), and/or instructing

---

[111] *See supra* n. 40.
[112] *See* PX1, McCollin Decl. at ¶ 2; PX 3, McCollin Dep. at 22:6-14.
[113] *Id.* at M&T_0001125 (stating that Clark possessed the minimum management experience).
[114] *Id.* at M&T_0001123 (listing application status as declined offer).
[115] *See* PX 33, Spreadsheets at p. 7 (listing Requisition No. 3CQFC, Branch Manager).

`

redeployment candidates to compete for the same, is particularly disconcerting, where, as here, there exists vacant positions at the same grade level.  Even more problematic, here, Defendant chose to select a less qualified applicant for a lower grade position, rather than reassign McCollin, who was overqualified for the same.  By way of illustration, Defendant hired Daryl Blackwell, an external applicant, to fill Req. No. 3CNFX (Assistant Branch Manager, Belvedere).  Blackwell had less than four years of non-management retail banking experience, and further, expressly indicated to Defendant his disinterest in management positions within the bank.[116]  Though his tenure was ultimately short-lived, Blackwell was selected for the assistant branch manager vacancy.  Indeed,  Defendant terminated Blackwell for performance issues in or around 2014.[117]

Finally, Defendant selected James Daly Hassett, an internal applicant, to fill Requisition No. 3CPP4 (Assistant Branch Manager, Fells Point).  As described above, Hassett, a relationship banker for merely two years prior to his promotion, had no management experience.

## C.  DEFENDANT TERMINATED MCCOLLIN BECAUSE OF HER DISABILITY

There is no dispute that Defendant terminated McCollin because of her alleged failure to return to work after taking leave.[118] As an initial matter, McCollin's termination letter expressly

---

[116] *See* PX 19, M&T Job Applications, Blackwell at M&T_0000507, 512-13.

[117]   *Id.*  at M&T_0000506 (noting Blackwell was terminated for performance); *see also* PX 18, Jackson Dep. 14:8-14, 43:3-3:17 (testifying that she became the Belvedere assistant branch manager approximately one to two years before her retirement in 2015 (i.e., in or around 2014)) *cf.* PX 19, M&T Job Applications, Blackwell at M&T_0000582 (listing Blackwell's date of hire in or around August 2013).

[118]   At the time of her leave and subsequent discharge, McCollin was performing at a level that met Defendant's legitimate expectations.  Indeed, McCollin worked for Defendant for more than a decade and, up until her leave in December 2012, received successful performance ratings. *See generally* PX 4, McCollin Appraisals. For her performance, Defendant rewarded her incentive pay on a quarterly basis. PX 5, McCollin Employee Profile Report (listing McCollin's quarterly payouts every quarter since 2009).

`

attributes her discharge to her alleged failure to return from her disability-related leave.[119] Certainly, had McCollin not suffered from a disability, she would not have taken a leave of absence.  And had she not taken a leave of absence, she would have continued working as the branch manager of Edmonson Village.  If she had remained branch manager of Edmonson Village, Defendant would have had no reason to terminate her on September 9, 2013.  Because McCollin's termination was a direct result of her pregnancy-related disability, no additional proof is necessary. *See Martinsohn v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997) (When an employer concededly discharges an employee because of disability, employee need prove nothing more to show that employer discriminated against him because of his disability for purposes of *prima facie* case of disability discrimination under the ADA).

### D.     DEFENDANT HAS WAIVED UNDUE HARSHIP AS AN AFFIRMATIVE DEFENSE

In the instant case, Defendant failed to plead undue hardship as an affirmative defense. As a result, any attempt by Defendant to assert such an affirmative defense at this late hour, must be rejected by the Court.  *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999) (failure to raise an affirmative defense in the appropriate pleading results in the waiver of that defense).

Even if this Court were to find that Defendant did not so waive, such defense would be futile.  There is no evidence that Defendant would have been unable to hold open McCollin's Edmonson Village position for an additional four months, or that reassigning her to a vacant position would have somehow impeded its business operations. Indeed, as detailed below, none

---

[119] *See* PX 36, Letter of Termination ("[Your employment . . . has been terminated . .  due to a failure to return from your leave of absence.")

