EXHIBIT 13

MELISSA THOMPSON

UNITED STATED DISTRICT COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION

----------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

   - vs -  Case No.
       1:16-cv-03180-ELH

MANUFACTURERS AND TRADERS TRUST COMPANY,
d/b/a M&T BANK,

     Defendant.

----------------------------------------

   Examination before trial of MELISSA

THOMPSON, taken pursuant to the Federal Rules of

Civil Procedure, at the Equal Employment

Opportunity Commission, 6 Fountain Plaza,

Suite 350, Buffalo, New York, on November 1, 2017,

commencing at 10:07 a.m., before LORI K. BECK, CSR,

RDR, CRR, Notary Public.

1  vacant for more than 90 days was considered

2  protracted.

3          MS. GRAUMLICH:  Objection, form.

4          BY MS. CHUKWU:

5          Q.  Is that correct?

6          A.  Yes.

7          Q.  Do you have any understanding if that

8  is currently still the practice on the recruiting

9  side about filling positions as quickly as

10 possible?

11         A.  I do not.

12         Q.  So after you -- I believe you testified

13 that you were only in that role for about two to

14 three years, correct?

15         A.  Yes.

16         Q.  What title did you have after manager

17 of employment?

18         A.  Corporate programs manager.

19         Q.  And what is a corporate programs

20 manager?

21         A.  It is someone who's responsible for --

22 well, responsible for the oversight and

23 administration of programs that affect the bank

24 throughout the -- or employees throughout the

25 footprint.

```
 1         So that would include programs such as

 2   workplace accommodations, workplace -- workforce

 3   restructure, alternative work arrangements, and

 4   previously the replacement process.

 5         Q.   You said previously the replacement

 6   process?

 7         A.   That's correct.

 8         Q.   Why previously?

 9         A.   I'm no longer responsible for that.

10         Q.   So you mean at that time you were, as a

11   corporate manager, responsible for the replacement

12   program?

13         A.   Yes.

14         Q.   So let's start with these

15   accommodations.

16         A.   Yes, workplace accommodations.

17         Q.   What was M&T's practice with respect to

18   workplace accommodations?

19         MS. GRAUMLICH:  Objection, form.

20         BY MS. CHUKWU:

21         Q.   You can answer.

22         A.   And when you say what -- when you say

23   what was, you mean -- what time frame are we

24   looking at?

25         Q.   While you were a corporate manager,
```

1      A.    We talk about it.  It's a verbal

2  discussion.

3      Q.    How do you determine whether you need

4  to go above that employee's head?

5      A.    It's part of the interactive process,

6  so in essence, part of the reason why the

7  accommodations -- the workplace accommodations is

8  managed centrally is because we want to make sure

9  that in all parts of the footprint, that we're

10 treating employees consistently.

11      So we may have one, you know, part of the

12 footprint that does one thing and another part of

13 the footprint that says, "Oh, yeah, no big deal.

14 We can certainly accommodate that."

15      And so from my perspective, I have to see

16 the full gamut.  What I'm quickly able to determine

17 is, well, it's working in one area, so it may be

18 able to work in another area as well.

19      Q.    So as a corporate manager, do you have

20 the ability override a direct manager's decision as

21 to whether or not to accommodate an employee?

22      A.    Yes, I have done that in the past and

23 on occasion.

24      Q.    Have you ever experienced an M&T

25 employee seeking an accommodation of a reassignment

1  to a different position?

2        A.   Yes.

3        Q.   In such instances, has that employee

4  been granted that accommodation?

5        A.   Trying to think specifically.  Yes and

6  no.

7        Q.   Let's start with the yes, the instance

8  where that employee was granted the accommodation

9  of reassignment.  Do you recall the circumstances?

10       A.   Yes.

11       Q.   What were they?

12       A.   There was a comparable position that

13 was available to that particular employee within

14 the division that did not require that they -- I

15 think in that case it was a lifting scenario --

16 that did not require that they lift.

17            So we were able to transition them from that

18 one position into another position.

19       Q.   What do you mean by transition?

20       A.   Basically place them in the other -- in

21 a new role.

