**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**


| | | |
|---|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY** | ) | |
| **COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. No. 1:16-CV-03180-ELH** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MANUFACTURERS AND TRADERS TRUST** | ) | |
| **COMPANY, d/b/a M&T BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |


**PLAINTIFF EEOC'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION..................................................................................................... 1

II.     ARGUMENT ............................................................................................................ 2

    A.   EEOC HAS HAS ESTABLISHED A *PRIMA FACIE* CASE FOR
        FAILURE TO ACCOMMODATE .................................................. 2

        1.   The Incontrovertible Evidence Shows That McCollin Had an
            Actual Disability and Was Entitled to Accommodation............... 2

        2.   McCollin Has a Record of a Disability and Defendant Had
            Notice of the Same......................................................................... 3

        3.   Defendant Failed to Reasonably Accommodate McCollin by
            Failing to Reassign Her  ................................................................ 4

        4.   EEOC Does Not Seek to Add a "New Claim" – Evidence of
            Failure to Accommodate is Probative of its Unlawful Discharge
            Claim……………………………………………………….....9

    B.   EEOC HAS MET ITS BURDEN OF PRODUCTION AS TO ITS
        UNLAWFUL DISCHARGE CLAIM ................................................ 12

        1.   EEOC Has Provided Direct Evidence of
            Discrimination……………………………………………………12

        2.   McCollin's Discharge Occurred Under Circumstances That
            Raise a Reasonable Inference of Unlawful
            Discrimination……………………………………………….....13

            i.   Defendant Failed to Hold Open McCollin's Job…….….…15

            ii.   Defendant   Deviated   From   Its   Noncompetitive
                Reassignment Policy…………..…………..………........18

            iii.   Defendant   Failed   to   Afford   McCollin   Preferred
                Consideration…………………….…………...…..20

            iv.   Defendant Failed to Extend McCollin's Redeployment
                Contrary to its Own Practices……………………………21

**C.    DEFENDANT IS UNABLE TO ARTICULATE A LEGITIMATE NON-DISCRIMINATORY REASON FOR MCCOLLIN'S TERMINATION…..23**

**D.    PLAINTIFF HAS SHOWN THAT DEFENDANT'S REASONS FOR TERMINATING MCCOLLIN ARE PRETEXT ............................................ 23**

    **1.   Defendant Selected Less Qualified Applicants in Place of McCollin ........................................................... 23**

        **i.     Defendant Mischaracterizes McCollin's Experience........24**

**E.    DEFENDANT FAILED TO ASSERT AN UNDUE HARSHIP DEFENSE……………………………………………………………………….34**

**III.   CONCLUSION ......................................................... 35**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) Civ. No. 1:16-CV-03180-ELH ) |
| v. | ) ) |
| MANUFACTURERS AND TRADERS TRUST COMPANY, d/b/a M&T BANK, | ) ) ) |
| Defendant. | ) |

## I.      INTRODUCTION

Defendant's cross-motion addresses the case it *wishes* it confronted, rather than the case actually before this Court.  Relying on  *Severson v. Heartland Woodcraft, Inc*. 872 F.3d 476 (7th Cir. 2017), in which the Seventh Circuit  rejected an employee's  multi-month request for leave as an ADA accommodation, Defendant wrongly conflates a leave case such as *Severson* with the one here –  about an employee who, having received medical clearance to return-to work (1) sought to be reassigned as a reasonable accommodation (2) was repeatedly denied the only accommodation that would allow her to return to work; and (3) was instead terminated because of her disability. Consistent with the facts, EEOC pleaded that "McCollin received clearance to return to work in August 2013; however, Defendant failed to reassign [her] to a vacant position for which she was qualified (Complaint, ¶ 28, ECF 1)[1] and that "Defendant terminated McCollin's employment on September 9, 2013 . . ." *Id*. at ¶ 30.  Unlike Severson, who lost his job by staying away from work,

---

[1]  *Cf.* Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. & Supp. Def.'s Cross-Mot. Summ. ("Def.'s Mem.") ECF 66-1, at p. 28 citing *Duffy v. Al Packer Ford, Inc.*, Civil Case No. HAR 95-2202, 1996 U.S. Dist. LEXIS 7038, at *14 (D. Md. May 13, 1996) (finding plaintiff failed to raise a genuine issue as to whether he could have been reasonably accommodated through a transfer where plaintiff was unable to perform the essential functions of the position desired).

McCollin lost her job, by trying to return to work.

## II.   ARGUMENT

### A. EEOC HAS ESTABLISHED A *PRIMA FACIE* CASE FOR FAILURE TO ACCOMMODATE

The record is replete with evidence that McCollin was an individual who had a disability within the meaning of the ADA; that Defendant had notice of McCollin's disability; that with a reasonable accommodation of reassignment, McCollin could have performed the essential functions of the position she desired; and that Defendant refused to make such accommodation.[2] *See Wilson v Dollar Gen. Corp.,* 717 F.3d 337, 345 (4th Cir. 2013).  Accordingly, the Court must deny Defendant's motion for summary judgment and enter judgment in favor of EEOC.

### 1. The Incontrovertible Evidence Shows That McCollin Had an Actual Disability and Was Entitled to Accommodation

Defendant does not dispute knowledge of McCollin's impairment (*see* Pl.'s Mot. Summ. J. ("Pl.'s Mem."), ECF 63-1 at p. 17), but nevertheless argues against coverage because "[she] was not substantially limited in any life activities when she was released to work without restrictions."  Def's. Mem. at p. 26.   In so arguing, Defendant overlooks that, under the ADA, "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity **when active**." *Allen v. Balt. Cty.*, 91 F. Supp. 3d 722, 731 (D. Md. 2015) (emphasis added) (citing 42 U.S.C. § 12102(4) (rejecting employer's argument that plaintiff was not disabled because his chronic condition flared up on occasion; holding that a plaintiff's autoimmune disease

---

[2] To the extent Defendant insists on characterizing the evidence cited herein and in Plaintiff's moving brief as hearsay, this Court has expressly rejected such argument as specious.  *Jones v. Chapman*, Civil Action No. ELH-14-2627, 2017 U.S. Dist. LEXIS 64781, at *10 (D. Md. Apr. 28, 2017) (Defendants "cannot have it both ways. They cannot voluntarily produce documents and implicitly represent their authenticity and then contend they cannot be used by the Plaintiffs because the authenticity is lacking.").

was a disability under the ADA).[3]  Defendant further avers that even if the Court were to find McCollin covered by the ADA, "it is the limitation arising from the disability that determines the need for accommodation." *See* Def.'s Mem. at p. 26 (citing *Long v. Howard Univ.,* 439 F. Supp. 2d 68, 78 (D.D.C. 2006) and *Hamel v. Bd. of Educ.*, No. JKB-16-2876, 2018 U.S. Dist. LEXIS 48274, at *38 (D. Md. Mar. 22, 2018)).  Plaintiff agrees.  Here, there is a clear correlation between McCollin's disability and her requested accommodation (reassignment to a vacant position).  Her return to work from a disability-related absence caused her to seek her job and, when it was no longer available, reassignment to a vacant position.  *See Long,* 439 F. Supp. 2d at 77-78 (employer was required to reasonably accommodate plaintiff insofar as there was a causal link between his disability-based limitations and the accommodation); *Hamel*, 2018 U.S. Dist. LEXIS 48274 at *38. ("'[t]here must be a causal connection between the major life activity that is limited and the [need for the] accommodation sought.'").   Indeed, *Long* and *Hamel* bolster, rather than undermine, EEOC's claim that Defendant failed to reasonably accommodate McCollin by reassigning her to a vacant position.

### 2.  McCollin Has a Record of a Disability and Defendant Had Notice of The Same

Defendant incorrectly claims that it was unaware of McCollin's record of disability.  It was patently aware of her history of a physical impairment that substantially limited, *inter alia*, her reproductive functions. *See* Def.'s Mem. at pp. 6-7, ¶ 17; *see also* 42 U.S.C. § 12102(1)(B).  Its argument that McCollin should have submitted a true "record" of her disability is unavailing, as

---

[3] For this reason alone, the cases upon which Defendant relies falls flat.  *See e.g.,* Def.'s Mem. at p. 26, citing *Carrier v. VCA Animal Hosps., Inc.*, Civil Action No. DKC 11-0129, 2012 WL 3536758, at *7 (D. Md. Aug. 13, 2012) (incorrectly holding that the plaintiff, who suffered from epilepsy – a disability EEOC maintains is covered by the ADA – was not substantially limited in caring for herself, walking, seeing, and hearing"); *Dove v. UPS*, 912 F. Supp. 2d 353, 362 (M.D.N.C. 2012) (relying on pre-ADA amendment case in finding that plaintiff submitted insufficient evidence of a physical impairment that substantially limited any major life activity).

Defendant readily admits that she informed her manager of her record of repeated miscarriages. *Id.* at p. 6, ¶17.  *See James v. Or. Sandblasting & Coating, Inc*., No. 3:15-cv-01706-HZ 2016 U.S. Dist. LEXIS 167387, at *16-17 (D. Or. Dec. 4, 2016) (plaintiff's testimony that he told his supervisors and coworkers about his disability, but failed to proffer any medical record or documentation of a diagnosis is sufficient to establish "record of" disability). Moreover, as explained in ECF No. 63-1, in December 2012, McCollin indeed provided Defendant with her medical records describing her disability and resulting limitations.[45] *See* Pl.'s Mem. at p. 17.

Defendant's argument that McCollin did not need a reasonable accommodation, is, as a matter of fact and law, in error, given that Defendant terminated her when she was able to work and given that the ADA includes "reassignment to a vacant position" as a reasonable accommodation.  42 U.S.C. §12111(9)(B).   Accordingly, its reliance on *Rhodes v. Comcast Cable Communs. Mgmt., LLC,* Civil Action No. GLR-14-1824 2016 U.S. Dist. LEXIS 108898, at *22-26 (D. Md. Aug. 17, 2016) and *Edwards v. BNSF Ry. Co*. No. 15-cv-1217, 2015 U.S. Dist. LEXIS 148353, at *18 (C.D. Ill. Nov. 2, 2015), cases which do not involve reassignment, cannot assist Defendant.