`

of the factors courts consider in determining whether an undue hardship exists weighs in favor of

Defendant. *See* 42 U.S.C. § 12111(10)(B).

> **1.    Defendant Cannot Show That Holding Open McCollin's Job Would Have Constituted an Undue Hardship**

Undue hardship turns on the cost to the specific employer of providing the requested

accommodation. *See* 29 C.F.R. § 1630.2(p)(1) (defining undue hardship as "significant difficulty

or expense incurred by a covered entity").   In the instant case, the overwhelming weight of

evidence demonstrates that Defendant had the personnel, organizational infrastructure, and the

financial resources to tolerate McCollin's absence for the duration of her leave.

> **a.    Defendant Had Adequate Personnel**

With more than 1,058 employees in Baltimore City,[120] Defendant had enough personnel

to provide coverage for McCollin's branch to ensure her return to work in August 2013.  It could

have continued using existing employees to provide staff support in McCollin's absence,

including its "float staff." It failed to provide flex and/or overtime, or even hire temporary or

contract employees to fill in for McCollin before resorting to the extreme measure of replacing

her.  That Defendant's replacement policy specifically contemplates such avenues of coverage,

and that it failed to exhaust the same before summarily deciding to replace McCollin's position,

undermines any post-hoc argument that complying with company policy would have resulted in

an undue hardship.

---

[120]   The number of employees is considerably larger when Baltimore County is taken into account.  *See e,g.,*https://www.dllr.state.md.us/lmi/emplists/baltocounty.shtml (last visited April 19, 2018)(recognizing M&T has between 250-499 employees in Baltimore County alone).

`

      **b.**     **Defendant Had the Organizational Infrastructure to Accommodate McCollin**

Moreover, there is simply no evidence that Defendant lacked the infrastructure to hold open McCollin's job.  Such evidence cannot exist because Defendant failed to perform the requisite assessment to determine what burden, if any, would result from the same.  When raising an undue hardship defense, the burden is on the employer "to perform a cost-benefit analysis . . . [and to] analyze the hardship sought to be imposed through the lens of factors listed in the regulations, which include consideration of the industry to which the defendant belongs as well as the individual characteristics of the particular defendant-employer." *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 139 (2d Cir. 1995).  Where, as here, an employer fails to conduct *any* assessment of its business and/or staffing needs, as required under its own policy and the ADA, an undue hardship defense must be rejected.

      **c.**     **Defendant Had the Financial Capacity to Accommodate McCollin for an Additional Four Months**

Given Defendant's vast financial resources, it would be hard-pressed to argue that holding open McCollin's job would financially strain or otherwise impede its operations. Indeed, in 2013, Defendant experienced record high earnings of nearly $1.14 billion in net income.[121] Such earnings have significantly increased over the years (*see e.g.*, M&T's 2017 Annual Report touting $1.41 billion in net income[122]).  It is therefore highly unlikely that Defendant would have suffered significant hardship, if any, by holding open McCollin's position for an additional four months.

---

[121]  *See* M&T 2013 Annual Report (available at http://files.shareholder.com/downloads/ MTB/6211847391x0x726304/2111655C-F110-473F-B3C7-DF0318FC7B9E/2013_Annual_Report.pdf).
[122]  *See* M&T 2017 Annual Report (available at http://files.shareholder.com/downloads/

`

**2.     Non-Competitive Reassignment Would Not Have Imposed an Undue Hardship on Defendant's Business Operations**

Nor will Defendant be able to meet its burden to establish in any specific or verifiable way that reassigning McCollin to a vacant position that she was qualified to perform would have impeded its business operations.  As explained *supra*, Defendant, as a matter of company policy, routinely reassigns and/or transfers, and promotes employees into positions for which they are qualified without competition.

## V.  <u>CONCLUSION</u>

For the reasons stated herein, the Commission respectfully requests that the Court enter Summary Judgment in its favor.

Respectfully submitted,

_____/s/_____
Chioma Chukwu
Trial Attorney

_____/s/_____
MARIA SALACUSE
Supervisory Trial Attorney
Bar No. 15562

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201

MTB/6220702144x0x929224/F986B57C-95B9-4E45-8691-040437DC13CB/mtb2017AR.pdf).