22       Q.   Did that employee have to submit an

23 application for that position?

24       A.   Not in that -- not in that instance,

25 no.

```
 1        Q.   So if they didn't submit an
 2   application, does that mean they didn't compete for
 3   that position?
 4        A.   That's correct.
 5        Q.   Do you recall the division that that
 6   employee was in?
 7        A.   No, I'm not sure.  It could have been
 8   one of two, so no, I'm not sure.
 9        Q.   How long ago was that?
10        A.   I'm not sure specifically.
11        Q.   Was it within the last year?
12        A.   Yes.
13        Q.   Do you recall if the direct manager in
14   that instance was reluctant to accommodate that
15   employee?
16        A.   No.
17        MS. GRAUMLICH:  Objection to form.  What
18   direct manager are you talking about?
19        MS. CHUKWU:  No speaking objections, Betty.
20        BY MS. CHUKWU:
21        Q.   Please.
22        A.   No, that was not the case in that
23   particular instance.
24        Q.   Now, with respect to the instance --
25   you mentioned that there was an example you could
```

```
 1        BY MS. CHUKWU:

 2        Q.   You mentioned the replacement program.

 3        A.   Yes.

 4        Q.   Is that -- is that correct, how I'm

 5   referring to it?

 6        A.   It's actually replacement process, but

 7   yes, that's fine.

 8        Q.   I believe you said you no longer

 9   oversee that.

10        A.   That's correct.

11        Q.   Let's talk about when you did oversee

12   it.

13        A.   Okay.

14        Q.   What did that entail?

15        A.   If a manager was interested in

16   replacing someone who was out on disability for a

17   protracted period of time, then they would need --

18   be required to complete a replacement request form.

19        Once they completed the replacement request

20   form, they would need to submit that to employee

21   relations, either directly through the employee

22   relations specialist or -- or to me.  Generally the

23   former, not the latter.

24        Once that happened, we would review -- we,

25   being the employee relations specialist and I,
```

1    would typically review that, and then we would make

2    a decision as to whether or not we were going to

3    approve it.

4          Assuming that we did, we would then send out

5    a letter to the employee along with a copy of the

6    work -- the assessment form to be provided to the

7    doctor just in case the employee was eligible to

8    return to work with -- with or without

9    accommodation.

10          If the employee did not return that

11    information within the time frame or subsequently

12    picked up the call -- picked up the phone and

13    called and said, "I'm not going to be able to

14    return to work," then at that point, we would

15    simply allow the line of business to go ahead and

16    replace the position.

17          Q.    What is a line of business?

18          A.    That's the manager.

19          Q.    You testified that this is required for

20    managers to complete the form?

21          A.    That's correct.

22          Q.    So it must be completed for all

23    employees that a manager's seeking to replace?

24          A.    Yes, that's the process.

25          Q.    Is there any circumstance under which a

 1    manager would not have to complete the replacement

 2    form paperwork in order to have an employee

 3    replaced?

 4           A.    No, that's -- that's not part of the

 5    process, so not -- not that I'm aware of, no.

 6           I should say wasn't a part of the process.

 7           Q.    When you receive the completed forms,

 8    after the decision is made to replace the employee

 9    or to not replace the employee, what happens to

10    those forms?

11           A.    They're typically filed.

12           Q.    Where?

13           A.    When I was doing it, I had a file -- a

14    replacement file, and I would put the forms in

15    that.

16           Q.    When you were doing it, did you store

17    those files in your office?

18           A.    Yes.

19           Q.    For the older forms, would you send

20    them to the warehouse?

21           A.    Yes.

22           Q.    You mentioned you're no longer

23    overseeing the replacement process.

24           A.    That's correct.

25           Q.    When did you stop?

1      A.   I do not.

2      Q.   I'll direct your attention to the first

3   page, ending in Bates number 1810 --

4      A.   Okay.

5      Q.   -- in the middle of the box where it

6   says Replacement Rationale.

7      While you were overseeing the replacement

8   process, who would be required to complete that

9   section of the form?