### 3. Defendant Failed to Reasonably Accommodate McCollin By Failing to Reassign Her

It is undisputed that Defendant failed to reassign McCollin to a vacant position upon her

---

[4]  *See e.g.,* PX A, Unum Leave Profile at M&T_0000382-91.
[5]  For this reason, *Miller v. Coca-Cola Refreshments USA, Inc*., No. 2:16cv93, 2018 U.S. Dist. LEXIS 48473, at *45 (W.D. Pa. Mar. 23, 2018) is unhelpful to Defendant, as the plaintiff failed to notify the employer of any disability, rendering the "record of" coverage unsuccessful. Similarly, *Muench v. Alliant Foodservice*, 205 F. Supp. 2d 498, 503 n.2 (D. Md. 2002), also relied on by Defendant, does little to support its argument as it was decided prior to the ADA amendments which broadened coverage for individuals with a disability.

return to work.[6]  And despite its best attempts[7], Defendant is hard-pressed to argue that her eight months of leave was unreasonable since company policy allows leave for a period of up to 24 months.  *See* Def.'s Mem. at p. 3, ¶4; *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999)  (employer's benefit policy affording unpaid leave for up to one year belies undue hardship claim with respect to leave request for a shorter period of time); *Hunter v. BASF Corp.*, 5:14-cv-02313-MHH, 2017 U.S. Dist. LEXIS 35289, at *11-12 (N.D. Ala. Mar. 13, 2017) (citing *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995)), finding that employee's request for extended leave of absence was reasonable where defendant maintained a 26-week disability leave policy, and had the personnel, organizational infrastructure, and financial resources to withstand plaintiff's absence); *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 597 (S.D. W.Va. 2008) (acknowledging the reasonableness of extended leaves of absence under the ADA).  Here, Defendant deviated from its own extended leave of absence policies and refused to return her to work.  *See Hunter*, 2017 U.S. Dist. LEXIS 35289, at *11-12 (an employer may not "use its own mechanisms to delay an employee's return to work and thereby transform a reasonable accommodation into an unreasonable one.").

---

[6] Defendant mischaracterizes this claim as EEOC's insistence that "job restoration" is required under the ADA. Mindful that each case will depend on its own facts, EEOC maintains that here, Defendant failed to reasonably accommodate McCollin, by continuing her employment either in her job or in one of the many others for which she was qualified.  The slippery slope described by Defendant, while dramatic, is just not accurate.

[7] Defendant's characterization of EEOC's Enforcement Guidance is inaccurate.  The portion cited by Defendant has nothing to do with an employer's obligation (or lack thereof) to accommodate an employee for six months. *Cf.* Def.'s Mem. at p. 29. Instead, in defining what "vacant" position means in the reassignment context, it provides that a position is vacant if it becomes available within "a reasonable amount of time." EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *21.  In elucidating the meaning of "reasonable amount of time," EEOC explains that six months is not reasonable. Defendant omits the remainder of the Guidance, which holds, in pertinent part, "If, six months from now, the employer decides to advertise the position, it must allow the individual to apply for that position and give the application the consideration it deserves."

As explained in EEOC's moving brief, noncompetitive reassignment is not only reasonable, it is required as a matter of law, absent undue hardship.[8] *Craddock v. Lincoln National Life Insurance Co.*, 533 F. App'x 333, 337 (4th Cir. 2013) (unpublished) (reversing dismissal of a complaint in which the plaintiff claimed she was qualified for vacant positions; noting that "[t]he ADA expressly recognizes 'reassignment to a vacant position' as a reasonable accommodation."). Defendant's interpretation of "reassignment," as meaning only the opportunity to compete with non-disabled employees for a vacant position, cannot be reconciled with the plain language of the statute.[9]   An employee who competes for and obtains a job elsewhere in the company is not "reassigned"; she may have changed jobs, but like any other employee looking to laterally transfer or promote, has done so under her own power. Defendant urges this Court to follow *United States v. Woody*, 220 F. Supp. 3d 682, 690 (E.D. Va. 2016) for the proposition that the ADA does not require noncompetitive reassignment.   However, *Woody* has little value, as it improperly relied on *EEOC v. Humiston-Keeling, Inc.,* 227 F.3d 1024 (7th Cir. 2000), which was abrogated by *EEOC v. United Airlines, Inc.,* 693 F.3d 760 (7th Cir. 2012)) in finding that noncompetitive reassignment is unreasonable as a matter of law.

Defendant's effort to distinguish the anti-preference principles articulated in *US Airways, Inc. v. Barnett* is similarly unavailing.   *Id.* at 403-05. It argues that its Redeployment Policy is lawful because the ADA is only intended to provide individuals with disabilities the opportunity

---

[8] As explained *infra*, § D, Defendant has not and cannot make a showing of undue hardship under the facts of this case.

[9] Defendant argues that because McCollin was replaced while on leave in April 2013, she was considered an "applicant" under the ADA. *See* Def.'s Mem. at p. 30 (arguing that the ADA's legislative history addresses non-preferential treatment of "applicants").   Unfortunately for Defendant, under its policies, McCollin remained an employee up until her unlawful termination in September 2013, thereby obligating Defendant to accommodate her as an employee. *See* PX B, M&T STD/LTD Leave Policy at M&T_0000485 ("An individual on [long-term disability] may remain an employee of the bank for up to 24 months . . . During this period, the employee is considered an "inactive employee of M&T").   Moreover, as explained in Plaintiff's moving brief, the ADA may require certain preferences. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98 (2002).

to "obtain the same workplace opportunities that those without disabilities automatically enjoy." Def.'s Mem. at p. 31 (citing *Woody*, 220 F. Supp. at 693-95 (quoting *Barnett*). This argument must be rejected. Under Defendant's policy, employees with disabilities who require reassignment as an accommodation, and who are forced to compete, will be terminated if unsuccessful. On the contrary, employees without disabilities who compete for the same positions can remain employed in their current positions. Thus, only through reassignment can the disabled employee enjoy the same workplace opportunities that employees without disabilities enjoy – the opportunity to continue working as productive members of the workforce. "Anything else, such as requiring the reassigned employee to be the best qualified employee to the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history." *Smith v, Midland Brake*, 180 F.3d 1154, 1169 (10th Cir. 1999); *cf. EEOC v. United Airlines*, 693 F.3d 760, 765 (7th Cir. 2012) ("adopt[ing] a similar approach" to *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (1998) and *Smith*).

Predictably, Defendant relies on *EEOC v. St. Joseph's Hospital*, CASE No. 8:13-CV-2723-T030TGW 2014 U.S. Dist. LEXIS 185466 (M.D. Fla. Oct 31, 2014), in support of the proposition that it had no obligation to reassign McCollin without competition because it employed a "best-qualified" policy.[10] *See* Def.'s Mem. at p. 33. *St. Joseph's*, however, is neither controlling nor

---

[10] Even if Defendant maintained a "best-qualified policy," that it repeatedly selected applicants objectively less qualified than McCollin makes clear that such policy was inconsistently enforced. *See infra*, § A.3 Moreover, the record evidence demonstrates that Defendant regularly deviated from any alleged policy by identifying candidates (including branch managers) to fill positions without ever testing their qualifications against other applicants to determine if they were, indeed, the best qualified. *See* Pl.'s Mem., PX 15, 30(b)(6) Salman Dep. 65:1-70:24. *See also Woody*, 220 F. Sup. 3d at 694 (recognizing the "dispute over the consistency in application of a non-discriminatory hiring policy could conceivably form the basis for [denying] summary judgment"); *Wehner v. Best Buy Stores, L.P.*, No. MJG-15-2163, 2017 U.S. Dist. LEXIS 34349, at *22 (D. Md. Mar. 10, 2017) (citing *Woody*, "Other courts have held that inconsistently applied nondiscriminatory policies could preclude summary judgment or constitute special circumstances in cases like these."). Defendant further relies on the unpublished *Jackson v. FUJIFILM Manufacturing USA, Incorporation* opinion. *See* No. 8:09-1328-RBH-BHH, 2010 U.S. Dist. LEXIS 141130 (D.S.C. June 18, 2010). Like the other cases cited by Defendant, *Jackson* lacks persuasive power because in reaching its conclusion, it relied on two courts of appeals cases decided prior to *Barnett* wherein the Supreme Court

persuasive.  Indeed, this out-of-circuit case completely ignores *Barnett*'s discussion regarding the unique preferences afforded individuals covered by the ADA, as well as exceptions to disability-neutral rules.  Relying on the flawed premise that the seniority systems and/or civil service systems discussed in *Barnett* are the same as "best-qualified" policies, the *St. Joseph's* court summarily concluded that "reassignment in violation of an employer's best-qualified hiring or transfer policy is not reasonable 'in the run of cases.'"  But that result is not what *Barnett* compels.  To the contrary, *Barnett* carved out a narrow exception to the general rule for seniority provisions given their unique status in American labor law.  *See Barnett*, 535 U.S. at 403-05.  Best-qualified selection policies have no comparable status, and are so common that the exception would swallow the rule.[11]  *See United Airlines*, 693 F.3d at 761.  Indeed, were courts to conclude "best-qualified" policies trump employers' reassignment obligations as a matter of law, most failure to accommodate (reassignment) cases would inevitably morph into failure to hire cases, forcing plaintiffs to challenge the qualifications of hired applicants to test the legitimacy of the employers' alleged policy.  Additionally, there are significant differences between "best-qualified" policies and civil service or seniority systems.  Whereas the latter are well-established, well-documented, and objective systems, thereby "creating, and fulfilling, employee expectations of fair, uniform treatment," (*Barnett*, 535 U.S. at 404), "best-qualified" policies are often informal, undocumented, and are inherently subjective.[12]  As here, most employers cannot point to any actual policy, but

---

acknowledged the general rule that employers using reassignment as a reasonable accommodation may not require qualified disabled employees to compete for vacant jobs. *See Barnett*, 535 U.S. at 402-03.

[11]   Unlike seniority systems and/or civil service systems that are typically well-established, reduced to writing, thereby "creating, and fulfilling, employee expectations of fair, uniform treatment" (*Barnett*, 535 U.S. at 404), every employer could argue, post-hoc, that it subjectively implements a best-qualified practice/policy to evade liability.