10      A.   The manager who was seeking to replace

11   the employee.

12      Q.   Is this form something that would be

13   filled out electronically or by hand?

14      A.   Actually, we receive them in both

15   formats.

16      Q.   Directing your attention to the bottom

17   of the page.

18      A.   Okay.

19      Q.   On the left, it says Coverage Method

20   Employed.  Do you see that?

21      A.   Yes.

22      Q.   To the right of that, it says

23   Description; to the right of that, it says

24   Duration; and to the right of that, it says

25   Outcome.  Do you see that?

1          A.    Yes.

2          Q.    Who do you require to complete this

3    section of the form?

4          A.    The manager requesting the replacement.

5          Q.    With respect to the coverage methods,

6    what is cross-training resource sharing?

7          A.    Cross-training means getting other

8    staff members and training them to do various

9    responsibilities so that if someone leaves or if

10   someone is not able to come in, that person can

11   pick up the responsibilities.

12         Resource sharing is slightly different in

13   that you may have multiple departments who

14   basically share employees, so they help out when

15   there, you know -- there's high-volume times.

16         Q.    And then with respect to the column

17   titled Duration, is that where you would input how

18   long that particular coverage method was employed?

19         A.    That's correct.

20         Q.    With respect to the column titled

21   Outcome, what would the hiring manager be required

22   to fill in in that section?

23         A.    They just need to let us know

24   specifically, if you've been using that particular

25   method for X period of time, why is it now that you

 1   want to replace the employee.

 2          So what's the outcome that has resulted in

 3   your needing to replace the position.

 4          Q.   Let me direct your attention to the

 5   third line under Coverage Method Employed where it

 6   says Temporary/Contract Employee.  Do you see that?

 7          A.   Yes.

 8          Q.   Does M&T Bank utilize temporary and/or

 9   contract employees to cover the absence of an

10   employee while he or she is on leave?

11          A.   Sometimes, yes.

12          Q.   Does a hiring manager have to get

13   permission from someone above his or her title to

14   employ temporary and/or contract employees to cover

15   an absent employee?

16          A.   I don't know how the process works,

17   frankly.

18          Q.   So is it fair to say that you would not

19   be involved in approving a coverage method?

20          A.   That's correct.

21          Q.   Direct your attention to the second

22   page, first line.  It states:

23          Should the above referenced employee be

24   released to return to work prior to the completion

25   of the replacement process, the employee will be

1    returned to his or her original position.

2            Can you explain what that means?

3            A.    Absolutely. So once the manager

4    completed the request form, obviously we would give

5    the -- we would then start the recruitment process.

6            If the position was not replaced by the time

7    we received something from the employee saying,

8    "Hey, wait, I'm able to come back to work" -- if we

9    receive something before they're replaced, then we

10   would not allow them to replace, but we would

11   simply allow the employee to go back to their

12   original position.

13           Q.    When you were overseeing the

14   replacement process, how much time was afforded an

15   employee who was out on leave to return to work

16   before this process was employed?

17           A.    Well, we would not allow managers to

18   replace before 16 weeks, so the standard 12 weeks,

19   and then we gave them a four-week cushion.

20           Q.    I believe you testified earlier there

21   was a letter that you would send out to the

22   employee to determine whether or not they could

23   return to work with or without restrictions?

24           A.    That's correct.

25           Q.    Now, in that letter that would be sent

1          A.     No.

2          Q.     This is separate and apart?

3          A.     Hold on.  I'm trying to go through the

4     process again in my mind.  I'm just reading this

5     again.

6          Should the employee be medically released

7     return to work after the replacement process has

8     been completed, we will begin the interactive

9     process to identify an alternate M&T Bank position.

10         Okay.  So again, in that particular

11    instance, if there was a position that was

12    available -- so there's two things that would

13    typically happen.  One is that the HR -- the

14    employee relations specialist would canvass the

15    manager, because they were very close to the

16    managers, to find out if there was another position

17    available.