[12]   Indeed, in providing examples of how plaintiffs can show that special circumstances warrant a finding . . . the requested accommodation is reasonable on the particular facts, the *Barnett* Court explained "The plaintiff might show . . that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be

instead rely on inconsistent, often post hoc practices, to shield themselves from liability.[13]

Moreover, applicants to vacant positions, unlike employees subject to civil service or seniority

systems, cannot be said to have the same or similar expectations since applicants have no

understanding of who the competition pool is, if any, or, what their qualifications are as compared

to the same.  *See e.g.*, Def. Mot. to Strike, ECF 67-1 (moving to strike Decl. of Duane Carr (ECF

63-18) because he "lacks personal knowledge" about whether he competed against other

applicants).  To the extent Defendant's anticipated authority predates or otherwise does not accord

with the Supreme Court's opinion in *Barnett*, the cases rest on legally dubious grounds and should

be rejected.

### 4.   EEOC Does Not Seek to Add a "New Claim" – Evidence of Failure to Accommodate is Probative of its Unlawful Discharge Claim[14]

EEOC alleges only two claims: failure to accommodate (by failing to reassign) and

unlawful discharge.  Because EEOC does not seek to "add a new claim" in this case, this issue

requires no further consideration by the Court.  This does not, however, mean that Defendant's

failure to hold open McCollin's job has no bearing on EEOC's unlawful discharge claim.  On the

contrary, Defendant's failure to do so is significant probative evidence from which a reasonable

---

followed-to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference."  *Barnett* at 405-06.  Under a "best qualified" policy, an employer need not "retain the right" to change the system since it is the employer who determines (and routinely changes) the requisite qualifications for positions.  *See e.g.*, PX C, Deposition Excerpts of Michelle Denoncourt ("Denoncourt Dep.") 26:10-27:4 (stating that "job descriptions evolve at any organization").

[13]  *See generally* PX D, M&T Job Posting and Recruitment Policies) (failing to mention "best-qualified" standard, thus creating no expectation on the part of applicants).

[14]  Although EEOC declined to bring a separate failure to accommodate cause of action (i.e., failure to hold open McCollin's job), Plaintiff has neither waived nor precluded itself from proffering such evidence in support of EEOC's unlawful discharge claim.  Likewise, EEOC did not abandon its ability to rebut Defendant's defenses by not affirmatively pleading related facts since EEOC had no obligation to allege facts which would negate an affirmative defense in its Complaint.  *C.L. Ritter Lumber Co. v. Consolidation Coal Co.,* No. 1:11CV00019, 2011 WL 3793320, at *6 (W.D. Va. Aug. 25, 2011), *report and recommendation adopted*, No. 1:11CV00019, 2011 WL 4963195 (W.D. Va. Oct. 19, 2011), citing *LaGrasta v. First Union Secs., Inc.,* 358 F.3d 840, 845 (11th Cir.2004) and *Tregenza v. Great Am. Commc'ns.* Co., 12 F.3d 717, 718 (7th Cir.1993)).

juror could find that it unlawfully discharged McCollin in violation of the ADA.

There is no question that an employer's failure to accommodate an employee can be evidence probative of its intent to discriminate. *See e.g.*, *Kells v. Sinclair Buick-GMC Corp. Truck, Inc.*, 210 F.3d 827, 834 (8th Cir. 2000) *rev. on other grounds* (reversing summary judgment for the defendant-employer; concluding that "failing to provide an employee with reasonable accommodations can tend to prove that the employer also acted adversely against the employee *because of* the individual's disability") (emphasis added); *Hall v. Claussen*, 6 Fed. App'x 655, 675 (10th Cir. 2001) (citing *Kells*, finding sufficient plaintiff's evidence that he was terminated *because of* his disability where the defendant-employer was aware of his medical condition, but refused to reassign him to a vacant position, and instead attempted to place him in a position for which he was not qualified, and later terminated the employee); *see also EEOC v. McLeod Health, Inc*., 271 F. Supp. 3d 813, 819 (D.S.C. 2017) (finding proper the magistrate's report weighing of evidence of defendant's failure to reassign an employee in an ADA wrongful discharge case where failure to accommodate was not alleged in the complaint).[15]   Here, the overwhelming weight of evidence

---

[15]   Moreover, that other circuits, including this one, have found evidence of an employer's failure to accommodate sufficient to satisfy the more stringent "deliberateness" requirement in the constructive discharge context, renders it entirely appropriate for consideration in wrongful discharge cases.  *See e.g., Crabill v. Charlotte Mecklenburg Bd. of Educ*., 423 F. App'x 314, 324 (4th Cir. 2011) (citing *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993) (finding a genuine dispute of material fact as to whether plaintiff's forced retirement was causally related to her employers failure to provide a reasonable accommodation of transfer); *Talley v. Family Dollar Food Stores,* 542 F.3d 1099, 1109-10 (6th Cir. 2008) ("[W]hen an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable."); *Madock v. McHugh*, Civil Action No. ELH-10-02706, 2011 U.S. Dist. LEXIS 92392, at *1 (D. Md. Aug. 18, 2011) ("A complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge.").  Significantly, the Supreme Court has since rejected a "deliberateness" requirement in proving constructive discharge.  *See Green v. Brennan*, 136 S. Ct. 1769, 1779-80 (2016) (internal citations omitted) ("We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along."); *accord EEOC v. Consol Energy, Inc*., 860 F.3d 131, 144 (4th Cir. June 12, 2017) ("As a result of intervening Supreme Court case law, 'deliberateness' is no longer a component of a constructive discharge claim.").

demonstrates that Defendant refused to accommodate McCollin in spite of her repeated attempts to be reassigned.

Defendant likewise argues that "the EEOC cannot now challenge that it was an undue hardship for M&T to hold McCollin's position open until she could return when its own Determination did not find cause on that issue." Def.'s Mem. at p. 44.   But the Commission has challenged Defendant on this issue all along.  For example, in response to Defendant's First Set of Interrogatories requesting that Plaintiff "identify and describe in detail each and every act(s) of discrimination and failure to accommodate which [it] claim[s] McCollin experienced during her employment with Defendant," EEOC responded, in no uncertain terms:

> Bartolotta posted McCollin's Edmonson Branch position on or around April 16, 2016 [sic]. On or around June 19, 2013, McCollin informed Burke that she would be released to return to work on August 5, 2013 . . . In or around this same time, McCollin's former Edmonson Village branch manager position remained unfilled; **nevertheless, Defendant refused to reinstate her to her former position**.[16]

Additionally, in response to EEOC's First Set of Interrogatories requesting Defendant to explain its "decision not to return McCollin to her Edmonson Village Branch Manager position," it responded that "[Defendant] replaced McCollin as the Edmonson Village Branch Manager because it *imposed an undue hardship* on M&T to continue to hold that position open."  And when Plaintiff further requested all facts in support of Defendant's Second Affirmative Defense in its Amended Answer (ECF 17) that "any and all actions taken or decisions made by M&T concerning McCollin were based upon legitimate and non-discriminatory and non-retaliatory business reasons, which reasons cannot shown to be pretextual," Defendant responded:

> On April 4, 2013, M&T sent McCollin a letter, informing her that, **based on its business and staffing requirements**, M&T could no longer hold her Branch Manager position open . . . .  Thereafter, M&T posted McCollin's position for

---

[16]  *See* PX E, EEOC Interrog. Resp. (emphasis added).

replacement. Although M&T had **legitimate business necessity** to (and did) fill McCollin's position . . . .[17]

Nothing requires EEOC to accept as true Defendant's reasons for failing to hold open McCollin's original position, or subsequently terminating her employment.  Nor should it, as the incontrovertible evidence demonstrates that Defendant failed to adhere to its own policies to ensure she remained employed.  *Cf.*  Def.'s Mem.at p. 38 (stating that it terminated McCollin because she "had not and could not return to work" and "did not find a position under M&T's Redeployment Policy).  Given the contrary evidence on the record, whether Defendant could hold open McCollin's job is, at a minimum, a triable issue of fact.

## B.  EEOC HAS MET ITS BURDEN OF PRODUCTION AS TO ITS UNLAWFUL DISCHARGE CLAIM[18]

### 1.  EEOC Has Provided Direct Evidence of Discrimination

Defendant terminated McCollin because of her disability. *See* Pl.'s Mem. at  pp. 30-31. In challenging causation, Defendant summarily cites to *Tullius v. Silgan Plastics Corp*., Civil Action No. 5:15CV149, 2017 U.S. Dist. LEXIS 69837, at *11 (N.D.W. Va. May 8, 2017) and *EEOC v. McCleod Health, Inc.* 271 F. Supp. 3d 813 (D.S.C. 2017) for the proposition that McCollin was not terminated "because of" her disability.  Its reliance on both cases falls short.

In *Tullius*, a *pro se* plaintiff alleged that she was, *inter alia,* discharged in violation of the ADA.   The court rejected this claim, finding that the plaintiff, who was terminated at the conclusion of her short-term disability leave, failed to comply with defendant's leave policy requiring employees who had exhausted their leave be "ready, willing, and able to work, with or

---

[17]  *See* PX F, M&T's Interrog. Resp. (emphasis added).
[18]  Defendant does not dispute that McCollin was discharged, nor that she met Defendant's legitimate expectations at the time of her termination.

without reasonable accommodation" at the expiration of the same.[19] *Tullius,* 2017 U.S. Dist. LEXIS 69837, at \**4-5.  Finding that the plaintiff failed to submit any indication of her ability to return to work, judgment was entered in favor of the defendant. *Tullius,* 2017 U.S. Dist. LEXIS 69837, at \**30-31.

Contrary to Defendant's representation, *McLeod* does not suggest that an employer's discharge of an employee for exhausting medical leave and for failing to "find an alternative position" could not constitute an ADA discharge claim. *Cf.* Def.'s Mem. at p. 37 (incorrectly summarizing the court's findings). In *McLeod*, the court dismissed the plaintiff's discharge claim where it found a failure to make a threshold showing that the employee was a "qualified" individual.  The court further found no liability when the employer purportedly waived the required qualifications of a vacant position for the employee, and where the employee allegedly declined to accept the position, a far cry from what happened here.

### 2. McCollin's Discharge Occurred Under Circumstances That Raise a Reasonable Inference of Unlawful Discrimination[20]

Were the Court to find an absence of direct evidence of discriminatory motive or intent, the "*McDonnell Douglas* inference may [still] permit [EEOC] to prevail." *EEOC v. Electrolux Corp.*, 611 F. Supp. 926, 928 (E.D. Va. 1985).   In satisfying the fourth prong under the *McDonnell Douglas* framework, Defendant wrongly suggests that EEOC must show "either the position remained open or a non-disabled person replaced plaintiff." *See* Def.'s Mem. at p. 36.  No such

---

[19]  The court further found that the plaintiff was not a qualified person with a disability and also failed to request additional leave or any other reasonable accommodation that would have allowed her to continue working.