18         The secondary piece of that would be talent

19    acquisition, so there's open reqs or an open req

20    report.  If we were to note that there was

21    something on the open req report, we would reach

22    out to the -- to the recruiter and let them know

23    that we have someone who might be ideally suited

24    for that particular position, and then we would go

25    through the process of trying to identify whether

 1  or not that person would be suited or be able to be
 2  placed in that role.
 3       Q.   Is the talent acquisition -- working
 4  with talent acquisition to identify open -- or
 5  vacant positions -- is that part of the
 6  redeployment process?
 7       A.   The answer to that is maybe, and I
 8  realize that that's an ambiguous answer, but -- so
 9  here's the thing:
10       When you say the -- everything -- any time
11  we try to find a position for the employee, I deem
12  that to be redeployment.  The redeployment process
13  as it relates to Career Partners International is
14  still the redeployment process, but that is
15  separate, and that comes later.  That's before this
16  actually takes place.
17       So it was actually a two-pronged process.
18  So if the person is released within the first 90
19  days, then one of the things we would ask the
20  managers to do is let us know what position, if
21  any, you would place that person in, and if there
22  is something listed here and the person is released
23  within 90 days after the position has been
24  replaced, then we would go back to the manager and
25  suggest to them that they need to place the

 1   employee in one of those positions, assuming that
 2   they're still available.

 3        So that's the first part of the process, and
 4   that also includes the canvassing piece.  Sometimes
 5   there's a position; sometimes there isn't.  If
 6   there isn't a position that's readily available,
 7   that's when we start canvassing and we start asking
 8   managers what's available.

 9        Very often those positions are posted, and
10   if and when those positions are posted, that's when
11   we go back to talent acquisition and we're like,
12   "Look, we've got someone that we're going to be
13   placing in that position" or "we need to place in
14   that position."

15        Q.   And just to be clear, when you say we
16   would go to talent acquisition, you're referring to
17   employee --

18        A.   Employee relations, yes.

19        Q.   What do you mean when you say place an
20   employee in one of the positions identified by the
21   manager?

22        A.   That means that they are simply slotted
23   into the role.  They do not have to interview for
24   the position.  We simply place them in the
25   position.

1          Q.    So the positions that are identified --

2    I'm going to direct your attention back to

3    Exhibit 2 ending in Bates number 1811.

4          A.    Yes.

5          Q.    Are those the positions that the

6    manager would list in the section titled Other

7    Available Divisional/Departmental Positions?

8          A.    That is correct.

9          Q.    Underneath that title, it says:

10         Positions must be similar in scope of

11   responsibilities and compensation.

12         Do you see that?

13         A.    That -- that is correct.

14         Q.    What does it mean to be similar in

15   scope of responsibilities?

16         A.    So if you have a salesperson, we want

17   to make sure that the position is comparable in

18   that there's a sales component of it.

19         If you have someone who's in an

20   administrative role, particularly an entry-level

21   administrative role, we want to make sure that

22   you're not trying to slot them into a sales

23   position that -- where they might not be ideally

24   suited.

25         So we're talking about similar

1   responsibilities, similar duties, similar type of

2   role, and we certainly don't want to impact their

3   compensation if there's any way possible, so we

4   want to keep them whole whenever we can.

5        Q.   Were there circumstances under which

6   perhaps there was not an available position at the

7   job grade, so that employee was placed into a

8   position at a lower job grade?

9        A.   Yes, there are -- there are

10  circumstances in which that might have happened.

11       Q.   What do you mean when you say a

12  position is readily available?

13       A.   Did I say that?

14       Q.   So I'll clarify.

15       You testified that if -- if no positions

16  were available -- were readily available, you would

17  then move to talent acquisition to work with them

18  to see if there were any positions.

19       A.   Yes, and -- and that simply would mean

20  if the position was open.  Very often managers have

21  positions that they are about to post, have not

22  necessarily gotten approval to post yet, but they

23  will be in short order.

24       So we always need to understand whether or

25  not those positions are -- whether they have

1        A.    That's correct.

2        Q.    So is it fair to say that this

3   redeployment assistance flyer is no longer used

4   within the bank?

5        A.    That's correct.

6        Q.    Is there a workforce restructuring

7   flyer that has replaced it?