[20]  The parties agree that to survive summary judgment, EEOC must show "that (1) [McCollin] is within the . . . protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (citing *Haulbrook v. Michelin N. Am., Inc*., 252 F.3d 696, 702 (4th Cir. 2001).

showing is required.

The Fourth Circuit reformulated the fourth prong to require only that a "plaintiff present some other affirmative evidence that disability was a determining factor in the employer's decision." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58-59 (4th Cir. 1995) (citations omitted). *See e.g., Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity alone can create a genuine dispute to causation in ADA wrongful discharge case); *Gower v. Wrenn Handling*, 892 F. Supp. 724, 727-28 (M.D.N.C. 1995) (finding that an employer's failure to reasonably accommodate employee created a genuine issue of material fact concerning whether plaintiff's discharge constituted unlawful discrimination based on his disability).  As the *Ennis* Court explained:

> [W]here disability, in contrast to race, age, or gender, is at issue, the plaintiff in many, if not most, cases will be unable to determine whether a replacement employee is within or without the protected class, that is, whether or not that person is disabled or associates with a disabled person. Under the Act, even the employer is generally forbidden from inquiring about the disability of an employee or prospective employee . . . [E]ven if the plaintiff could obtain such information, requiring a showing that the replacement was outside the protected class would lead to the dismissal of many legitimate disability discrimination claims, since most replacements would fall within the broad scope of the ADA's protected class – the enormous number of Americans with disabilities, as defined by the Act, exponentially increased by those persons who are associated with individuals who are disabled, as so defined.

*Id.*[21]

That Defendant wholly disregarded its obligation to reassign McCollin under the ADA goes beyond raising a reasonable inference—it is definitive proof of unlawful discrimination under the plain language of the ADA.  Especially, where, as here, competent evidence demonstrates that Defendant hires applicants and reassigns employees without competition. *See* Pl.'s Mem. at 6,

---

[21]  The Court further reiterated that the *McDonnell Douglas* framework is flexible and should not be applied in a "'rigid, mechanized, or ritualistic' manner." *Id.* at 59 (*citing Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978)).

n.40.[22]   At a minimum, Defendant's failure to reassign McCollin raises a genuine issue of material

fact as to whether her discharge occurred under circumstances that raise a reasonable inference of

unlawful discrimination.

### i.   Defendant Failed to Hold Open McCollin's Job

Here, there is a genuine issue of material fact concerning whether Defendant could have,

but chose not to, hold open McCollin's Edmonson Village branch manager position.  To the extent

Defendant contends that EEOC is foreclosed from submitting such evidence in support of its

unlawful discharge claim, such argument fails.  *See supra*, § A.4.   Here, the evidence shows that

at the time Defendant replaced McCollin's Edmonson Village position, it was aware that she had

plans to return after the birth of her baby, in July 2013.[23]   Notwithstanding this knowledge,

Defendant replaced McCollin just 11 weeks before she was scheduled to return, citing "business

and staffing requirements."   There is no evidence in the record supporting Defendant's contention

that it had "business and staffing requirements" rendering it unable to hold open McCollin's job.[24]

Pointing to the testimony of Anne Bartolotta, Defendant claims that holding open McCollin's job

---

[22]   That external applicants who hired, or employees who are reassigned, without competition submitted applications or interviewed for the positions in question is of no moment.  Defendant is unable to show that such applicants actually competed against other candidates rending such applications and interviews a mere formality.  *See* Pl.'s Mem. at p. 6, n.40 (citing deposition testimony showing that applicants who were hired and/or employees reassigned without competition, submitted applications and/or were interviewed).

[23]   *See* PX G, Deposition of Excerpts Candace McCollin ("McCollin Dep.") 46:20-47:19; PX H, Defendant's Position Statement at EEOC000235 (admitting McCollin advised Defendant of plans to return in **March 2013**).   Records submitted by Defendant during the administrative proceedings are proper for consideration.  *See EEOC v. Town & Country Toyota, Inc.*, 7 Fed. Appx. 226, at *4 (4th Cir. 2001) (relying on evidence submitted by defendant during EEOC's investigation in reversing district court's grant of summary judgment; noting that contradictions between a non-discriminatory rationale for firing disabled employee propounded by employer and earlier statements made in response letter to EEOC were convincing evidence of pretext).  *See also* PX I, April 12, 2013 Bartolotta Email to Burke (**April 12, 2013** email from Bartolotta, "Any word from [McCollin] since you sent the letter. She told another Manager she got it and doesn't really care because she isn't coming back until after the baby.").

[24]   *See e.g.,* PX J, Deposition Excerpts of John Burke ("Burke Dep.") 78:16-79:2 (testifying that as the author of the April 4, 2013 letter he did not consult with Bartolotta on her purported business and staffing requirements).

would have been "disruptive."[25]   It further laments, without a scintilla of evidence, that "covering McCollin's branch  . . . was detrimental to [the branch managers who provided support in McCollin's absence] branch and to them both personally and financially."  Def.'s Mem. at pp. 7-8, ¶ 20.  Bartolotta's testimony is apropos of nothing, as it provides no foundation for her belief, and is thus tantamount to mere speculation.[26]   *See Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (finding speculative testimony insufficient to withstand summary judgment).  Moreover, this Court should reject as hearsay any testimony from Bartolotta concerning what the branch managers offering support allegedly told her, if at all.  *Id*. at 967 (inadmissible hearsay in depositions and affidavits may not support or oppose summary judgment motion).

EEOC has provided countervailing evidence demonstrating that Defendant had the ability to – and did– provide adequate coverage of the Edmonson Village branch in McCollin's absence.  *See* Pl.'s Mem. at pp. 8-9, n. 61.  Faced with the truth, Defendant attempts to rebut the declaration of Kandee Smith, through the declaration of Albert Bulson.  Significantly, however, it makes no effort to refute that Smith was sent to Edmonson Village to help manage the branch.  Instead it focuses its efforts on the duties Smith was "not authorized" to perform.  As Defendant is well aware, a branch manager's job duties consist of more than hiring, firing, and/or making business sales calls.[27]   In any event, the record reveals that Smith had performed at least one business sales

---

[25]   Defendant also argues that it would have been an undue burden to hold open McCollin's job.  *See* Def.'s Mem. at p. 45.  But just because Defendant says it does not make it so.  *See e.g*., *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 417-18 (4th Cir. 2015) (reversing district court's grant of summary judgment as to undue hardship; in so doing, taking into account defendant's "substantial personnel resources" while rejecting Defendant's argument that plaintiff's proposed accommodations would disrupt its business operations).

[26]   *See* PX K, Deposition Excerpts of Anne Ciminelli ("Ciminelli Dep") 79:19-80:6.

[27]   *See generally* PX K, Ciminelli Dep 45:5-46:18 (prospecting for business not the focus for Tier 1 branches); PX G, McCollin Dep. 97:9-21 (describing instance when another branch manager, Matt Bielecki, helped perform her duties by opening new accounts and performing account maintenance).

call in her capacity as Float Teller Manager filling in for a branch manager.[28]   At bottom, Defendant does not and cannot dispute that Smith helped manage the Edmonson Village branch in McCollin's absence.[29]  *See* Def.'s Mem. at pp. 44-45 (failing to dispute that Smith's performed McCollin's duties while she was on leave); Def.'s Mem., attaching Exh. R, Declaration of Albert Bulson (failing to dispute Smith's role in filling in for McCollin at Edmonson Village).

Defendant incorrectly argues that McCollin's failure to respond to its April 4, 2013 letter is fatal to EEOC's contention that it could have held open her Edmonson Village position. *See* Def.'s Mem. at p. 44.  McCollin's lack of response was completely reasonable, given that in March 2013, she informed Bartolotta (by phone) of her inability to return to work until after the birth of her baby in July 2013.30  Less than one month after that conversation,  on April 4, 2013, at Bartolotta's urging, Defendant warned McCollin via letter  that if she could not return to work by April 14, 2013, her positon would be replaced.[31] Defendant affirmatively foreclosed any discussion about what other accommodations, apart from "returning to work in some capacity," existed.  *See* Pl.'s Mem., PX 29, McCollin Replacement Records –Replacement Letter at M&T_0001894.  Any reasonable person in McCollin's position would have understood that responding to Defendant's letter – to reiterate what she had just told her manager – would be fruitless.[32]  *See Butelmeyer v. Fort Wayne Community Schs*., 100 F.3d 1281, 1285 (7th Cir. 1996) (excusing plaintiff from requesting reasonable accommodation because "he may have thought it was futile to ask, after [his employer] told him he would not receive any more special treatment.")   Accordingly, a reasonable

---

[28] *See* PX L, Declaration of Kandee Smith ("Smith Decl."), ¶4.

[29]  Defendant failed to disclose this fact at any point during the litigation despite being responsive to Plaintiff's discovery requests.  *See* Pl.'s Opp'n to Def.'s Mot. to Strike, ECF 68 at p. 3.

[30] *See* PX G, McCollin Dep. 46:20- 47:19.

[31]  Bartolotta, who had communicated with McCollin only one month earlier regarding her leave status, had no intention of facilitating the interactive process in good faith.  *See supra*, PX I, Bartolotta Email to Burke.

[32] *See* PX G, McCollin Dep. 48:14-50:16.

jury could find that McCollin's failure to respond to Defendant's letter was a logical result of the bad faith on the part of Defendant. *Wehner v. Best Buy Stores, L.P.*, No. MJG-15-2163, 2017 U.S. Dist. LEXIS 34349, at *26 (D. Md. Mar. 10, 2017).