8        A.    No.

9        Q.    How are employees notified of the

10  benefits afforded them through the workforce

11  restructuring process?

12       A.    At the time that they're notified that

13  their position is going to be impacted, we provide

14  them with their severance documents, and in

15  addition to their severance documents, we also

16  provide them with the outplacement information.

17       Q.    When you say the outplacement

18  information, do you mean information related to the

19  vendor that's used?

20       A.    That's correct.

21       Q.    I want to direct your attention to the

22  bottom of the first page ending in Bates number

23  1770.

24       A.    Okay.

25       Q.    The second to last bullet.  It states:

1   Perform -- under -- under the title Eligibility

2   Requirements, second to last bullet states:

3          Performance rating of at least a 3 for

4   non-officers or successful performance for officers

5   prior to the first day of leave.

6          Is this a requirement that M&T currently

7   employees under the workforce restructure process?

8          MS. GRAUMLICH:  Objection to relevance.  You

9   may answer.

10         THE WITNESS:  No.

11         BY MS. CHUKWU:

12         Q.   Under the redeployment assistance

13  process, what did this particular requirement mean

14  as it relates to that employee?

15         A.   It meant that they were a successful

16  performer, so there were no performance issues

17  noted in their most recent performance appraisal.

18         Q.   Are performance appraisals the same as

19  job evaluations?

20         A.   Yes, actually, they are.

21         Q.   How often are performance appraisals

22  conducted for employees?

23         A.   Annually.

24         Q.   So with respect to the redeployment

25  assistance process, how would M&T Bank know whether

1          Q.    Second bullet under Notable

2    Redeployment Assistance Facts.  It states:

3          It is the responsibility of the replaced

4    employee to actively seek opportunities

5    commensurate with his or her current skill set,

6    salary requirement, and preferred work schedule.

7          Do you see that?

8          A.    Yes, I do.  Yes, I do.

9          Q.    How does that differ -- how is that

10   different than the replacement request form ending

11   on page Bates number 1811, which states that, first

12   sentence of the second paragraph, should the

13   employee be medically released return to work after

14   the replacement process has been completed, we will

15   begin the interactive process to identify an

16   alternate M&T Bank position?

17         A.    Okay.

18         MS. GRAUMLICH:  Objection to form.  Go

19   ahead.

20         THE WITNESS:  So if we look at this in

21   the -- this process in the form of three buckets,

22   the first bucket being before the position is

23   replaced, the second bucket being up to 90 days,

24   and then the third bucket being 91 days and going

25   forward, this first paragraph that you're talking

1  about on the replacement request form is

2  referencing what we would do during that first

3  90-day period.

4        So if the position was replaced and the

5  person came back within 90 days, we would find them

6  something, and we would attempt to place them

7  within a position.

8        If the person came back after 90 days, then

9  the person would have the responsibility of trying

10 to go out and actively try to work with the vendor

11 that we've hired as well as with our talent

12 acquisition team to identify a position.

13       And so the difference really is we do

14 everything we possibly can to place the employee if

15 they come back within the first 90 days, but after

16 that fact, we have them work with the vendor.

17       BY MS. CHUKWU:

18       Q.   Was Ms. McCollin replaced before the 90

19 days?

20       A.   It's -- I -- I don't know.  I believe

21 so, but I don't know the answer to that.

22       Q.   So with respect to the redeployment

23 process, this is referring to the third bucket, as

24 you described, where the employee did not return to

25 work within the 90 days and now is seeking

1   opportunities commensurate with his or her skill

2   set, salary requirement, and preferable work

3   schedule; is that correct?

4      A.    That is correct.

5      Q.    I believe you testified that you

6   considered the redeployment process to be all of

7   these -- strike that.

8      MS. GRAUMLICH:   Why don't we take a break.

9      (A recess was then taken.)

10   BY MS. CHUKWU:

11      Q.    Back on the record.

12      Okay.   So I was trying to clarify the -- I

13   believe the term you used was the three buckets as

14   it relates to an employee returning to work and

15   seeking to be placed.