### ii.   Defendant Deviated From Its Noncompetitive Reassignment Policy

There is ample evidence demonstrating that Defendant deviated from its noncompetitive replacement policy ("Replacement Process") when it failed to reassign McCollin to a vacant position.   It is undisputed that Defendant reassigns displaced employees returning from leave without competition as a matter of company policy.[33]  *See* Def.'s Mem. at pp. 2-3, ¶3.  It is also undisputed that McCollin became eligible for noncompetitive reassignment per Defendant's Replacement Process when she submitted her return to work form on or around July 22, 2013.[34] *Id* at p. 9, ¶¶ 24-25.  It is further undisputed that the 90-day noncompetitive reassignment window is triggered "from the date that the manager [completes, signs, and submits] the [Replacement Request Form],[35] and not when a manager simply *requests* to replace an employee. The Replacement Request Form, a prerequisite to replacing employees, further provides that if an employee is released to "return to work *after* the replacement process has been completed, [Defendant] will . . . identify an alternate M&T Bank position. . . .  in which [the] employee *will be placed*."[36] When questioned what Defendant means by "placing" an employee into an alternate

---

[33] For this reason alone, the Court should find that Defendant regularly deviates from any purported "best-qualified" policy.

[34] *See* PX M, July & August 2013Burke Emails to Thompson (emails from John Burke to Melissa Thompson demonstrating McCollin was eligible for noncompetitive replacement on or around July 25, 2013; confirming that the 90-day redeployment process began *after* Defendant "reached out" to regional managers).

[35] PX N, Deposition Excerpts of Melissa Thompson ("Thompson Dep.")) 127:8-17.  Here, the record is devoid of evidence showing that Defendant submitted a Replacement Request Form or that it ever completed the "replacement process" pursuant to its policies.  *Id.*. at 127:18-25; PX J, Burke Dep. 58:20-59:20; PX K, Ciminelli Dep. 93:10-13.

[36] *See* Pl.'s Mem., PX 12, M&T Policies – Replacement Request Form at M&T_0001811. This language alone demonstrates that it is the date of the **completion of the replacement process** rather than the date

position, Melissa Thompson, Employee Relations Corporate Programs Manager, explained that it means to **"slot"** the employee into a vacant position **without interview**.[37]

In spite of its policy, DefendaDiane nt admits that rather than place McCollin in a vacant position without competition, it "reached out to regional managers . . . to see if any were **interested in interviewing** McCollin." Def.'s Mem. at p. 9, ¶25.  Then, relying on the discriminatory animus expressed by McCollin's former manager, Dan Fulmer, the other managers refused to afford McCollin an interview.[38][39]

Defendant has offered no explanation for deviating from its policy with respect to McCollin.  Its failure to automatically reassign McCollin raises further issues of material fact that are squarely within the jury's purview to consider, including, but not limited to, the sincerity of Defendant's efforts to retain McCollin as an employee prior to terminating her because of her disability, and whether Defendant intentionally discriminated against McCollin in discharging her. Based on the foregoing, summary judgment as to EEOC's unlawful discharge claim is not appropriate.

---

the **request was made**, that triggers the 90-day noncompetitive reassignment eligibility period.
[37] *See* PX N, Thompson Dep. 116:19-25.
[38]  *See e.g.,* PX O, July 25, 2013 Fulmer Email to Prusak (Fulmer email to Regional Manager Jim Prusak, "I am not sure that White Marsh is the best fit for [McCollin]. **Plus the drive with a newborn may cause problems for her).**  When questioned about the motivation behind his email to Prusak, Fulmer could not decide which explanation better suited Defendant's narrative – his unlawful paternalism or McCollin's "inferior" experience. *See* PX P, Deposition Excerpts of Dan Fulmer ("Fulmer Dep.") 160:5-166:18.
[39] *See also* PX Q, July 30, 2013 Burke Email to Mosco (email from Burke to Retail Regional Manager Phil Mosco, "[Fulmer] mentioned he spoke with you. I assume that you'd like to decline interviewing her at this point?"). Notably, the same managers who refused to consider McCollin under Defendant's noncompetitive reassignment policy were the same managers who oversaw the eight branch and assistant branch manager positions to which she later applied or expressed interest.  *See* PX R, 2013 M&T Greater Baltimore Market Branches Chart (i.e., Retail Managers Michelle Denoncourt; James Prusak; and Phil Mosco).

### iii.    Defendant Failed to Afford McCollin Preferred Consideration [40]

There is no dispute that McCollin, given her status as a "workforce restructure" applicant, should have been afforded preferential consideration for positions for which she met the minimum qualification to ensure she remained employed with Defendant.[41] Notwithstanding Defendant's mantra that it "[] want[s] to keep [its] folks" employed,[42] it failed to give McCollin due consideration. *See* Def. Mem. at p. 11 ¶¶ 33, 36, 38-40.

Defendant contends that McCollin was not interviewed for at least two positions because she had non-favorable prior HR or line manager interview notes in her application profile. *See* Def.'s Mem. at pp. 13-14, ¶¶38-39.  However, according to Angela Skowronski, Defendant's Talent Acquisition Recruiter, "non-favorable" interview notes merely means that an individual was not selected for hire.[43]   Using this metric, every applicant previously not hired would have "non-favorable" feedback that should have impacted their advancement in the hiring process.  It did not.  Nevertheless, Skowronski testified that advancing applicants with prior "non-favorable" interview notes was discretionary.[44]   Indeed, the record reveals that Skowronski advanced the application of Daryl Blackwell for an assistant branch manager position, despite reviewing the "non-favorable" interview notes contained therein.[45]   Furthermore, that McCollin was hired by

---

[40] Skowronski's wavering position on the number of non-favorable interview notes required before she can preclude an applicant from consideration calls into question the legitimacy of any such metric.  PX S, Deposition of Angela Skowronski ("Skowronski Dep.") 210:24-212:1.

[41] *See* PX N, Thompson Dep. 135:23-136:9 ("Preferred consideration means that they would -- if they meet the minimum qualifications of the position, that they would be afforded an interview."); PX T, 30(b)(6) Deposition of Kristen Lucia ("30(b)(6) Lucia Dep.") 17:22-18:3, 21:12-18 (testifying that workforce restructure employees are given preferential consideration because Defendant would prefer not to lay off its employees).

[42] *See* PX T, 30(b)(6) Lucia Dep. 24:8-12; PX K, Ciminelli Dep. 65:15-21; PX C, Denoncourt Dep.  27:17-28:20.

[43] *See* PX U, 30(b)(6) Deposition Excerpts of Angela Skowronski ("30(b)(6) Skowronski Dep.") 13:5-12; 43:2-6.

[44] *See* PX S, Skowronski Dep. 84:7-14; 214:7-25.

[45] *Cf.* Pl.'s Mem., PX 19, M&T Applications – Blackwell at M&T_0000507-08 (July 2013 interview notes

Defendant for the Edmonson Village branch manager position similarly belies any argument that she lacked "favorable" interview notes.[46]

### iv.   Defendant Failed to Extend McCollin's Redeployment Contrary to Its Own Practices[47]

Defendant failed to ensure McCollin's reassignment, by refusing to extend her 30-day posting period under its Redeployment Policy. *Cf.* Def.'s Mem. at p. 3, at ¶6.   While Defendant's policy provides that participants may post for a period of 30 days as internal applicants before they are terminated (*id*.), Defendant retained the right to extend that window when the circumstances permitted.   Such circumstances included instances where the participant's redeployment period was or appeared to have been abridged.[48]

Here, Defendant admits that it failed to consider McCollin's August 29, 2013 application for Req. No. 3COT4 (Assistant Branch Manager – Highlandtown).   *See* Def.'s Mem. at p. 11, ¶ 33.   It avers, however, that such failure was unintentional, after recruiter Angela Skowronski, failed

---

for Relationship Banker II position reflecting notes from Michael Mistretta indicating Blackwell was unable to "express his performances in several categories" and Erin Bold indicating Blackwell "doesn't seem to want to spend time in the branch calling."; *with* PX U, 30(b)(6) Skowronski Dep. 42:22-43:9 (testifying that non-favorable interview notes include notes indicating that an applicant "can't express [his] sales performance during an interview" or "tells [the interviewer] that he [does not] want to spend much time in a branch making calls"); *but see* Pl.'s Mem., PX 19, M&T Applications – Blackwell at M&T_0000506 (Angela Skowronski notes, "moving forward application to meet with hiring manager Michelle Denoncourt for a branch manager interview.").   *See also id.*, Hassett at M&T_0000639-40 (Skowronski advancing application under Req. No. 3CPP4 despite prior "non-favorable" interview notes under recommending against hire because Hassett "[was] not quite ready for an assistant manager position").

[46] *See* PX U, 30(b)(6) Skowronski Dep. 12:13-19 (explaining favorable feedback means the applicant is recommended for hire).

[47] Notably, unlike with McCollin, Defendant did not require all employees returning from extended leaves of absence to participate in its Redeployment program in order to secure positions within the branch. *See e.g.*, Pl.'s Opp'n to Def. Mot. to Strike, ECF 68, attaching Exh. 7, Am. Decl. of Duane Carr, ¶ 5.

[48] *See* PX V, September 6, 2013 Thompson Email to Lucia (Email from Melissa Thompson to Talent Acquisition Team Manager, Kristen Lucia, "As these employees are afforded only 90 days of redeployment assistance, we want to be sure that this time is not truncated **or that there is an appearance that this time has been truncated. When the latter occurs, we may be required to extend the redeployment period beyond the 90 days**").

to "interpret[] McCollin's leave of absence designation correctly" and "thought [she] was still ineligible to return to work." *Id.*  Of course, this contention is contrary to the record evidence which shows that on August 9, 2013, clear instructions were provided to the recruiters, including Skowronski, that "McCollin's position was replaced while on leave of absence" and that she was "eligible for preferencial [sic] consideration through November 11, 2013."[49]  The evidence further suggests that on September 4, 2013, *prior* to hiring under Req. 3COT4, Skowronski was informed that McCollin was eligible to post for positions.[50]  Nevertheless, it was Defendant's "mistake" that precluded McCollin from consideration of this assistant branch manager position, thereby creating the appearance that it had truncated her redeployment assistance period.  Per Defendant's own policy, it should have extended McCollin's 30-day posting period.  It did not.

That Defendant failed to extend her redeployment is particularly problematic where, as here, it knew that McCollin sought, as an accommodation, an extension.[51]  Moreover, Defendant's own redeployment representative, Diane Robinson, intervened on McCollin's behalf and requested that it delay her termination.[52]  Despite the appearance that McCollin had not been afforded the full 30-day posting period due to Defendant's "misinterpretation" of her eligibility to apply for positions, it failed to extend her redeployment assistance in any capacity.[53]

---

[49]  *See* PX W, McCollin M&T Applications ("McCollin Applications") – 3COT4 at M&T_0000600.