16      A.    Yes.

17      Q.    And so with respect to the redeployment

18   process, I believe you testified that a

19   redeployment process would be considered part of

20   the third bucket where the employee has not

21   returned to work within the 90 days afforded him or

22   her.

23      A.    That's correct.

24      Q.    And I believe -- well, my

25   understanding -- correct me if I'm wrong -- is that

1   with respect to the first and second bucket,

2   employee relations -- well, in your role as the

3   corporate manager, you would work with employee

4   relations to find a position for the employee to be

5   placed in if he or she can return to work within

6   the 90 days.

7        A.   That's correct.

8        Q.   And when we talk about within the 90

9   days, are we talking about from the date that

10  they're notified that they need to return to work

11  or their position would be replaced?

12       A.   No, it's 90 days from the date that the

13  manager executes the document.

14       Q.   Execute means to complete and submit?

15       A.   To -- yes, complete, submit, and sign

16  the document.  Actually, complete, sign, and

17  submit.

18       Q.   And I believe you testified that you

19  don't know whether a replacement form was ever

20  submitted in connection with replacing

21  Ms. McCollin's job; is that correct?

22       A.   That's correct.  That's -- the process

23  is there should have been a replacement form that

24  was filled out, but I don't know whether one ever

25  was.

1  requisition report, does it reflect positions that

2  hiring managers are looking to fill?

3       A.   Yes.

4       Q.   Those positions that the -- the hiring

5  managers are looking to fill as they are listed in

6  the requisition reports, are they posted?

7       A.   I would presume so, but again, I'm --

8  I'm not sure how they do it.

9       Q.   Is a requisition report -- is that area

10  more of like territory of talent acquisition?

11       A.   Yes.

12       Q.   Does M&T Bank, to your knowledge,

13  prioritize applications it receives depending on

14  the status of the applicants, whether it's an

15  internal employee, an external candidate?

16       A.   As I understand it, they do, but I

17  don't really understand the nuances of it or how

18  they prioritize it, but I know that there's a, for

19  lack of a better term, pecking order.

20       Q.   Do you have any understanding of who

21  would be at the top of that pecking order?

22       A.   No.

23       Q.   Do you know whether workforce

24  restructure employees are prioritized?

25       A.   They are given preferred consideration

1  for positions, yes.

2          Q.    What does that mean?

3          A.    Preferred consideration means that they

4  would -- if they meet the minimum qualifications of

5  the position, that they would be afforded an

6  interview.

7          Q.    With whom?

8          A.    Either the hiring manager or HR,

9  depending on the circumstances.

10         Q.    What are the different circumstances?

11         A.    Well, that's really in the wheelhouse

12  of our -- our friends in talent acquisition.

13         Q.    Have you known of any workforce

14  restructure employees who have been interviewed

15  with hiring managers before HR?

16         MS. GRAUMLICH:  Objection to form.

17         THE WITNESS:  Yes, I don't really know what

18  order -- in what order it happens, but I do know

19  that some of my folks who have been workforce

20  restructured have received interviews from both

21  managers and HR folks.

22         But in terms of what order, I can't speak to

23  that.

24         BY MS. CHUKWU:

25         Q.    Have you known of any employees subject

1 · workforce restructure designation in Taleo to

2 ensure that she receives preferred consideration

3 for positions where she meets minimum

4 qualifications.  She should be afforded this

5 consideration for the next 90 days.

6       Does this refresh your recollection as to

7 the designation that Ms. McCollin received?

8       A.   Yes.

9       Q.   Do you know whether Ms. McCollin was

10 ever offered a severance in connection had with her

11 termination?

12       A.   Not that I'm aware of, no.

13       · Q.   With respect to the redeployment

14 process while it was in existence, did you have the

15 ability to extend the period under which an

16 employee would be eligible to receive the

17 outsourced vendor assistance?

18       A.   I do.

19       Q.   Did you afford Ms. McCollin additional

20 redeployment assistance in connection with her job

21 search?

22       A.   Not that I'm aware of.

23       Q.   What, if anything, did you do to ensure

24 that Ms. McCollin was given preferred consideration

25 in connection with her job search?