[50]  Defendant wrongly claimed that McCollin declined to interview for the position, and withdrew from consideration during EEOC's investigation.  *See* Pl.'s Mem., PX 31, M&T Request for Information Response at EEOC000258.

[51]  *See* PX X, August 30, 2013 McCollin Email to Burke ("**Is there anyway to hold of [sic] at least until September 12th just to see what the outcome of the interview will be**??").

[52]  *See* PX Y, September 4, 2013 Diane Robinson Email to Thompson ( "Candace feels that many have not called her because of [her leave of absence] status and that her 30 days to apply as an internal candidate has been impacted by this status. **Is there any way she could be extended due to this circumstance?**").

[53]  *See* PX Z, September 4, 2013 McCollin Email to Burke *Cf.* PX AA, September 9, 2013 Thompson Email to Burke et. al. ("We can have an offline discussion about whether it makes sense to extend [McCollin's] redeployment assistance, if you'd like.").

### C. DEFENDANT IS UNABLE TO ARTICULATE A LEGITIMATE NON-DISCRIMINATORY REASON FOR MCCOLLIN'S TERMINATION

Defendant contends that it discharged McCollin because it filled her Edmonson Village branch manager position while she was on leave.  *See* Def.'s Mem. at p. 38.  It further maintains that it terminated McCollin because "she did not find a position under Defendant's Redeployment Policy." *Id.*  These facts are undisputed but they beg the question "why" and cannot, alone, constitute legitimate non-discriminatory reasons. As detailed above, that Defendant has failed to provide evidence of its inability to hold open McCollin's job, and subsequently failed to reassign her to any vacant position for which she was qualified, discredits Defendant's articulated legitimate, nondiscriminatory reasons for terminating her, and raises a genuine issue of material fact as to whether its such reason is pretextual.

### D. PLAINTIFF HAS SHOWN THAT DEFENDANT'S REASONS FOR TERMINATING MCCOLLIN ARE PRETEXT

Defendant's proffered reasons for terminating McCollin fail at first light.  As discussed *supra*, Defendant could have continued holding open McCollin's job for three months to ensure her return to work.  Similarly, during the period of her redeployment, McCollin applied to or expressed interest in several positions for which she was qualified; nevertheless, Defendant selected less qualified applicants.  To show pretext, EEOC must provide the Court with evidence that Defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004).  EEOC has met its burden.

#### 1.   Defendant Selected Less Qualified Applicants in Place of McCollin

Even if McCollin were required to compete for vacant position (and she was not), that Defendant failed to select her over less qualified applicants renders its rationale unworthy of

credence.   Defendant claims that "the candidates identified by EEOC cannot objectively be viewed as superior to McCollin." *See* Def.'s Mem. at p. 39.  Plaintiff agrees.  As illustrated further below, the record evidence demonstrates that McCollin was objectively superior to those hired, thereby undermining any argument that Defendant hires the most qualified.   *See Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006) (a reasonable fact finder could conclude the plaintiff was better qualified than the employee promoted by defendant where the plaintiff displayed the applicable aptitude needed for the position); *see also McLaughlin v. CSX Transp., Inc.*, 211 F. Supp. 3d 770, 784-85 (D.S.C. 2016) (denying summary judgment; plaintiff provided enough evidence to show a material question of fact exists as whether she was more qualified than hired applicants where she  had seniority with  and was trained by the company).

### i.   Defendant Mischaracterizes McCollin's Experience

 Notwithstanding McCollin's **nine-year tenure** as an assistant and branch manager, Defendant argues that she had not even two years of sales experience.   *See* Def.'s Mem. at p. 40.  At the same time, Defendant inflates Amanda Clark's sales experience by crediting her time spent as a waitress. *See* Def.'s Mem. at pp. 39-40.  Defendant likewise extolls the two years of sales experience possessed by selectee James Daly Hassett, which he earned as a relationship banker for M&T. *See* Def.'s Mem. at pp. 12-13, ¶ 37.  However, it conveniently disregards the two years McCollin herself spent as a relationship bank for M&T.[54]  *See* Pl.'s Mem. at p.1; *but see* Def.'s Mem. at p. 40.

Defendant further contends that it sought branch manager applicants with "strong sales

---

[54] Any attempt by Defendant to discredit McCollin's time spent with Provident Bank from her tenure with M&T must be rejected.  Indeed, Defendant conveniently regards Nakiah Saunders, hired by Provident Bank in 2004, as an M&T employee "since 2004." *See* Def.'s Mem. at p. 14, ¶ 41.

acumen," and those with experience successfully obtaining "small to midsize business."[55]   Def.'s

Mem. at p. 6, ¶ 15.   Assuming, *arguendo*, this were true, Defendant testified that "strong sales

acumen" is required for all branch managers, including those at Tier 1 branches.[56] Since McCollin

was hired as a Tier 1 branch manager, including Edmonson Village, she necessarily possessed the

"strong sales acumen" sought by Defendant.[57]   Nevertheless, Defendant fails to explain why, if it

believed McCollin did not possess the sales acumen required for branch manager positions, it

failed to select her for any of its vacant assistant branch manager positions, which did less exacting

sales, including business sales, requirements.[58] Nor did Defendant see fit to recommend McCollin

for specific positions that "better fit" her skills, after failing to select her for the positions to which

she applied, as it did other applicants.[59]   Notwithstanding Defendant's preferences, genuine issues

of material fact exist regarding whether Defendant was required to waive such preferred

qualifications to reasonably accommodate McCollin, and whether its failure to consider waiving

the qualifications violated its obligation to engage in the interactive process as required by the

---

[55]  *But see* PX BB, Deposition Excerpts of James Prusak ("Prusak Dep.") 53:13-18  (explaining all M&T Bank branches did not have the same calling expectation).

[56] *See* PX T, 30(b)(6) Lucia Dep. 42:8-15.

[57] *See* PX K, Ciminelli Dep. 45:5-23 (describing qualities sought in Tier 1 branch managers, including sales experience) *id.* at 49:25-50:4 (testifying that she hired McCollin for Edmonson Village because she was "the best qualified").

[58]  *See also* PX BB, Prusak Dep. 54:10-14 (assistant branch managers "really did not having calling, commercial calling expectations").

[59] *See* PX P, Fulmer Dep. 159:15-161:11 (McCollin would have been better suited for an assistant branch manager role which focuses on individual sales goals and branch operations).  *But see e.g.,* PX CC, M&T Applications Excerpts at M&T_0000578-579 (Michelle Denoncourt recommending Curtis Pope Jr for assistant branch manager of Belvedere branch; Phil Mosco recommending Pope for alternate openings in "a branch that does not have aggressive business goals."); M&T_0000631 (Branch Manager Matt Bielecki recommending Elvira M. Guerra for hire as assistant branch manager, even though she "did not have any individual sales production goals" and was "not life or series 6 licensed.");.M&T_0000673 (Matt Bielecki recommending Christine Nicaj, an applicant to Req. No. 3CPP4 (Fells Point – Assistant Branch Manager), who was neither life no series 6 licensed, and who "did not have individual sales goals" or do much selling," for a relationship banker position); M&T_0000909 (Phil Mosco recommending Joann Shorb, an applicant to Req. No. 3CO8D (Highlandtown – Branch Manager), a candidate he found unfocused, and who would need "lots of help on the business focus," for alternate openings such as Retail Manager in East Baltimore).

ADA. *See Wehner v. Best Buy Stores, L.P.*, No. MJG-15-2163, 2017 U.S. Dist. LEXIS 34349, at

*23-24 (D. Md. Mar. 10, 2017).

- ▪ Job Requisition 3CNFX (Assistant Branch Manager – Belvedere):

Defendant cannot rebut Plaintiff's evidence showing that McCollin was demonstrably

more qualified than selectee Daryl Blackwell.  McCollin, with approximately **12 years of retail**

**banking experience**, had three times the experience as Blackwell, who had less than four years

with a different bank.[60]  And even if Blackwell had five years of non-retail related management

experience (which the record does not support), it paled in comparison to McCollin's

approximately **9 years of retail banking *management* experience**.  McCollin's 18 years of **total**

**sales experience**[61] (including six years of retail/waitressing, and thus, per Defendant, sales), far

exceeded Blackwell's "more than three years of sales experience."[62]  Defendant's justifications

for selecting Blackwell over McCollin fall short. Blackwell applied for a non-management role

with M&T (i.e., Relationship Banker II) and during his human resources interview, unequivocally

informed Defendant that he was leaving his employer because he was uninterested in

management opportunities.[63]  Blackwell did not possess any licenses, nor a college degree.[64]

---

[60] Defendant provides no evidence in support of its contention that Blackwell had anything other than less than four years of experience.  *Cf.* Pl.'s Mem., PX 19, M&T Applications – Blackwell at M&T_0000507 and M&T_0000512 (reflecting that Blackwell began working for Wells Fargo as a personal banker (i.e., retail banking) in **September 2009**); *with* PX DD, August 22, 2013 Daryl Blackwell Interview Feedback (**August 22, 2013** interview for the assistant branch manager position).

[61] *See* PX EE, Declaration of Candace McCollin ("McCollin Decl."), ¶ 4.

[62] Defendant cannot post-hoc contend that Blackwell had significantly more than three years of sales experience.  This is especially true where, as here, Defendant indicated the years of experience in its DMT notes.   *See generally* Pl.'s Mem., PX 33, M&T Requisition Spreadsheet Excerpts taken from M&T_0000759 at pp. 1-5 (listing range of years of sales experience for applicants, but only listing Blackwell with a little over three years).

[63] *See* Pl.'s Mem., PX 19, M&T Applications – Blackwell at M&T_0000507 (interview notes from Angela Skowronski, "Why Leave: He has hit his feeling [sic] – they have the next steps in management or Business Relationship Management-*Not looking to pursue a Management role.*").

[64] *See* PX DD, August 22, 2013 Daryl Blackwell Interview Feedback.