1      A.    I sent an email to Sue Caradonna so

2  that Sue could designate her as, quote, unquote,

3  workforce restructure in the system.

4      The reason she's designated as workforce

5  restructure and not redeployment is because the

6  system has limitations, and so we had to put them

7  under the same -- workforce restructure and the

8  people who were being redeployed under the same

9  designation.

10     Having said that, Sue would then enter it

11 into the system so that whenever the recruiter saw

12 that particular symbol associated with an employee

13 pop up on a req, they knew that that person was to

14 be given an interview or offered an interview.

15     The other piece of that is that as it

16 relates to Patty, when someone is released to

17 return to work, we needed to have a designation for

18 them as well, and so we couldn't make them active,

19 because technically they were not actively at work.

20     So we have a leave reason of leave of

21 absence, but then -- I'm sorry -- yes, and then a

22 descriptor on a secondary page that is replaced

23 while on leave, and so that's a placeholder so that

24 the -- the recruiter understands that for at least

25 the first 30 days, this particular person is not

1  absolutely.

2        Q.    Why would there -- why would it not

3  have made sense to do that?

4        A.    Again, that's the -- the call of the

5  recruiter.  So again, the recruiter is the one who

6  needs to make the call in terms of whether or not

7  they feel that person meets the minimum

8  qualifications and whether or not that person

9  should immediately be directed to the line manager.

10        I just need to make sure that they get the

11  interview and that they're getting the attention

12  that they deserve.

13        Q.    So if a recruiter determined that

14  Ms. McCollin met the minimum qualifications, then

15  you would have expected that she be put in font of

16  a hiring manager?

17        A.    Yes, if a recruiter deemed her to be

18  the best qualified, absolutely.

19        Q.    Well, a moment ago you testified if

20  they meet the minimum qualifications.  Is your

21  testimony that the discretion was the recruiter's

22  with respect to if she met -- the applicant met

23  the -- was the best qualified?  Strike that.

24        My question is:  Was it your intention to

25  communicate that Ms. McCollin should be interviewed

 1  by hiring managers where she met the minimum

 2  qualifications?

 3          MS. GRAUMLICH:  Objection to form.

 4          THE WITNESS:  Do I still answer that?

 5          BY MS. CHUKWU:

 6          Q.  Yes.

 7          MS. GRAUMLICH:  Yes, you can.

 8          THE WITNESS:  All right.  Was it -- I'm

 9  sorry, I need you to repeat that again.

10          (The record was read as requested.)

11          THE WITNESS:  Not -- not -- no.  No, not

12  necessarily.  I want her to have an interview or

13  any of these employees to have an interview if they

14  meet the minimum qualifications.

15          Whether that interview take place with the

16  recruiter or whether it take place with the

17  manager, that's really their call, but I -- but I

18  want them to have at least some interview, because

19  if they meet the minimum qualifications and they

20  meet with a recruiter, then they then have the

21  opportunity, after working with Career Partners, to

22  present their skill set.

23          The other thing that's important about them

24  meeting with the recruiter is that even though the

25  employee -- or the -- the person who's been

1   replaced might have an interest in position A, they

2   may have transferrable skills that they don't

3   realize for position B.  So it's really important

4   that they meet with the HR person so that they can

5   discern where they best meet and for what positions

6   they're best suited.

7        But from my perspective, I just needed to

8   make sure that they got an interview and that

9   they -- someone saw them.

10       BY MS. CHUKWU:

11       Q.   When you say HR would determine whether

12  they're suited, you're talking about --

13       A.   Talent acquisition, I'm sorry.

14       Q.   Okay.  You're fine.

15       A.   I keep doing that.

16       Q.   Do you know if anyone within talent

17  acquisition was working with Ms. McCollin as it

18  relates to her skill set and finding positions that

19  were best suited for her?

20       A.   I do not know that.  I know that there

21  were a number of recruiters that I -- for a

22  position -- a number of positions for which she

23  applied that had multiple recruiters, and I reached

24  out to those recruiters directly to have -- to make

25  sure that she got an interview.