It matters not that Defendant extended an offer to Blackwell, an external applicant, on August 28, 2013 – the day before McCollin applied, on August 29, 2013.[65]  Defendant's duty to reassign McCollin was triggered on or around July 22, 2013 when McCollin submitted her clearance to return to work.  *See* Pl.'s Mem. at pp. 9-10.  Moreover, this position (previously held by Laveda Sears) had been vacant since **June 4, 2013** – nearly 3 months before Blackwell applied.[66]

Significantly, Defendant does not dispute that after it terminated Blackwell for performance, it reassigned Jackie Jackson, an M&T employee who possessed only in-store experience, prior "non-favorable" interview notes,[67] and who was not meeting her sales goals at the time of application, to become assistant branch manager of Belvedere branch without competition.[68]

- Job Requisition 3CPS7 (Branch Manager – Calvert & Fayette):

Defendant similarly fails to rebut the record evidence demonstrating that selectee Amanda Clark's qualifications are inferior to McCollin's.  Much like the other candidates hired by

---

[65] *See* PX FF, Defendant Application Tracking Spreadsheet – 3CNFX, taken from Defendant's Bates No. M&T_00001267.

[66] *See* PX GG, Requisition Tracking – 3CNFX; *see also* Pl.'s Mem. at p. 11, n.80.

[67] *See* Pl.'s Mem. at 12, n. 84; *see also* Pl.'s Mem., PX 19, M&T Applications – Jackson at M&T_0000725-726 (reflecting December 16, 2013 interview notes, "Inability to properly neutralize employee conflict . . . Would prefer not to leave the branch for occasional appointments/onsites . . . I do not think that this candidate is a good fit for the proposed position. She is not meeting sales objectives at her current branch. . . .").

[68] *See* PX HH, Jackson Dep. 14:4-14, 43:3-44:4; 45:3-6 (testifying that before her 2015 retirement was assistant branch manager of Belvedere for approximately one year) *but see* Pl.'s Mem., PX 19, M&T Applications – Jackson at M&T_0000725-726 (showing no record of Belvedere application or interview therewith) *cf. with* Pl.'s Mem., PX 19, M&T Applications – Saunders at M&T_ 0000729-31 (showing applications and interviews that post-date her application to and hire under Req. No. 3COFM (Branch Manager – Ingleside) in 2016, including applications through 2016) and Blackwell at M&T_0000506 (showing applications that pre-and post-date his tenure with Defendant).  Importantly, Jackson testified that her job duties as the assistant branch manager of Belvedere (the last job she held before her retirement in 2015) were no different than the duties of in-store assistant managers. *See* PX HH, Jackson Dep. 44:10-19.

Defendant, Clark had very little sales experience and "minimum experience in management."[69] Nevertheless, Defendant made allowances for Clark to receive on-the-job training *after* hired into this position. *Id.* ("She's very coachable.").

- ▪ Job Requisition 3CQ6Q (Assistant Branch Manager – Nottingham Square at White Marsh)[70]

The record simply does not support that selectee Nakiah Saunders had "over 20 years of sales experience."  Def.'s Mem. at p. 14, ¶ 39.  Instead, it demonstrates that Saunders worked as an assistant and branch manager at three in-store branches (Smith Avenue Shoppers, Rockdale Shippers and Perring Plaza), over a period of three years at the time of application.[71]  And though she worked at Provident Bank prior to the acquisition as a District Operations Manager and Dollar Tree as Store Manager, there is no evidence that she conducted or participated in any sales in either of these roles.[72]

The record evidence demonstrates that like the Belvedere branch, the Assistant Branch Manager – Nottingham Square at White Marsh position had been vacant since (and likely before) May 22, 2013.[73]  Defendant did not hire Sanders until December 30, 2013.[74]  And although Prusak admittedly had no reason not to consider McCollin, the position remained vacant thereafter.[75]

---

[69] Pl.'s Mem., PX 19, M&T Applications – Clark at M&T_0001125.

[70] This branch fell under Retail Regional Manager Jim Prusak, who refused to reassign McCollin to a vacant position despite Defendant's noncompetitive reassignment policy two months prior to her application. *See* PX BB, Prusak Dep. 58:9-60:4.

[71] *See* PX P, Fulmer Dep. 40:20-41:19; 56:9-61:5 (testifying that he managed in-store branches for a period of time); *see also* PX R, 2013 M&T Greater Baltimore Market Branches Chart (listing Smith Avenue Shoppers, Rockdale, and Perring Plaza as in-store branches).

[72] *See generally* Pl.'s Mem., PX 19, M&T Applications – Saunders, M&T_0000730-738.

[73] *See* Pl.'s Mem., PX 35, August 2013 Requisition at M&T_000081 (reflecting Req. No. 3CNE4, Assistant Branch Manager at Nottingham Square at White Marsh, had been open for 79 days as of August 9, 2013); *id.*, September 2013 Requisition at M&T_000209 (reflecting Req. No. 3CPDS, Assistant Branch Manager at Nottingham Square at White Marsh, had been open for 17 days as of September 20, 2013).

[74] *See* PX II, Requisition Tracking – 3CQ6Q at M&T_0001676-77 (reflecting that Req. No. 3CPDS was reposted as Req. No. 3CQ6Q).

[75] *See* PX BB, Prusak Dep 78:16-21.

- <u>Job Requisition 3COSK (M&T at Work Specialist – Harford Road)</u>

Nowhere in McCollin's application does Defendant indicate that McCollin was "not excited" about the M&T at Work Specialist position. *Cf.* Def.'s Mem. at p. 10, ¶ 29.  Instead, the record evidence shows that after Dan Fulmer informed Skowronski that he was unwilling to consider McCollin's candidacy,[76] Skowronki still proceeded with conducting a sham "interview," failing to ask her any questions about her skills and/or experience.[77] Defendant further maintains that McCollin was not considered for the position because her experience was only with in-store branches. *See* Def.'s Mem. at p. 6, ¶ 16.  This statement is demonstrably false, as there is no dispute that McCollin worked as branch manager for Edmonson Village, a brick and mortar [i.e., "traditional" stand-alone bank branch], prior to going on leave.[78]

- <u>Job Requisition 3COV6 (Branch Manager – Brooklyn Park Shoppers):</u>

Defendant's reasons for failing to select McCollin for this position are plainly pretextual. Here, interviewing manager, Jim Henstrand, failed to select McCollin for Brooklyn Park Shoppers after learning that she was seeking to return to work after returning from disability leave.[79] Defendant contends that McCollin was not selected (prior to its decision to cancel the requisition) because "she showed very little energy or excitement about the position."  *See* Def.'s Mem. at p. 12, ¶ 36.   However, Henstrand's credibility is severely undermined by the countervailing evidence reflecting how excited McCollin in fact was.[80]  "Courts traditionally

---

[76]  *See* PX JJ, August 27, 2013 Skowronski Email to Fulmer.

[77]  *See* PX W, McCollin Applications, at M&T 0000972-73.

[78]  *See e.g.,* PX K, Ciminelli Dep. 32:2-4 (testifying that Edmonson Village was a brick and mortar branch).

[79]  *See* PX KK, August 20, 2013 McCollin Email to Jim Henstrand (email from McCollin to Hendstrand, "Due to a high-risk pregnancy I was placed on bed rest for my entire pregnancy and was unable to work. I was released to come back to work on August 5 . . . I just wanted to give you a heads up about my interest and would like you to consider me for that position").

[80]  *See* PX LL, September 20, 2013 Robinson Email to Thompson (email from redeployment representative Robinson, "I wanted to let you know that Candace McCollin interviewed for the Branch Manager job at the Brooklyn Park Shoppers location.  They told her that they would get back to her next week and **she is very excited about the position** . . .").

treat explanations that rely heavily on subjective considerations with caution." *Aka*, 156 F.3d at 1298 (rejecting employer's rationale for failing to hire plaintiff, finding genuine issue of fact regarding whether plaintiff displayed no 'enthusiasm' during the interview, and allegedly said "he really was not interested in doing pharmacy work.); *Perfetti v. First Nat. Bank of Chicago,* 950 F.2d 449, 457 (7th Cir. 1991) (discussing "the ease with which employers may use subjective factors to camouflage discrimination"); *Lilly v. Harris-Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir. 1988) (employer's reliance on subjective "intangibles" such a correct attitude, revealed well-settled indicia of an employment environment where discrimination could flourish). Moreover, that Henstrand justified McCollin's non-selection by stating that she appeared to "just want a job and not a career" during her interview, flies in the face of the facts.  Henstrand was aware of McCollin's long-standing tenure with the bank.[81]  Nor does Henstrand's rationale that McCollin was unable to provide "observation coaching examples" ring true.  Indeed, coaching was a particular strength of McCollin, and she willingly provided examples when requested.[82]

Even if Defendant decided to close Brooklyn Park Shoppers, it has failed to provide a scintilla of evidence showing why it could not have placed McCollin in the six-month "temporary [Brooklyn Park Shoppers] assignment" that would have allowed her to return to work with full salary.[83]  This is especially true, where, as here, the hiring manager, Henstrand, had knowledge

---

[81] *See* PX KK, August 20, 2013 McCollin Email to Jim Henstrand (reflecting McCollin's interest in the Brooklyn Park Shoppers position, indicating former Brooklyn Parks branch manager Shani Brooks spoke to Henstand on her behalf, and **stating that she had been with the Defendant for 11 years**).

[82] *See e.g.*, Pl.'s Mem., PX 4, McCollin's Performance Appraisals at EEOC000211 (McCollin 2012 performance appraisal, listing under "Engage and Develop Our Employees" competency, "This is a strong area for Candace. She has a well engaged team that she continues to meet with to ensure their success."); PX W, McCollin Applications, at M&T_0000662 (Skowronski interview notes for Req. No 3CPP4 (Fells Point – Assistant Branch Manager) listing McCollin's recent coaching examples).

[83] *See e.g.,* PX HH, Jackson Dep. 34:9-15; 85:16-86:6 (testifying that she was placed at Brooklyn Park Shoppers for a period of 5-6 months and received her full branch manager salary).

that McCollin had experience closing M&T branches.[84]  Defendant is hard-pressed to argue it had concerns over McCollin's sales experience given that such "temporary assignments" may have had less rigid standards for sales goals.[85]   Instead, closing branches consisted of administrative tasks such as informing customers of the imminent closure, and creating signage regarding the same.[86]

- Job Requisition 3COV6 (Branch Manager – Ingleside Branch):

Defendant claims there is no evidence that McCollin expressed interest in the Ingleside branch manager position.[87]  Nevertheless, Defendant selected Shani Brooks, an applicant with less management and retail banking experience than McCollin.[88]  While Defendant states that Bartolotta "did not want McCollin . . . because she only had experience managing Tier 1 branches and Ingleside was a Tier 4/5 branch with different branch manager demands," the record reveals Brooks had experience limited to **"Tier 1" in-store retail banking branches** as assistant branch managers**.[89]**  Additionally, Bartolotta's shifting explanation is significantly probative of pretext. The reason Defendant now proffers is vastly different than the purported performance-related issues Bartolotta offered as justification to Burke, at the time McCollin should have been

---

[84] *See supra* PX KK, McCollin Email to Hendstrand ("Just recently I've managed the Mondawmin Shopper's location which closed in November 2012 for 5 years.").
[85] *See* PX HH, Jackson Dep. 41:17-20.
[86] *See* PX P, Fulmer Dep. 45:9-12; *see also* PX W, McCollin Applications, at M&T_0000662-63 (McCollin explaining her role in closing Mondawmin Mall branch).
[87] *But see* PX MM, July 25, 2013 McCollin Email to Burke (reflecting McCollin's expression of interest in Ingleside).
[88] Notably, Brooks applied, and Bartolotta interviewed and recommended for hire, all on the same day – **July 29, 2013**, *prior* to the recruiter Marissa Brown, conducting a screening interview on **August 6, 2013.** *Cf.* PX NN, Shani Brooks Application at M&T_0001926 *with* PX OO Shani Brooks Interview Feedback). This is highly probative evidence that Brooks did not compete against any applicants for the Ingleside Branch position.
[89] *See* PX PP, Shani Brooks Performance Appraisal Excerpts at M&T_0001958-59 (reflecting that Brooks worked for Brooklyn Park Shoppers and Catonsville Walmart, both instore branches); PX OO Shani Brooks Interview Feedback (reflecting in-store experience at Brooklyn Park Shoppers); PX P, Fulmer Dep. 91:5-9.

31

noncompetitively reassigned.[90]  Even assuming her assessment of McCollin at the time were true

(and it was not), Bartolotta subsequently admitted that she did not have enough experience with

McCollin to "know anything" about her performance.[91]

- Job Requisition 3CPP4 (Assistant Branch Manager – Fells Point):[92]

Defendant contends that selectee James Daly Hassett, was hired over McCollin because he

had "two years of sales experience (which McCollin did not have)."[93] *See* Def.'s Mem. at p. 40.

There is no evidence Hassett possessed strong sales acumen, nor experience obtaining small to

midsize businesses as customers.  The record evidence further demonstrates that Hassett, who did

not possess his series 6 license, did "not have management experience," was "very green on . . .

leadership skills," and needed "a lot of coaching and hands on training."[94]  Unlike with McCollin,

however, Defendant accommodated Hassett's inexperience by suggesting he receive on-the-job

---

[90] *See* PX QQ, July 25, 2013 John Burke Handwritten Notes (reflecting July 25, 2013 conversation between Burke and Anne Bartolotta about McCollin); *see also* PX J, Burke Dep. 107:2-122:8 (authenticating handwritten notes). When the only issue of fact is created by an affiant contradicting her prior deposition testimony, the Court may disregard the conflicting statements in the affidavit. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990).

[91] *See* PX K, Ciminelli Dep. 98:23-99:20; *accord* PX RR, July 25, 2013 Bartolotta Email to Prusak.

[92] The "non-favorable" feedback provided by the hiring manager, Matt Bielecki, occurred under circumstances giving rise to an inference of discrimination.  Indeed, the feedback, including the language used, is eerily similar to that provided by Jim Henstrand (Req. 3COV6).  And, such feedback was provided immediately *after* recruiter Skowronski, who had access to all interview notes, called Bielecki to "discuss" McCollin.  *See* PX SS, October 3, 2013 Skowronski Email to Matt Bielecki.   As McCollin testified, Bielecki, with whom she had worked previously, appeared very uncomfortable interacting with her during her interview. PX G, McCollin Dep. 96:12-97:6.  Given Skowronski's inability to recall or otherwise explain her conversation with Bielecki during her deposition, any post-hoc justification proffered by Defendant must be rejected.  *See* PX T, Skowronski Dep. 88:8-90:23

[93] *But see* PX P, Fulmer Dep. 44:7-14 (in-store branches focused on "checking sales, credit card sales"; under McCollin, Mondawmin did very well when it came to these types of sales transactions); *see also* Pl.'s Mem., PX 33, at p. 5  (taken from Defendant's Bates No. M&T_000759 ) (Angela Skowronski 2012 DMT notes stating McCollin was hired as branch manager for Edmonson Village (Req. 3CIZ4) because she "**has 15 years of branch sales experience** starting as a platform [sic] employee and over 5 years of Branch Managerial experience.").

[94] *See* PX TT, James Daly Hassett Interview Feedback at M&T_0000708-09.

training *after* hired into this position.  Moreover, despite possessing "non-favorable" interview notes, recruiter Skowronski advanced Hassett through the hiring process.[95]

To the extent Defendant failed to select McCollin for this position, in part, because she "didn't seem enthusiastic," (Def.'s Mem. at p. 13, ¶ 37) or for Req. No. 3COV6 (Branch Manager – Brooklyn Park Shoppers) because she "showed very little energy or excitement about the position" (*id* at p. 12, ¶ 36), it has failed to provide any evidence that McCollin was afforded the same benefit of feedback concerning her interview performance that other redeployment participants received. *See e.g.,* PX UU, September 20, 2013 Thompson Email to Robinson (providing feedback to redeployment representative Diane Robinson about redeployment participant's alleged negative attitude during interviews to allow candidate to improve interview performance); PX N, Thompson Dep. 146:9-149:8 (testifying that she does not recall providing similar feedback to Robinson on McCollin's behalf).  It has not because it did not.

- ▪ Job Requisition 3CO6D (Enhanced Due Diligence Investigator):

Defendant contends that McCollin was not considered for an Enhanced Due Diligence (EDD) Investigator position because she did not have the requisite "three years of compliance **or** investigative experience **or** familiarity working with [the Bank Secrecy Act and anti-money laundering]."[96]  *See* Def.'s Mem. at p. 14, ¶ 40 (emphasis added).  McCollin possessed the requisite experience to be afforded, at minimum, an interview, which Defendant did not grant.  Indeed,

---

[95]  Pl.'s Mem., PX 19, M&T Applications – Hassett at M&T_0000640 (interview notes reflecting Hassett was not selected for a manager position, holding he was "not quite ready for an assistant manager position, especially not one at a tier 4 branch.").

[96]  *But see* Pl.'s Mem., PX 2, Job Descriptions, BSA Compliance Specialist I/Enhanced Due Diligence Investigator at M&T_0001274 (listing qualifications, "bachelors' degree or the equivalent in work experience with 3+ years experience in an audit or risk management function, 4+ years experience in a compliance related position, **or 6+ years banking experience**.  **Management or supervisor experience preferred**").

McCollin had approximately six years of experience participating in bank fraud investigations.[97]

Tellingly, in a parallel Fair Labor Standards Act class and collective action, Defendant has admitted that between September 1, 2013 until October 30, 2015, bank tellers (Grade 6) and/or other branch employees, were hired as EDD Investigators.  *See Brissett et al v. Manufacturers and Traders Trust Company*, Civ. No. 1:16-cv-00766-GLR (July 5, 2016), ECF. No. 20, ¶ 4 (Cond. Cert. Stip.); *see also id.* (May 20, 2016), ECF 11-1, at pp. 3-4 (Pl.'s Mem. Supp. of Cond. Cert.) ("These newly promoted EDD Investigators did not have the experience or education possessed by Plaintiffs and other similarly situated employees.  Nevertheless, the front line branch employees that were promoted, many of whom were tellers, were able to perform the same job duties to the same degree as Plaintiffs. . .").  Accordingly, a reasonable jury can infer that Defendant's failure to select or otherwise consider McCollin for this vacancy had little to do with her purported lack of experience.  *See supra Wehner*, 2017 U.S. Dist. LEXIS 34349, at**22-23.

At bottom, EEOC has presented and Defendant is unable to refute, overwhelming evidence of pretext.  *See Marshall v. AT&T Mobility, LLC*, 793 F. Supp. 2d 761, 783 (D.S.C. 2011).

### E.  DEFENDANT FAILED TO ASSERT AN UNDUE HARDSHIP DEFENSE

Defendant correctly did not plead undue hardship as an affirmative defense. Nor could it, as reassigning McCollin would not have caused undue hardship.  *See generally* Def.'s Mem.

---

[97]  *See* PX G, McCollin Dep. 22:6-14; 91:13-92:14 (testifying that as a branch manager, her job duties included investigating potential bank fraud); *see also* Pl.'s Mem., PX 2, Job Descriptions, Branch Manager at M&T_0001270 ("Ensure compliance with operational, security and control policies/procedures, preventing fraud and protecting customer assets"); PX VV, 2008 Branch Manager Job Description at M&T_0001898 (Make sure branch adheres to operational policies, compliance requirements and security measures.); PX WW, 30(b)(6) Deposition Excerpts of David Acara ("30(b)(6) Acara Dep.") 15:3-11. (explaining the meaning of "compliance," "it could mean anything related to any type of background in risk and regulatory affairs within an organization, whether it's a bank or outside institution, making sure that either the institution or outside influences are following the rules and regulations that may be set either by federal, state, or even company policy.").

Indeed, there is no evidence that  (1) deviating from its noncompetitive reassignment policy pursuant to its Replacement Process (by affording McCollin more than 90 days to be noncompetitively reassigned); (2) deviating from its Redeployment Policy (by extending the 90 days in which McCollin received job-search assistance); and/or (3) deviating from its alleged "best-qualified" policy,  would, in fact, have caused it undue hardship. *See Ransom v. Arizona Board of Regents*, 983 F. Supp. 895 (D. Ariz. 1997) (granting summary judgment for plaintiff where employer failed to show that modifying its policy would be an undue hardship).

### III.   <u>CONCLUSION</u>

For all of these reasons, Plaintiff respectfully requests that the Court enter Summary Judgment in its favor on the issue of liability and deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

_____/s/_____
Chioma Chukwu
Trial Attorney

_____/s/_____
MARIA SALACUSE
Supervisory Trial Attorney
Bar No. 15562

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201