IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
    *Plaintiff*,

v.                       Civil No. ELH-16-3180

MANUFACTURERS AND TRADERS
TRUST COMPANY d/b/a M&T BANK,
    *Defendant*.

## MEMORANDUM OPINION

In this hotly contested employment discrimination case, the Equal Employment Opportunity Commission (the "EEOC") filed suit against Manufacturers and Traders Trust Company d/b/a M&T Bank ("M&T" or the "Bank") to obtain "appropriate relief" for Candace McCollin," a former employee of M&T. ECF 1 ("Complaint") at 1. The EEOC claims that M&T violated the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. §§ 12112(a) and (b), by failing to provide reasonable accommodations to McCollin and by terminating her employment because of her disability, cervical insufficiency. ECF 1, ¶¶ 13-14, 33. In particular, the EEOC contends that, after McCollin received clearance from her doctor to return to work following the birth of her baby, M&T failed to reassign her to a vacant position for which she was qualified and then terminated her. *Id.* ¶¶ 28, 36-37. The EEOC seeks back pay with prejudgment interest for McCollin, as well as "front pay," reinstatement, compensatory damages, punitive damages, and injunctive relief. *Id.* at 7-8.

At the conclusion of extensive discovery (and many discovery disputes), the parties filed cross-motions for summary judgment, which have been fully briefed. Specifically, plaintiff moved for summary judgment (ECF 63), supported by a memorandum (ECF 63-1) (collectively, the

"EEOC Motion") and voluminous exhibits. ECF 63-2 to ECF 63-37. The Bank filed a combined opposition to the EEOC Motion and a cross motion for summary judgment (ECF 66), supported by a memorandum (ECF 66-1) (collectively, the "Bank Motion") and numerous exhibits. ECF 66-2 to ECF 66-33. The EEOC filed a combined reply in support of its motion and an opposition to the Bank Motion (ECF 70), along with many additional exhibits. ECF 70-1 to ECF 70-49; *see also* ECF 71. The Bank filed a consolidated reply in support of its own cross motion and in opposition to the EEOC Motion (ECF 72), along with more exhibits. ECF 72-2 to ECF 72-13; *see also* ECF 73.[1]

The Bank has also moved to strike (ECF 67) EEOC exhibits 14 and 17, *i.e.*, ECF 63-15 and ECF 63-18. The motion to strike concerns the declarations of Duane Carr and Kandee Smith. The EEOC opposes the motion to strike. ECF 68. M&T has replied. ECF 69.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the EEOC Motion (ECF 63) as to the failure to accommodate claim, but deny the EEOC Motion as to the unlawful discharge claim. Conversely, I shall deny the Bank Motion (ECF 66) as to the failure to accommodate claim, but grant it as to the unlawful discharge claim. Further, in making my decision, I do not find it necessary to rely upon the disputed declarations. Therefore, I will deny, as moot, the Bank's motion to strike the declarations of Carr and Smith. ECF 67.

---

[1] Collectively, the parties submitted approximately 1,250 pages in exhibits.

# I.    Factual and Procedural Background[2]

McCollin, a high school graduate, gave birth to her first child in 1998, without complications. ECF 63-1 at 5.[3]  In 1999, she was diagnosed with abnormal cells in her cervix, which were removed by a loop electrosurgical excision procedure ("LEEP"). ECF 63-1 at 5; ECF 66-1, ¶ 10.  The year after the LEEP procedure, McCollin suffered her first miscarriage, which occurred during her first trimester. ECF 63-1 at 5.

In 2001, McCollin began her career in retail banking as a bank teller. ECF 63-1 at 4.  She was hired as a relationship banker with Provident Bank in 2002, and rose to the level of assistant branch manager in 2004 and branch manager in 2007 at an in-store branch, Mondawmin Mall Shoppers. *Id.* at 4.[4]

In 2008, McCollin suffered her second miscarriage, at around 19 weeks. ECF 63-1 at 5.  At that time, she was diagnosed with an incompetent cervix. *Id.* at 6.

M&T Bank, headquartered in Buffalo, New York, is one of Baltimore's largest employers. *Id.*  It acquired Provident Bank in 2009. *Id.* at 4-5.  M&T retained McCollin as branch manager

---

[2]  The facts set forth in this section are undisputed, unless otherwise noted. Therefore, for convenience, I shall sometimes cite to the parties' briefs, rather than to the voluminous exhibits.

[3] Citations are to the electronic pagination as it appears on the docket.

[4] M&T distinguishes traditional stand alone branches and in-store branches. ECF 66-1 at 13.

of Mondawmin Mall Shoppers. *Id.* at 4-6; ECF 66-1 at 13. In 2010, while McCollin was employed by M&T, she suffered her third miscarriage, at about 20 weeks. ECF 63-1 at 6.

In 2012, M&T announced its intention to close the Mondawmin Mall Shoppers branch as part of its process of closing all of its in-store branches by 2014. *Id.* at 5-6; ECF 66-1 at 14. McCollin applied for a vacant branch manager position at M&T's Edmonson Village branch, a traditional retail banking branch, and on October 10, 2012, she was selected to fill the position by Regional Retail Sales Manager Anne Bartolotta.[5] *See* ECF 63-2 (McCollin Decl.), ¶ 2; ECF 63-8 (Dep. of Bartolotta) at 4:25-5:4.

The Bank maintains an equal employment opportunity ("EEO") policy. Melissa Thompson, M&T's Corporate Programs Manager, is responsible for the Bank's EEO program. ECF 63-1 at 7; ECF 63-14 (Thompson Dep.) at 3. It "provide[s] equal employment opportunities to all employees and applicants without regard to . . . disability" and provides for "reasonable accommodation[s] to qualified individuals with disabilities." ECF 63-13 at 2, 4. Moreover, the Bank provides leave and job reassignment as reasonable accommodations. ECF 66-2 at 2-3 (Thompson Decl.); ECF 66-2 at 4-7 (M&T EEO Policy). Defendant's Employee Relations Department ("ERD") is responsible for enforcing its EEO policy, including reasonable accommodation requests.

M&T's disability and Family Medical Leave Act ("FMLA") programs are administered through UNUM, a third-party provider. ECF 63-13 at 7; ECF 66-2 at 9. Pursuant to Bank policy,

---

[5]   Anne Bartolotta is now Anne Ciminelli. ECF 66-1 at 13 n. 10. She is referred to here as Bartolotta.

employees must notify their managers prior to taking FMLA and/or short-term disability ("STD") leave, along with the dates of their anticipated leave. Employees unable to return to work by 26 weeks after commencing STD are eligible for long-term disability ("LTD") benefits. ECF 63-13 at 8. The Bank permits up to 24 months' LTD leave before terminating employees unable to return to work. *Id.* Prior to returning to work, these employees must submit medical release forms indicating their restrictions, if any. *Id.* "If benefits are denied earlier than 24 months, the employee may return to work based on position availability." *Id.*

M&T also has a Replacement Policy to ensure adequate staffing. Pursuant to the Replacement Policy, a manager may request permission to replace an employee who has been on leave for at least 16 weeks, if justified by business need. ECF 66-3 (Thompson Dep.) at 10, 15, 31. If Employee Relations ("ER") approves the replacement request, M&T notifies the employee by mail, advising that M&T can no longer hold open the position, and asking if the employee is currently able to return to work, with or without an accommodation. ECF 66-3 at 9; ECF 66-5 (letter of 4/4/13 from Bank to McCollin); ECF 66-6 (McCollin Dep.) at 31-33. The employee has 10 business days to respond. ECF 66-3 at 15-16. If the employee is unable to return to work, M&T begins the process of replacing the employee. ECF 66-5; ECF 66-3 at 14-15.

If an employee is released to return to work within 90 days after the replacement request, M&T will place that employee in a job, without competition. ECF 66-3 at 17-19, 21-24. However, an employee who returns to work after the initial 90-day period must seek a new position through

M&T's Redeployment Policy.[6] That policy assists employees in finding a new position if they are "returning from an extended leave of absence, within 24 months of his/her first day of leave, whose position was replaced due to the staffing needs of the business." ECF 66-7 (Redeployment Policy); ECF 66-3 at 20-23; ECF 66-4 (Replacement Request Form); ECF 66-8 (John Burke Dep.) at 6; ECF 66-9 (Diane Robinson Dep.) at 6-7.

Pursuant to the Redeployment Policy, employees search independently and apply for vacant positions through M&T's online job posting system with the aid of M&T's talent acquisition team and a third-party vendor, Career Partners International ("CPI"). ECF 66-7; ECF 66-3 at 22; ECF 66-9 at 6-7. Notably, if an employee does not obtain a position at M&T within 30 days of being released to return to work, with or without an accommodation, his or her status as an employee ends. Nevertheless, the individual may continue to apply for positions for another 60 days with the assistance of the talent acquisition team and CPI. *See* ECF 66-5 at 2; ECF 66-10 (Arthur Salman Rule 30(b)(6) Dep.) at 6-7.

In addition, the Bank utilizes a "float pool," which consists of tellers and relationship bankers, to provide additional employee coverage. ECF 63-4 (McCollin Dep.) at 17. The parties dispute whether it includes other employees as well. *Compare* ECF 63-1 at 35 *with* ECF 66-1 at 16. And, when necessary, the Bank may hire temporary workers to satisfy temporary staffing needs. ECF 63-16 at 13:18-25.

---

[6] The EEOC points out in a footnote that as of 2015 the Bank "no longer offers redeployment assistance." ECF 63-1 at 9 n. 41.

M&T considers applicants for job postings in the following order of priority: (1) Workforce Restructure employees, which includes employees whose jobs have been eliminated or are subject to the Redeployment Policy; (2) internal employees; (3) employee referrals; and (4) external applicants. ECF 66-1 at 12; ECF 66-11 (Skowronski Dep.) at 9:1-10:9, 20:1-10; ECF 66-3 (Thompson Dep.) at 25:23-26:9; ECF 66-12 (Kristen Lucia Rule 30(b)(6) Dep.) at 9:12-16.

The Bank's Redeployment Policy provides "preferred consideration" to employees, meaning recruiters review those employees' applications first and typically will interview the employee if he or she meets the minimum qualifications for the job. ECF 66-12 at 7: 6-10 ("If they meet the minimum qualifications of the position, they will be granted a human resources interview and then sent down to the line of business for review."); *see also* ECF 66-3 at 30:11-22; ECF 66-11 at 11:7-13:15. In its briefs, M&T contends that it has a "best qualified" policy, pursuant to which it hires the most qualified candidate for each position. ECF 66-1 at 13, 41; ECF 72 at 15 n. 5. But, M&T does not point to a formal, written statement of its policy.

The EEOC does not directly dispute that M&T has a "best-qualified" employee policy. Instead, it states in a footnote: "Even if Defendant maintained a 'best-qualified policy,' that it repeatedly selected applicants objectively less qualified than McCollin makes clear that such policy was inconsistently enforced." ECF 70 at 10 n. 10.

Pursuant to the Bank's EEO policy, there are circumstances under which it would reassign employees with disability-related work restrictions to vacant positions, without competition. ECF 63-1 at 8; ECF 63-14 at 5-7. In accordance with this replacement process, M&T reassigns displaced employees to comparable vacant positions, without competition, upon return to work.

ECF 63-1 at 8 (citing ECF 63-13 at 10, Replacement Request Form; ECF 63-14 at 18-19). Defendant's Employee Relations Department is charged with identifying comparable positions that are or will become available within 90 days of an employee's replacement should the employee return to work. ECF 63-13 at 11. If no comparable positions are available, or if the employee is released later than 90 days after replacement, the Bank may refer the employee to its third-party outplacement vendor for 90 days' redeployment assistance. *See* ECF 63-13 at 14-15; ECF 63-14 at 15-17; ECF 63-16 at 10-12.

In November 2012, McCollin learned that she was pregnant and that, as a high-risk patient, she would need to undergo a surgical procedure to help her carry the baby to term, followed by bedrest until delivery. ECF 63-1 at 11; ECF 66-1 at 14-15. According to McCollin, in November 2012, she told her supervisor, Anne Bartolotta, of her condition, her history of miscarriages, and her need to take extended leave for the surgical procedure and recovery. ECF 63-1 at 11; ECF 63-2, ¶ 6; ECF 66-1 at 14-15; *see also* ECF 63-8 at 8:4 − 9:16; ECF 63-26. Bartolotta advised McCollin to contact M&T's third-party provider, UNUM, presumably in regard to FMLA leave or disability. *See* ECF 63-8 at 9:17-22.

McCollin initiated a claim on November 29, 2012, and her leave began when she underwent surgery on December 10, 2012. *See* ECF 63-26; ECF 63-27. McCollin asserts that she told Bartolotta in March 2013 that she would be unable to return to work until the birth of her baby in July 2013. ECF 63-2, ¶ 7. McCollin initially took leave under the FMLA and was later approved for STD. *See* ECF 63-1 at 11 n. 58; ECF 66-1 at 15.

On March 19, 2013, Bartolotta received notice from UNUM that McCollin's FMLA leave had ended on March 7, 2013, and that her STD would end on March 25, 2013. ECF 66-1 at 15 (citing the email exhibit at ECF 66-18). Bartolotta contacted John Burke, Employee Relations Specialist for M&T's Greater Baltimore region, on or about March 20, 2013, about replacing McCollin as Branch Manager. ECF 63-1 at 12; ECF 66-1 at 15. Burke began the replacement process and sent McCollin a form letter on April 4, 2013, informing her that her position could not be held open and she would be replaced unless she could return to work in some capacity. ECF 63-1 at 12; ECF 66-1 at 16, 27; ECF 70-10 at 5: 10-12.

The letter stated, in part, ECF 63-30 at 5:

> This action will not affect your current short-term disability benefits, as long as you continue to provide the required medical documentation to substantiate your leave of absence.

> If you are currently able to return to work in some capacity, please have your health care provider complete the attached Accommodations Assessment Form and return to me for further review. If I am not in receipt of the referenced form by April 14, 2013, we will proceed with the replacement of your position.

> As a result of the referenced action, you will be eligible for 90 days ("Posting Period") of redeployment assistance, during which time one of our assigned vendors will help you to identify another position within the bank that is commensurate with your work status, pay, skills and experience. If your health care provider formally releases you to return to work within 24 months of your first day of disability, you will be required to contact me within 5 business days of your release in order to receive redeployment assistance.

McCollin did not respond, but she continued to submit documents to UNUM in support of her disability claim. ECF 63-1 at 12; ECF 66-1 at 16. On or about April 15, 2013, Burke posted McCollin's Edmonson Village position. ECF 63-1 at 12. On May 20, 2013, M&T hired McCollin's replacement, Laveda Sears, as Branch Manager at the Edmonson Village branch. *Id.*;

ECF 66-1 at 16. Sears had been the assistant branch manager at M&T's Belvedere location. ECF 63-1 at 12.

McCollin successfully gave birth by Cesarean section on June 10, 2013. ECF 63-1 at 12. Soon after, on June 19, 2013, she informed Burke that she would be released to work on August 5, 2013, and she faxed a Return to Work form to Burke on July 22, 2013. *Id.* at 12-13; ECF 66-21 at 2. Burke then contacted about four or five Retail Regional Sales Managers with vacant branch and assistant branch manager positions in their regions about reassigning McCollin to any of their vacancies. ECF 63-1 at 13; ECF 66-1 at 17; ECF 63-31 at 7-10, 12. However, M&T did not reassign McCollin to any of the eight vacant positions. On August 9, 2013, M&T referred McCollin to CPI for redeployment assistance. ECF 63-31 at 13 (email from Thompson to Diane Robinson of CPI).

Between August and October 2013, McCollin applied for, or expressed interest in, nine or ten vacant positions that were at or below her grade level, including branch manager, assistant branch manager, Enhance Due Diligence Investigator, and Work Specialist. *See* ECF 63-1 at 13-14; ECF 66-1 at 29 (disputing whether McCollin applied for the Ingleside Branch Manager position). The parties dispute plaintiff's qualifications for these positions. *Compare* ECF 63-1 at 14-15 *with* ECF 66-1 at 17-23.

Plaintiff received four interviews but no reassignment. ECF 63-1 at 14. The EEOC claims that the Bank "selected less qualified applicants . . . ," some of whom were external candidates. *Id.* Moreover, it contends that about 20 other branch manager or investigator positions were

available between August 2013 and March 2014, but the Bank failed to offer McCollin any of them. *Id.* at 13-14, ECF 66-1 at 17-22.

As noted, "If an employee does not obtain a position at M&T after the first 30 days of the posting period, her status as an employee ends, but she could continue to apply for positions for the remaining 60 days with the assistance of the talent acquisition team and CPI." ECF 66-1 at 11. On September 9, 2013, the 30-day period within which McCollin could apply as an internal candidate came to an end, and M&T terminated plaintiff's employment due to her "failure to return from [her] leave of absence." ECF 63-37 (Termination letter).

Thereafter, McCollin filed a charge of discrimination with the EEOC. On March 31, 2016, she was issued a Letter of Determination finding reasonable cause to believe that the ADA was violated. ECF 1, ¶¶ 7-8. After the EEOC was unable to secure a conciliation agreement with M&T, it issued a Notice of Failure of Conciliation on July 26, 2016. *Id.* ¶¶ 10-11. This suit followed on September 19, 2016. *See* ECF 1.

Additional facts are included in the Discussion.

## II. Standard of Review

Both parties have moved for summary judgment under Fed. R. Civ. P. 56. Rule 56(a) provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no

genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in *Bouchat* ) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*,

475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)

(citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But, if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

### III.  Discussion

### A.  The ADA

The ADA, 42 U.S.C. §§ 12101 *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," *id.* § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2).  To that end, the statute "prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189." *A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).

The ADA contains five titles:  Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions. Of relevance here, Title I prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge

of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'").[7]

A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" *Id.* § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co*., 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)). Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . working" and "reproductive functions." 42 U.S.C. §12102(2)(A)-(B). An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," will be considered to have a disability. *Id.* § 12102(1)(B)-(C).

---

[7] "Modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the ADA incorporates that statute's enforcement procedures, *id.* § 12117(a), including the requirement that a plaintiff must exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court, *see id.* § 2000e–5(b), (f)(1)." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012). The administrative claims process is "an integral part" of the enforcement scheme that Congress set out in Title VII. *Chacko v. Patuxent Inst.,* 429 F.3d 505, 510 (4th Cir. 2005). By incorporation, it is also integral to the ADA. *See Sydnor*, 681 F.3d at 593. "Allowing [the EEOC] first crack at these cases respects Congress's intent 'to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Id.* (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

Under Title I of the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]" *Id.* §12112(b)(5)(A); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013).[8]  Additionally, "discrimination against a qualified individual on the basis of disability" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(B).  And, the ADA bars the discharge of a qualified employee because she is disabled.  *Summers*, 740 F.3d at 328.

As noted, "[o]ne form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 311 (4th Cir. 2011).  "A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position,' 29 C.F.R. § 1630.2(o)(1)(ii); or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without

---

[8] The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide.  *See, e.g.*, *Robertson v. Las Animas Cty. Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

disabilities,' *id.* § 1630.2(o)(1)(iii)." *Hamel v. Bd. of Educ. of Harford Cty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018). However, an accommodation is not reasonable as a matter of law "if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of [the] program." *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288, (1987) (internal citations omitted); *see Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012). The concept of reasonable accommodation is discussed in more detail, *infra*.

The EEOC asserts two ADA claims against M&T: (1) failure to accommodate; and (2) wrongful discharge. *See* ECF 70 at 9.

## B.     Failure To Accommodate

To establish a prima facie case for failure to accommodate, the EEOC must show: (1) the employee was an individual with a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3) with reasonable accommodation, the employee could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001); *see also Stephenson v. Pfizer*, 641 F. App'x 214, 219 (4th Cir. 2016) (per curiam); *Jacobs*, 780 F.3d at 579; *Wilson v. Dollar Gen. Corp.*, 717 F.3d at 345.

As discussed, *infra*, an employee need not demonstrate that the employer had a discriminatory intent. Notably, "at the summary judgment stage, the employee 'need only show that an accommodation seems reasonable on its face,' and then the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship.'" *Reyazuddin*, 789 F.3d

at 414 (some quotations and citation omitted); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002). If the employee cannot show the accommodation is reasonable "in the run of cases," summary judgment against the plaintiff typically follows. However, the plaintiff may still "show that special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts." *Barnett*, 535 U.S. at 405.

A reasonable accommodation "may include . . . job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (emphasis added). A reasonable accommodation may also include accrued paid leave or unpaid leave. *See* 29 C.F.R. pt. 1630 app. § 1630.2(o) ("[O]ther accommodations could include . . . permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment[.]").

The EEOC claims that M&T failed to provide a reasonable accommodation "by forcing [McCollin] to compete for vacant positions for which she was qualified." ECF 63-1 at 21. The Bank maintains that at the time of plaintiff's termination on September 9, 2013, she was not disabled and had no record of disability. ECF 66-1 at 34-35. Moreover, M&T asserts that the ADA does not require reassignment without competition. *Id.* at 36-43.[9]

---

[9] In the EEOC Motion, the EEOC first asserted that M&T failed to provide a reasonable accommodation when it failed "to hold [McCollin's] job open while she was on leave[.]" ECF 63-1 at 21. However, M&T argued that the Complaint does not allege that "M&T failed to reasonably accommodate McCollin because it did not hold her position open while she was unable

### 1. McCollin Has A Record Of Disability

A person is disabled if she has: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). A plaintiff has a "record of disability" if she can show that she "'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Foore v. Richmond*, 6 F. App'x 148, 153 (4th Cir. 2001) (quoting 29 C.F.R. § 1630.2(k)(1)).

The question of whether a plaintiff is disabled or has a record of disability under the ADA is "'a question of law for the court.'" *Coghill v. Bd. of Educ. of Prince George's Cty.*, GJH-14-2767, 2017 WL 1049470, at *5 (D. Md. Mar. 17, 2017) (quoting *Rose v. Home Depot U.S.A., Inc.*,

---

to work." *Id.* at 49. And, it noted that plaintiff did not amend the Complaint to add this claim. *See* Docket; *see also* ECF 66-1 at 48 n.30.

To be sure, "a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009); *see Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint.") (citations omitted); *cf. Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (concluding that the district court properly refused to consider an argument raised by the plaintiff for the first time in her response to the defendant's motion for summary judgment); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (concluding that the plaintiff could not raise a new claim in response to the defendant's summary judgment motion).

However, in a subsequent filing (ECF 70), the EEOC stated that it is not raising a claim that the Bank denied plaintiff a reasonable accommodation by failing to hold her job open while she was on medical or maternity leave. Rather, the EEOC contends that the failure to hold open the position evidences wrongful discharge. That contention is discussed, *infra*.

186 F. Supp. 2d 595, 608 (D. Md. 2002)), *aff'd,* 703 F. App'x 211 (4th Cir. 2017). To resolve this question, the court must make an "an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). "[T]he date of an adverse employment decision is the relevant date for determining whether a plaintiff is a "qualified individual with a disability." *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000). According to the parties, the adverse employment decision occurred on September 9, 2013, and that date is therefore the relevant date for determining whether McCollin was disabled or had a record of disability for both the failure to accommodate and wrongful discharge claims.

The EEOC maintains that McCollin has an incompetent cervix and is therefore disabled. ECF 63-1 at 17-20. It also contends that she had a record of disability due to her prior miscarriages. *Id.* As noted, M&T claims that at the time of the termination, McCollin had neither a disability nor a record of disability. ECF 66-1 at 34-36.

Regardless of whether plaintiff was disabled when she was ready to return to work, it is clear that she had a record of disability. The EEOC acknowledges that "pregnancy itself is not an impairment within the meaning of the ADA." ECF 63-1 at 15. But, it contends, correctly, that "pregnancy-related impairments, including complications related to the reproductive system, fall squarely within its ambit." ECF 63-1 at 15 (citing 29 C.F.R. § 1630) (stating that a "pregnancy-related impairment that substantially limits a major life activity is a disability").

The EEOC's Enforcement Guidance ("Guidance" or "E.G.") states that "some impairments of the reproductive system may make a pregnancy more difficult and thus necessitate certain physical restrictions to enable a full term pregnancy . . . . Disorders of the uterus and cervix may

be causes of these complications." Enforcement Guidance: Pregnancy Discrimination and Related Issues (Pregnancy Guidance) (June 25, 2015), https://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm (citations omitted). Moreover, several courts have recognized that reproductive impairments are covered by the ADA. *See, e.g.*, *Spencer v. James Marine, Inc., et al.*, 617 F.3d 380, 398-99 (6th Cir. 2010) (deferring to EEOC's interpretive guidelines; finding that an incompetent cervix meets the pre-amended ADA definition of disability); *Soodman v. Wildman, Harrold, Allen & Dixon*, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997) (incompetent cervix causing danger of pre-term labor constitutes disability under ADA). Therefore, it is clear that an incompetent cervix constitutes a disability.

The EEOC established that McCollin had a record of cervical incompetence since at least 2008. *See* ECF 63-10 at 2-4 (medical records of McCollin); ECF 63-2 at 2-3 (McCollin Decl.); ECF 63-9 (Decl. of Dr. Murray Pearlman, plaintiff's physician). As indicated, McCollin suffered miscarriages in 1999, 2008, and 2010, and the miscarriages in 2008 and 2010 were attributed to cervical incompetence. *See* ECF 63-10 (medical records of McCollin); ECF 63-9, ¶¶ 4-6 (Pearlman Decl.).

Further, McCollin provided M&T Bank with adequate notice of her record of disability. It is undisputed that "[i]n November 2012, McCollin informed her manager, Anne Bartolotta, that she was pregnant, had had miscarriages in the past, and needed to have a procedure to carry the baby to term." ECF 66-1 at 14-15; *see* ECF 63-4 at 9 ("I told [Bartolotta] that I was pregnant. I had to get a procedure done so that I would be able to carry the baby full term. I told her about the previous losses that I had."); ECF 63-8 (Bartolotta Dep.) at 8 ("I remember the conversation [with

McCollin]. She was pregnant, and she told me that her doctor needed . . . to do something to enable her to carry the baby full term.  She told me she had lost some babies."); ECF 63-26 at 2 (e-mail from McCollin to Bartolotta, dated November 29, 2012).

Yet, M&T argues that McCollin had no record of disability because she failed to provide notice. ECF 66-1 at 35. Specifically, when McCollin requested leave, she did not provide defendant with actual medical records or a physician's declaration. ECF 66-1 at 35.  In support of its argument, M&T relies primarily on *Muench v. Alliant Foodservice, Inc.*, 205 F. Supp. 2d 498, 503 n.2 (D. Md. 2002).

In that case, the court decided at summary judgment that the plaintiff failed to establish a disability or a record of disability.  Plaintiff's medical records were the only evidence of a record of disability, but they failed to establish that plaintiff had a disability, let alone a record of one.  *Id.* In a footnote, the court stated that "those records were never disclosed to Alliant, so it cannot be charged with knowledge of this record of Plaintiff's disability."  *Id.*  In M&T's view, this sentence demonstrates that McCollin had to provide actual medical records to establish a record of disability. ECF 66-1 at 35.

But, this lone sentence cannot sustain the weight that M&T places on it. Indeed, M&T's argument—that an employee must document his or her actual medical condition in order to establish a record of disability—conflicts with the ADA's lax notification requirements.   In particular, 29 C.F.R. pt. 1630 app. § 1630.2(k) provides: "An individual may have a "record of" a substantially limiting impairment—and thus be protected under the "record of" prong of the statute—even if a covered entity does not specifically know about the relevant record."

- 22 -

Case law also supports the EEOC's position. In *Jacobs*, 780 F.3d at 575, at the summary judgment stage, the Fourth Circuit concluded that an employee's conversation with her supervisors about her disability constituted "affirmative evidence from which a reasonable jury could conclude" that the employer had knowledge of the employee's disability. The Court further explained: "'The employer need only know the underlying facts, not the legal significance of those facts.'" *Id.* (quoting *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)); *see James v. Oregon Sandblasting & Coating, Inc.*, No. 3:15-CV-01706-HZ, 2016 WL 7107227, at *6 (D. Or. Dec. 4, 2016) (concluding that where the employee had told "his supervisors and coworkers" about his disability "in an effort to obtain help," the "Plaintiff can establish an issue of fact as to whether he has a 'record of a disability'").

To be sure, M&T Bank could have asked McCollin to produce medical records or other documentation to establish her disability. In this regard, 29 C.F.R. pt. 1630 app. § 1630.9 states: "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." But, the Bank failed to do so. Therefore, M&T Bank cannot now contest the adequacy of McCollin's notice, on the ground that she failed to produce medical records that M&T never requested.

Further, the Bank contends that the EEOC must establish that the M&T relied on McCollin's record of disability when it failed to provide an accommodation. *See* ECF 72 at 10-11. Defendant rests its argument on *Miller v. Coca-Cola Refreshments USA, Inc.*, No. 2:16CV93, 2018 WL 1456502, at *16-17 (W.D. Pa. Mar. 23, 2018). In that case, on a motion for summary

judgment, the court concluded that the plaintiff's claims for failure to hire and wrongful discharge failed because he could not show that the employer relied on his record of disability "in failing to hire him . . . or in terminating his employment." *Id.* at *17.

But, to prevail on a claim for failure to accommodate, a plaintiff need not show that the employer relied on the record itself or acted with a discriminatory motive. The "denial of a 'reasonable accommodation' alone is discrimination." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 742 (D. Md. 1996); *see also* 42 U.S.C. § 12112(b)(5)(A) (listing "not making reasonable accommodations" as discrimination under the ADA). The Bank's efforts to impute elements from one form of discrimination into another are unavailing.

M&T also claims that, even if McCollin had such a record, she was not in need of an accommodation when she was ready to return to work. ECF 66-1 at 35-36. According to the Bank, "a plaintiff cannot make a failure to accommodate claim based on a record of disability without any current limitation in need of accommodation." ECF 72 at 13.

Section 1630.2(k)(3) of 29 C.F.R. provides (emphases added):

An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation *if needed* and *related to the past disability*. For example, an employee with an impairment that previously limited, but no longer substantially limits, a major life activity may need leave or a schedule change to permit him or her to attend follow-up or "monitoring" appointments with a health care provider.

McCollin took leave only because of her disability. And, while she was on leave, she was replaced; her position was filled. Accordingly, when she was ready to return to work, she lacked a position to which she could return, and needed a reassignment. That reassignment was necessary

because of the past disability. It is of no consequence that McCollin's impairment "no longer substantially limits[] a major life activity." 29 C.F.R. § 1630.2(k)(3).

The two cases M&T cites do not suggest otherwise. In the first case, *Rhodes v. Comcast Cable Communications Management, LLC*, GLR-14-1824, 2016 WL 4376653 (D. Md. Aug. 17, 2016), Rhodes took leave as a result of mental health problems. After she was released to return to work, Rhodes—unlike McCollin—was restored to her previous position. But, even though Rhodes was capable of performing the job, she refused to return to her previous position. Instead, she sought a second reasonable accommodation: reassignment to another position or paid relocation to another city. *Id*. at *9. Accordingly, at summary judgment, the court concluded that Rhodes was no longer disabled and therefore was not entitled to the reassignment or relocation.

In contrast, McCollin was not restored to her previous position. As a result of her disability, she, unlike Rhodes, had no position upon her return from leave and did not refuse the restoration of her previous position. Accordingly, her request for reassignment was both needed and the immediate result of her disability-induced leave.

The second case M&T cites, *Edwards v. BNSF Railway Company, Co.*, No. 15-CV-1217, 2015 WL 6690020, at *6 (C.D. Ill. Nov. 2, 2015), is plainly inapposite. There, Edwards had previously torn his meniscus, but had no current impairments that limited him in any major life activities. Nevertheless, Edwards requested that his employer waive a weight-loss requirement. Because defendant's requested accommodation was not needed for him to continue working, the court granted the employer's motion to dismiss for failure to state a claim. However, unlike

Edwards, McCollin no longer had a position with her employer. As a result of her record of disability, she had no job and needed a reassignment to continue working.

## 2. McCollin Was A Qualified Individual

A "qualified individual" is defined as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' . . . means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."); *see also Reyazuddin*, 789 F.3d at 414. However, "[w]hen an employee seeks reassignment as a reasonable accommodation for a disability, the relevant question when deciding whether she is a qualified individual is not whether the employee is qualified for her current position, but whether she is qualified for the new job." *E.E.O.C. v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016).

To determine whether an individual is qualified, the court "must decide (1) whether she could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether "'any reasonable accommodation by the employer would enable [her] to perform those functions."' *Tyndall v. Nat'l Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993)); *see Halpern*, 669 F.3d at 462. "The plaintiff 'bears the burden of demonstrating that [the complainant] could perform the essential functions of her job.'" *E.E.O.C. v. Womble*

*Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (quoting *Tyndall*, 31 F.3d at 213); *see Halpern*, 669 F.3d at 462.

Defendant concedes that McCollin met the minimum qualifications for Assistant Branch Manager at the Belvedere Branch. This position was available as early as July 25, 2013, when John Burke, Senior Employee Relations Specialist, emailed Michelle Denoncourt, the Belvedere Branch's manager, to see if she was interested in McCollin for that position. ECF 63-31 at 8. M&T acknowledged that McCollin, who had previously served as a branch manager, met the minimum qualifications for the Assistant Branch Manager position. ECF 63-32 at 3.[10] Nevertheless, McCollin was not offered a non-competitive reassignment to the position.[11]

### 3. Reassignment After Extended Leave Is A Reasonable Accommodation

M&T argues that when an employer cancels the position of an employee on extended leave, the employer is not obligated to provide an additional reasonable accommodation. In support of this position, M&T asserts that the ADA does not require an employer to provide extended leave as a reasonable accommodation.

---

[10] Defendant contends that the position was already offered to an outside applicant on August 28, 2013, the day before McCollin applied for the position. However, M&T considered plaintiff for the position over a month earlier, but did not make her an offer, even though she met the minimum qualifications.

[11] As even EEOC concedes, an employer need not reassign an employee if the employee is not qualified for any available positions or positions likely to become available in the near-term. However, the Court need not determine how long an employer must retain an employee to find a reassignment. When McCollin was ready to return to work on August 5, 2013, the Belevedere Assistant Branch Manager position was available. ECF 63-31 at 8; ECF 66-21 at 2.

In essence, the Board asks the Court to adopt the Seventh Circuit's per se rule that extended leave is not a "reasonable accommodation" under the ADA. ECF 66-1 at 37 (citing *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017)). But, there is good reason to doubt the soundness of *Severson*'s logic. *See Golden v. Indianapolis Hous. Agency*, 698 F. App'x 835, 837 (7th Cir. 2017) (Rovner, J., concurring) (describing *Severson* as "nonsensical"); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647-48 (1st Cir. 2000) (rejecting a per se rule that long-term leave cannot be a reasonable accommodation) (cited favorably by *Barnett*, 535 U.S. at 398).

Notably, *Severson*'s bright-line rule against extended leave conflicts with the Fourth Circuit's 2013 decision in *Wilson*, 717 F.3d 337. There, the Court concluded that "a leave request will not be unreasonable on its face so long as it (1) is for a limited, finite period of time; (2) consists of accrued paid leave or unpaid leave; and (3) is shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question." *Wilson*, 717 F.3d at 345 (citing *Halpern*, 669 F.3d at 465-66, and *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)); *see also Moore v. Md. Dep't of Pub. Safety & Corr. Servs. Patuxent Inst.*, CCB-11-0553, 2013 WL 549864, at *4 (D. Md. Feb. 13, 2013) ("Additional medical leave is a reasonable accommodation only where it is 'finite and will be reasonably likely to enable the employee to return to work.'") (quoting *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 596 (S.D.W. Va. 2008)).

McCollin's request for leave was reasonable under *Wilson* and granted by M&T. First, McCollin requested leave for a finite period. She told M&T that she would be ready to return to work after the birth of her baby in July 2013. ECF 63-2, ¶ 7; *see also Garcia-Ayala*, 212 F.3d at

648 ("Some employees, by the nature of their disability, are unable to provide an absolutely assured time for their return to employment, but that does not necessarily make a request for leave to a particular date indefinite. Each case must be scrutinized on its own facts. An unvarying requirement for definiteness again departs from the need for individual factual evaluation."). On June 19, 2013, McCollin told M&T that she would be released to return to work on August 5, 2013. ECF 63-31 at 2. By that point, she had not even used one of the two years of paid leave provided under M&T's policy.

Further, it is undisputed that leave was likely to enable McCollin "to perform the essential functions of the job in question" upon her return. *Wilson*, 717 F.3d at 345. In fact, as the Bank notes, McCollin was "released to return to work without restrictions." ECF 66-1 at 35.

An employer need not provide a reasonable accommodation if it poses an undue hardship on the employer. M&T had a generous paid leave policy. But, defendant does not claim that the leave created an undue hardship. Indeed, because McCollin took less leave than M&T allows under its own leave policy, it would be hard for M&T to claim a hardship. *See, e.g.*, *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998) (concluding that employer suffered no undue burden when the leaves it provided the plaintiff were "were less accommodating than company policy required, and the corresponding conditions . . . attached to the leaves of absence were more restrictive than company policy allowed"), *overruled on other grounds by New Hampshire v. Maine*, 532 U.S. 742 (2001).

Instead, M&T argues that even if it was required to provide leave, it need not provide an additional reasonable accommodation. As discussed, the EEOC cannot challenge the decision to

- 29 -

fill McCollin's position while she was on leave. Accordingly, the Court shall assume the validity of M&T's decision not to hold open McCollin's position. Nevertheless, the "duty to provide reasonable accommodation is a continuing one . . . and not exhausted by one effort." *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 171-72 (1st Cir. 1998); *see also McAlindin v. Cty. of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999) (same) (quoting *Criado v. IBM Corp.*, 145 F.3d 437, 445 (1st Cir. 1998)). Because the initial leave was a reasonable accommodation, M&T retained the obligation to provide another reasonable accommodation if one was available.

### 4. McCollin Was Entitled To Noncompetitive Reassignment

The parties vigorously dispute whether McCollin was entitled to a noncompetitive reassignment. The EEOC argues that the Bank violated the ADA by "forcing" McCollin "to compete for vacant positions for which she was qualified." ECF 63-1 at 18; *see id.* at 20. It posits: "Nothing in the statute or legislative history suggests that Congress intended that employees needing reassignment as a reasonable accommodation should be required to apply for and compete against other applicants, who, importantly, do not require such an accommodation. This is so because such a requirement simply cannot be viewed as an accommodation at all." *Id.* at 22.

M&T contends that the ADA does not require an employer to place an individual in a new position after she has been replaced while on an extended leave of absence. ECF 66-1 at 25, 37. Moreover, the Bank insists that the ADA certainly did not require it to give McCollin a position without competition. *Id.* In its view, non-competitive reassignment is not a reasonable accommodation under the ADA. *Id.*

The Bank urges the Court to follow *United States v. Woody*, 220 F. Supp. 3d 682, 688 (E.D. Va. 2016), and *E.E.O.C. v. Humiston-Keeling, Inc.*, 227 F.3d 1024, 1026 (7th Cir. 2000), *overruled by E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012). *See* ECF 66-1 at 36. In those cases, the courts concluded that "the employer must . . . consider the feasibility of assigning the worker to a different job in which his disability will not be an impediment to full performance, and if the reassignment is feasible and does not require the employer to turn away a superior applicant, the reassignment is mandatory." *Humiston-Keeling*, 227 F.3d at 1027; *see also Woody*, 220, F. Supp. 3d at 689-90. By contrast, if the disabled employee is not the best-qualified person for the position, reassignment is not a reasonable accommodation. In M&T's view, requiring reassignment without competition is tantamount to "affirmative action," which it believes is barred by the ADA. ECF 66-1 at 38.

### a. Deference

The EEOC claims that if the statute is ambiguous, the Court should defer to the EEOC's Enforcement Guidance interpreting EEOC regulations implementing the ADA. ECF 63-1 (citing *Jacobs*, 780 F.3d at 572-73 (deferring to the EEOC regulations interpreting the ADA) (citing *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 427 (4th Cir. 1999) (affording *Chevron* deference to the EEOC's interpretation of a Title VII provision expressly adopted by the ADA)); *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

If the E.G. is interpreting the ADA itself, the Guidance, "'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Meritor Sav. Bank, FSB v. Vinson*,

477 U.S. 57, 65 (1986) (quoting *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141-42 (1976)). That is, the EEOC's interpretation of the ADA in the Guidance is entitled to deference, depending on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Woody*, 220 F. Supp. 3d at 690 n. 7 (finding that the EEOC Guidance is entitled only to *Skidmore* deference). But, if the Guidance is interpreting the EEOC's regulations under the ADA, that interpretation may be entitled to greater deference. *See Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400 (2019) (discussing the *Auer* doctrine, under *Auer v. Robbins*, 519 U.S. 452 (1997)).

Ultimately, the proper level of deference afforded to the E.G. is of no consequence. I am persuaded by the EEOC's reading of the statute.

### b. Text

"As with any question of statutory interpretation, our analysis begins with the plain language" of the statute. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *accord In re Wright*, 826 F.3d 774, 779 (4th Cir. 2016). If the statutory language is unambiguous, " 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' " *Clark v. Absolute Collection Serv., Inc.*, 741 F.3d 487, 490 (4th Cir. 2014) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)).

"[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. ___, ___, 135 S. Ct. 2480, 2489 (2015) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 133 (2000)) (internal quotation marks omitted). Courts "'construe statutes, not isolated provisions.'" *Burwell*, 135 S. Ct. at 2489 (quoting *Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).

Pursuant to the ADA, no employer "shall discriminate against *a qualified individual on the basis of disability* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Failing to provide a reasonable accommodation is one form of discrimination. *Id.* § 12112(b)(5)(A).

Under the statute, a reasonable accommodation "may include . . . job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* § 12111(9) (emphasis added). Therefore, under the ADA's plain meaning, when there is a "vacant position" and a disabled employee is "qualified" for that position, reassignment is a "reasonable accommodation" in the general run of cases. *See Barnett*, 535 U.S. at 403 ("We also assume that normally such a request [for reassignment] would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system.").

Although M&T asserts that reassignment is required only if the employee is the *most* qualified, the plain text requires only that the employee be "qualified." As the Tenth Circuit recognized, "Anything more, such as requiring the reassigned employee to be the best qualified

employee for the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history." *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1169 (10th Cir. 1999). Indeed, limiting reassignment to the best qualified employee is tantamount to allowing a disabled employee merely to compete for another position. But, an "employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been 'reassigned'; the core word 'assign' implies some active effort on the part of the employer." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 (D.C. Cir. 1998); *see also Midland Brake*, 180 F.3d at 1165.

M&T "seeks to single out one listed reasonable accommodation—reassignment to a vacant position—and denigrate it to second-class status." *Midland Brake*, 180 F.3d at 1168 n.6. An employer cannot "escape its duty to offer the other enumerated reasonable accommodations to keep a disabled employee in his or her existing job by the same expedient of finding a more qualified person to fulfill that job." *Id.* For example, if a disabled employee seeks a "modified work schedule" or a "modification of equipment" as a reasonable accommodation, the employer cannot "find a more qualified employee to fill the job, and then assert that it was thereby absolved of its obligation to offer a reasonable accommodation to the disabled employee." *Id.* I see no textual basis for treating reassignment different from other reasonable accommodations.

Further, M&T maintains that the ADA provides merely that "'reasonable accommodations' '*may* include' . . . 'reassignment to a vacant position[,]'" not that they "shall include" reassignment. *Woody*, 220 F. Supp. 3d at 688 (quoting 42 U.S.C. § 12111(9)) (emphasis added). ECF 66-1 at 39. As a result, in its view, the text does not require reassignment to be

"'always mandatory.'" *Id.* at 690. Rather, reassignment is required only if "reasonable," that is, if the employee is the most qualified person.

But, M&T misunderstands § 121119(9). "The words 'may include' precede the nonexclusive list of examples of reasonable accommodation precisely because the list is nonexclusive and various accommodations may or may not be appropriate depending upon the disability and other circumstances of employment." *Midland Brake*, 180 F.3d at 1168 n. 7. The words simply indicate that a court must perform an individualized analysis. H.R. REP. NO. 101-485, pt. 2, at 62 (1990), 1990 WL 125563 ("[T]he list is not meant to suggest that employers must follow all of the actions listed in each particular case. Rather, the decision as to what reasonable accommodation is appropriate is one which must be determined based on the particular facts of the individual case.").

Congress's use of the words "may include" is not an invitation to rewrite the "statutory phrase 'qualified individual with a disability' to read, instead, 'best qualified individual, notwithstanding the disability." *Midland Brake*, 180 F.3d at 1168. Nor is it an opportunity to smuggle a "best qualified" standard into the word "reasonable." *Id.*

### c. Purpose And Legislative History

The ADA's statutory purposes and legislative history support the straightforward conclusion that, under the circumstance here, the ADA requires reassignment without competition. In the "Findings and Purposes" section of the ADA, Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]" 42 U.S.C.

§ 12101(a)(7). Further, Congress found that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis[.]" *Id.* § 12101(a)(8). "Thus, the ADA has multiple objectives, and by defining discrimination as it did to include the failure to offer reasonable accommodations, one of Congress' objectives was to facilitate economic independence for otherwise qualified disabled individuals." *Midland Brake*, 180 F.3d at 1168.

The Supreme Court has recognized that these objectives "will sometimes require affirmative conduct," like reassignment, "to promote entry of disabled people into the work force." *Barnett*, 535 U.S. at 401. The Supreme Court explained in *Barnett*, 535 U.S. at 397 (formatting modified):

> [T]he Act specifies . . . that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective.

Reassignment without competition is needed for McCollin and other qualified individuals "with disabilities to obtain the *same workplace opportunities* that those without disabilities automatically enjoy." *Barnett*, 535 U.S. at 397 (emphasis added). Without reassignment, such employees would be terminated. By contrast, applicants and other employees without disabilities can remain employed in their current positions.

The ADA's legislative history provides additional support for the view that reassignment without competition is a reasonable accommodation. The House Report for the ADA states, H.R. REP. NO. 101-485, pt. 2, at 63 (1990), 1990 WL 125563:

> Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker. Efforts should be made, however, to accommodate an employee in the position that he or she was hired to fill before reassignment is considered. The Committee also wishes to make clear the reassignment need only be to a vacant position—"bumping" another employee out of a position to create a vacancy is not required.

See also S. REP. NO. 101-116 at 6 (1989). "Had Congress intended that disabled employees be treated exactly like other job applicants, there would have been no need for the report to go on to explain that '"bumping" another employee out of a position to create a vacancy is not required[.]'" Aka, 156 F.3d at 1304 (quoting H.R. REP. NO. 101-485, pt. 2, at 63).

The Bank counters that the legislative history expressly protected the employer's ability "to select *applicants* for reasons unrelated to the existence or consequence of a disability." H.R. REP. NO. 101-485, pt. 2, at 63 (emphasis added). Further, the House Report clarified that "the employer has no obligation under this legislation to prefer *applicants* with disabilities over other applicants on the basis of disability." *Id.* at 55-56 (emphasis added).

But, M&T misplaces its reliance on the legislative history's discussion of applicants, setting aside its discussion of employees like McCollin. *See Aka*, 156 F.3d at 1304 (citing H.R. REP. NO. 101-485, pt. 2, at 56) ("Although the ADA's legislative history does warn against 'preferences' for disabled applicants, it also makes clear that reasonable accommodations for

existing employees who become disabled on the job do not fall within that ban."); *see also Midland Brake, Inc.*, 180 F.3d at 1168 ("However, the legislative history clearly distinguishes between the affirmative action of modifying the essential functions of a job (which is not required) and the duty to reassign a disabled person to an existing vacant job, if necessary to enable the disabled person to keep his or her employment with the company (which is required).").

Indeed, reassignment to a vacant position, by definition, is available only to an employee, not to an applicant. And, unlike a disabled applicant, a disabled employee who needs a reassignment will necessarily lose her job without one. *See* H.R. REP. NO. 101-485, pt. 2, at 56 ("If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker.").[12]

Further, in *Woody*, 220 F. Supp. 3d at 688, the court invoked the "No Elephants in Mouseholes" canon to support the claim that reassignment without competition is unreasonable. The Supreme Court has recognized that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Under this theory, the purpose of the ADA is to provide equal opportunity, not "affirmative action," to

_____

[12] As previously noted, McCollin was an M&T employee, not an applicant, until she was terminated in September 2013. *See* ECF 70-2 at 3 ("An individual on [long-term disability] may remain an employee of the bank for up to 24 months from his or her first day of disability. . . . During this period, the employee is considered an 'inactive' employee of M&T."). Therefore, she was entitled to the same protections under the ADA as any other employee.

individuals with disabilities. Consequently, Congress would not have "created an affirmative action regime for the disabled" by requiring reassignment without competition in the definitions section of the ADA. *Woody*, 220 F. Supp. 3d at 688-89.

But, there are no elephants here. As discussed, the "*Barnett* Court rejected this anti-preference interpretation of the ADA, noting that this argument 'fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal.'" *United Airlines, Inc.*, 693 F.3d at 763 (quoting *Barnett*, 535 U.S. at 397). Indeed, reassignment without competition is consistent with the Supreme Court's reading of the ADA. *Barnett*, 535 U.S. at 397.

Even if reassignment without competition were at odds with the ADA's statement of purposes, reassignment without competition still would "not alter the fundamental details" of the statute. *Whitman*, 531 U.S. at 468. Indeed, it would not threaten the viability or functioning of the remainder of the ADA. *Compare Burwell*, 135 S. Ct. at 2495 (rejecting the view that "Congress made *the viability of the entire* Affordable Care Act turn on the ultimate ancillary provision: a sub-sub-sub section of the Tax Code") (emphasis added). Although Congress may enact a statute to further a specific objective, it does not follow that every provision within the statute will be consistent with that goal. One remedial provision conflicting with one purpose of the statute would not necessarily justify setting aside the plain text.

Nor are there any mouseholes. I cannot imagine a more obvious place for Congress to have defined the meaning of "reasonable accommodation" than in the definitions section of Title I. Although a definitions section may be a backwater of irrelevant minutiae in some statutes, that is

not the case for the ADA.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (dedicated almost entirely to correcting definitions in the ADA).  Indeed, after reviewing the "Findings and Purposes" section of the ADA, the reader need only turn the page to read the Definitions section.  *See* 104 Stat. 328-29 (Findings and Purposes), 330-31 (Definitions Section of Title I).

### d.  *US Airways, Inc. v. Barnett*

The Supreme Court's 2002 decision in *Barnett*, 535 U.S. 391, supports the EEOC's claim that reassignment without competition is generally a reasonable accommodation.  There, the Court considered whether the ADA required US Airways to reassign a disabled employee, despite the company's established seniority system.

The Supreme Court recognized that reassignment without competition is generally a reasonable accommodation. *Barnett*, 535 U.S. at 403; *see also United Airlines*, 693 F.3d at 764. Citing the definition of "reasonable accommodation," the *Barnett* Court "assume[d] that normally such a request [for mandatory reassignment] would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system." *Barnett*, 535 U.S. at 403; *see id.* ("'[R]easonable accommodation' may include 'reassignment to a vacant position.'") (quoting 42 U.S.C. § 12111(9)); *see also United Airlines*, 693 F.3d at 764 ("The Supreme Court has found that accommodation through appointment to a vacant position is reasonable. Absent a showing of undue hardship, an employer must implement such a reassignment policy.").

The *Barnett* Court recognized that the presence of "neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability" does not "create an automatic exemption" from the need to provide reasonable accommodation. *Barnett*, 535 U.S. at 398. However, the Court distinguished seniority systems from other "neutral rules" maintained by an employer. It concluded that it would ordinarily be unreasonable to require an employer with a seniority system to reassign a disabled employee. *Id.* at 403. The Court explained that the "typical seniority system provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment." *Id.* at 404. These benefits include "job security and an opportunity for steady and predictable advancement based on objective standards." *Id.* (internal quotation omitted). Seniority systems also "encourage employees to invest in the employing company, accepting less than their value to the firm early in their careers in return for greater benefits in later years." *Id.* (internal citation omitted). "Most important," the Court recognized that the typical seniority system depends upon "the employees' expectations of consistent, uniform treatment." *Id.* Requiring reassignment for employers with a seniority system might undermine those expectations.

Unlike a seniority system, a best-qualified candidate policy provides no guarantee of steady and predictable advancement. Indeed, by its very nature, a best-qualified employee policy undermines predictability, as employees cannot know the pool of applicants against whom they will compete. Furthermore, whereas a seniority system relies on objective rules, a "best-qualified" policy often turns on subjective determinations. And, "the violation of a best-qualified selection policy does not involve the property-rights and administrative concerns (and resulting burdens)

presented by the violation of a seniority policy." *United Airlines*, 693 F.3d at 764. Accordingly, the benefits of best-qualified candidate policies do not turn on the promise of "steady and predictable advancement based on objective standards," nor on "the employees' expectations of consistent, uniform treatment." *Barnett*, 535 U.S. at 404.

Moreover, as the Seventh Circuit has recognized, equating a best-qualified selection policy with a seniority system would "so enlarge[] the narrow, fact-specific exception set out in *Barnett* as to swallow the rule." *United Airlines*, 693 F.3d at 764 (highlighting "the relative rarity of seniority systems and the distinct challenges of mandating reassignment in a system where employees are already entitled to particular positions based on years of employment").

Nevertheless, M&T maintains that reassignment in violation of an employer's best-qualified hiring policy is generally unreasonable. *See* ECF 66-1 at 41. M&T relies primarily on the Eleventh Circuit's decision in *St. Joseph's Hosp., Inc.*, 842 F.3d at 1346. There, the court stated:

> As things generally run, employers operate their businesses for profit, which requires efficiency and good performance. Passing over the best-qualified job applicants in favor of less-qualified ones is not a reasonable way to promote efficiency or good performance. In the case of hospitals, which is this case, the well-being and even the lives of patients can depend on having the best-qualified personnel. Undermining a hospital's best-qualified hiring or transfer policy imposes substantial costs on the hospital and potentially on patients.

However, in *Barnett*, 535 U.S. at 400, the Supreme Court explained that "an ordinary English meaning of the term 'reasonable accommodation' [does not] make of it a simple, redundant mirror image of the term 'undue hardship.'" Reasonableness is focused not on the employer's profitability, but on the effects of an accommodation on employees. *See* 42 U.S.C.

§ 12111(10)(A) (defining "undue hardship as "an action requiring significant difficulty or expense").  The Supreme Court explained that "a demand for an effective accommodation could prove unreasonable because of its impact, *not on business operations, but on fellow employees*— say, because it will lead to dismissals, relocations, or modification of employee benefits to which an employer, looking at the matter from the perspective of the business itself, may be relatively indifferent."  *Barnett*, 535 U.S. at 400-01 (emphasis added). But, these adverse effects on other employees do not apply when there is a best qualified employee policy.

Of import here, the Bank does not claim an undue hardship.  Moreover, M&T does not maintain a true best qualified employee policy.  Notably, "if an employee returns to work within 90 days of when the manager's replacement request is made, M&T will place that employee in a job without competition." ECF 66-1 at 27.  Thus, the best qualified policy comes into play only for an employee, such as plaintiff, whose disability necessitated an extended leave.

### 5.    Policy

M&T maintains that its Redeployment Policy went beyond what it was required to do. ECF 66-1 at 42-43. Specifically, M&T provided McCollin with paid leave after she exhausted her FMLA leave and after it terminated her position. *Id.* In addition, it facilitated her applications for vacant positions. *Id.* at 43. As a result, it maintains that it should not be punished for providing more than the law requires. *Id.*  The Bank posits that if courts punish employees when they do so, "employers would be better off terminating an employee's employment when business needs dictate replacement of an employee without giving the employee an equal-footing opportunity to return to work." *Id.*

The Bank's argument is entirely unpersuasive. First, although McCollin exhausted her FMLA leave, an employer's obligation to provide a reasonable accommodation under the ADA is distinct from its obligation under the FMLA. The fact that an employee exhausts her FMLA leave does not relieve her employer from providing a reasonable accommodation. Second, McCollin was legally entitled to the paid leave she took under M&T's Redeployment Policy. In fact, she was entitled to an additional 16 months of leave that she did not ultimately use. *Cf. Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (employee taking leave of less than the one-year of leave provided in company's benefits policy weighed against a finding of undue burden). Moreover, even without defendant's Redeployment Policy, McCollin may have been entitled to leave (albeit unpaid) under the ADA. It is unclear how M&T would be "punished" for maintaining its disability policy.

Further, providing a generous leave policy does not eliminate the defendant's obligation to comply with the ADA. Indeed, I see no support for M&T's argument in the two cases it cites. In both cases, an employer "ben[t] over backwards" and undertook "extraordinary measures" to accommodate a disabled worker. *E.E.O.C. v. Newport News Shipbuilding & Drydock Co.*, 949 F. Supp. 403, 408 (E.D. Va. 1996); *Delgado v. Sears Holdings Corp.*, No. 06 CV 6218, 2008 WL 4866619, at *9 (N.D. Ill. June 5, 2008). As a result, in each case, the court concluded only that the employer more than satisfied its obligations under the ADA and dismissed the failure to accommodate claim. The district courts did not conclude that the employers' robust benefit package or leave policy entitled the employer to a more relaxed standard of review under the ADA. Moreover, unlike those employers, M&T did not "bend[] over backwards" or undertake

"extraordinary measures" for McCollin. At most, it provided her with the leave and redeployment to which she was entitled pursuant to the terms of her employment.

The EEOC has established that reassignment "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett*, 535 U.S. at 401. Defendant has not shown any "special" or "case-specific[] circumstances" demonstrating undue hardship. *Id.* Accordingly, plaintiff is entitled to summary judgment on her reasonable accommodation claim.

## C. Unlawful Discharge

To establish a prime facie claim of wrongful discharge, the plaintiff is generally required to show that (1) the employee is a qualified individual with a disability; (2) the employee was discharged; (3) at the time of discharge, the employee was performing the job at a level that met the employer's legitimate expectations; and (4) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)); *see also Summers*, 740 F.3d at 328; *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995).[13]

---

[13] In some Fourth Circuit cases, the prima facie case under the ADA has been formulated as follows: "(1) [Plaintiff] 'was a qualified individual with a disability'; (2) he 'was discharged'; (3) he 'was fulfilling h[is] employer's legitimate expectations at the time of discharge'; and (4) 'the circumstances of h[is] discharge raise a reasonable inference of unlawful discrimination.'" *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (citation omitted). This formulation is consistent with *Gecewicz v. Henry Ford Macon's Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). However, the *Gecewicz* formulation expands the fourth element into separate (and more specific) fourth and fifth elements, so as to specify *how* "'the circumstances of [plaintiff's]

When alleging wrongful discharge, the plaintiff bears the burden of proving her claim by a preponderance of the evidence. In general, there are "two avenues of proof" at trial by which a plaintiff may prove intentional employment discrimination. *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). At summary judgment, these two avenues merely inform a court's evaluation of the evidence. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp.* . . . ."); *see also Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

The first avenue of proof is to offer "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*, 257 F.3d at 391; *see Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996)

---

discharge raise a reasonable inference of unlawful discrimination,'" *id.*, which is helpful to a court that must apply the standard.

Other circuits have provided a different formulation of the prima facie case under the ADA: "A prima facie case of disability discrimination under the ADA requires that the Employee (1) be a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 985 (10th Cir. 2012); *see, e.g.*, *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012).

(citation omitted), *cert. denied*, 520 U.S. 1116 (1997). A plaintiff who "demonstrates that his or her disability played a motivating role in the employment decision" is "entitled to relief." *Baird v. Rose*, 192 F.3d 462, 470 (4th Cir.1999). "'What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Rhoads*, 257 F.3d at 391-92 (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999)) (internal citation omitted).

The second avenue of proof available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the three steps of the *McDonnell Douglas* framework).[14] Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

In this case, plaintiff asserts that defendant terminated McCollin's employment because of "her alleged failure to return from her disability-related leave." ECF 63-1 at 34. Defendant was on leave solely due to her disability and would not have been fired if she had not taken leave. As

---

[14] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII. However, the burden-shifting methodology it endorsed has been adapted for use in cases of alleged discrimination in other statutory contexts. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in ADA employment discrimination case); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying *McDonnell Douglas* framework to employee's claim of age discrimination under ADEA). *But see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 n.2 (2009) (observing that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context").

a result, the EEOC asserts that M&T terminated her because of her disability. *Id.* The EEOC has provided direct evidence that McCollin would not have been terminated but for her disability. That is, it has shown a causal relationship between her disability and termination. However, it has not provided direct evidence of discriminatory intent, such as "'conduct or statements that . . . reflect directly the alleged discriminatory attitude[.]'" *Rhoads*, 257 F.3d at 391-92 (quoting *Brinkley*, 180 F.3d at 607).

Accordingly, the focus shifts to the *McDonnell Douglas* approach. The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). It establishes three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant. However, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). And, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.

If the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Adams v. Trs. of Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

On the other hand, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at

510 n. 3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

However, the relevance of the prima facie case under *McDonnell Douglas* at the summary judgment stage is limited. The Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). The Court has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*,'" and that, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination." *Merritt*, 601 F.3d at 294-95 (citation omitted).

On several occasions where the employer proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See, e.g.*, *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009);

*Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

The Court of Appeals for the District of Columbia Circuit has bluntly stated that, in considering an employer's motion for summary judgment, "the prima facie case is a largely unnecessary sideshow" in the vast majority of cases, and that "judicial inquiry into the prima facie case is usually misplaced." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). Writing for that court, then-Judge Kavanaugh explained, *id.* (emphasis in original):

> [B]y the time the district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker. That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is "no longer relevant" and thus "disappear[s]" and "drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).
>
> \* \* \*
>
> Lest there be any lingering uncertainty, we state the rule clearly: In a [discrimination] suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected classification]?

In this case, in addition to arguing that plaintiff has not established a prima facie case under the *McDonnell Douglas* standard, M&T has offered evidence of a legitimate, performance-based reason for the termination. M&T has "carrie[d] [its] burden of production" as to the second stage of the *McDonnell Douglas* burden-shifting scheme, and so "the presumption raised by the prima

facie case," if any, has been "rebutted." *Burdine*, 450 U.S. at 255. Put another way, M&T "has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

Therefore, I shall assume, *arguendo*, that the EEOC established a prima facie case under the first step of the *McDonnell Douglas* scheme. The evidence demonstrates that the Bank has satisfied its burden of production under the second step. So, the focus shifts to the third step under *McDonnell Douglas*: plaintiff must present evidence or argument from which a factfinder could conclude that defendant's proffered legitimate reason for McCollin's termination was pretextual, and that unlawful discrimination was the true reason. *See, e.g.*, *Adams*, 640 F.3d at 560. To do so, EEOC must prove "both that the reason was false, and that discrimination was the real reason." *Jiminez*, 57 F.3d at 378 (internal citation omitted).

"[T]he plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be material." *Holland*, 487 F.3d at 216 (internal quotations omitted). Rather, to show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256), and that discrimination was the true reason for the adverse employment action. *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason") (emphasis in *Hicks*); *accord Adams*,

640 F.3d at 560.

When the question at issue is whether the "'decision maker'" acted with discriminatory animus, only the "'perception of the decision maker'" is "'relevant'" to the question. *Hux*, 451 F.3d at 319 (citation omitted). Indeed, employment discrimination statutes do "not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003) (discussing Title VII). In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (brackets omitted) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)). In short, an employment discrimination claim "is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette*, 133 F.3d at 298-99 (citation omitted).

As outlined earlier, once an employer has proffered a non-discriminatory reason for its employment decision, the burden of production shifts back to the plaintiff to establish that the proffered reason was a pretext. The plaintiff may do so by presenting evidence that directly contradicts the employer's proffered justification, "or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). At that juncture, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may

permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

For example, a plaintiff can prove pretext by showing "that her qualifications were so plainly superior that the employer could not have preferred another candidate." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002). But, it "is not enough for plaintiff to show that her job qualifications are 'slightly superior'"; the plaintiff must make a "'strong showing'" that she is "'demonstrably'" or "'discernibly'" better. *Buckner v. Lew*, No. 5:13-CV-199-FL, 2015 WL 5725760, at *6 (E.D.N.C. Sept. 30, 2015) (quoting *Heiko*, 434 F.3d at 249), *aff'd* 668 F. App'x 487 (4th Cir. 2016). To make this showing, the employee "must compete for the promotion based on the qualifications established by her employer." *Anderson*, 406 F.3d at 269; *see Heiko*, 434 F.3d at 259 ("[W]e assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question.").

For example, in *Anderson*, 406 F.3d at 269, the Fourth Circuit concluded that plaintiff's superior resume and education failed to establish her superiority over other applicants where the employer's decision was based on a different set of criteria. By comparison, in *Heiko*, 434 F.3d at 260-61, the plaintiff showed not only that his qualifications were discernably better, but also that he had to train the selected individual because she lacked many of the required qualifications that he possessed.

A plaintiff may not rely solely "on his [or her] 'own assertions of discrimination'" to persuade a trier of fact. *Adam*, 640 F.3d at 560 (citation omitted). When a plaintiff fails "to present any other evidence—beyond baseless speculation—that [the employer's] stated reason was

pretextual, [the] trier of fact 'would be hard-pressed to conclude that [the plaintiff] established pretext.'" *Holland*, 487 F.3d at 217. And, when a plaintiff has presented nothing sufficient to raise a material issue of fact to place before the fact finder, her claim will not survive a motion for summary judgment.

To be sure, the Supreme Court has said that a "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 511. Thus, "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, '[n]o additional proof of discrimination is *required* . . . .'" *Id.* (emphasis in *St. Mary's Honor Center*) (citation omitted). Accordingly, if a plaintiff presents evidence or legitimate argument that could persuade a rational fact finder to disbelieve the defendant's justification for its employment decision, summary judgment in favor of the employer is not appropriate.

The EEOC asserts that defendant's failure to reassign McCollin occurred under circumstances that support an inference of intentional discrimination.[15] But these circumstances, considered separately or together, do not support a finding of pretext.

---

[15] The EEOC also appears to argue that the Court can infer intentional discrimination just from M&T's failure to reassign McCollin. ECF 70 at 17. In some cases, an employer's failure to provide a reasonable accommodation could create such an inference. But this is not such a case. M&T's decision not to provide this accommodation does not in and of itself support an inference of discriminatory intent.

## 1. Failure To Hold Open McCollin's Position

The EEOC contends that M&T has not provided evidence that "business and staffing requirements" rendered it unable to hold open McCollin's job. ECF 70 at 18.

When an employee is on leave, M&T holds open the position for a minimum of 16 weeks, which is four weeks more than the FMLA requires. ECF 72-3 at 8:11-15; ECF 66-3 at 15; *see* 29 U.S.C. § 2612(a)(1). During that 16-week period, M&T relied on two Ingleside Branch Managers— Darlene Scarborough and Myisha White—to cover for McCollin at the Edmonson Branch. ECF 72-3 at 6: 15-19; *see also* ECF 66-6 at 37:4-19. After 16 weeks, Bartolotta decided to replace McCollin. *Id.* at 9:7. Bartolotta testified that she replaced McCollin because McCollin's position, branch manager, was "critical." *Id.* at 9:24-25. Further, relying on Scarborough and White to cover the Edmonson Branch "was detrimental to the Ingleside branch and to [the two managers] both personally and financially, and it couldn't continue indefinitely." *Id.* at 9:25 – 10:4.[16]

The EEOC dismisses Bartolotta's testimony as "tantamount to mere speculation" because it contains "no foundation for her belief[.]" ECF 70 at 19. However, as the regional manager of these stores and 16 others, Bartolotta was well situated to evaluate the importance of McCollin's position and the impact of her absence on the Ingleside Branch. Indeed, the EEOC presents no evidence to the contrary.

---

[16] The EEOC maintains that Bartolotta's testimony "concerning what the branch managers offering support allegedly told her" is inadmissible hearsay. ECF 70 at 19. However, the statements were not offered for their truth; Bartolotta was characterizing the impact of McCollin's absence on the managers and the Bank. *See* Fed. R. Evid. 801(c).

The EEOC also contends that Kandee Smith, a float staff member, had previously "provided coverage for branches without branch managers, including branches with managers on extended leaves of absence." ECF 63-15, ¶ 3. She "covered" Edmonson Branch in 2012 for several months during the absence of the previous branch manager, Duanne Carr. *Id.* ¶ 4. In early 2013, when McCollin was on leave, M&T asked her again to cover Edmonson. *Id.* ¶ 5. She left when McCollin's replacement was hired in May 2013. *Id.* In response, M&T contends that float staff, like Smith, could not perform all of the duties of a branch manager. ECF 66-1 at 16; ECF 66-19.

This dispute is immaterial. Perhaps M&T could have made greater use of temporary substitutes to fill McCollin's position. But, its decision not to use these substitutes does not imply that McCollin's absence did not adversely affect M&T. Nor does it imply that M&T was acting out of discriminatory animus. After all, it is hardly surprising that an employer would not want to use temporary substitutes to fill a critical position for an extra eleven weeks. *See* ECF 70 at 18.

## 1. Deviation From The Non-Competitive Reassignment Policy

The EEOC maintains that M&T deviated from its non-competitive reassignment policy by failing to reassign McCollin to a vacant position in compliance with its Replacement Process. ECF 70 at 21. It asserts that under M&T's Replacement Process an employee is entitled to non-competitive reassignment if she returns to work within 90 days of her manager submitting a Replacement Request Form. ECF 70 at 21. In the EEOC's view, a manager informally requesting a replacement is not enough to trigger the 90-day window. *Id.* Therefore, because there is no indication of if or when McCollin's manager completed the Replacement Request Form, the EEOC avers that McCollin was entitled to a non-competitive reassignment. *Id.*

M&T disputes the EEOC's characterization of the Replacement Process. It maintains that the relevant period is 90 days after the manager makes a replacement request, not the completion of the paperwork. ECF 72 at 22. It also claims that the EEOC misconstrues the Replacement Request Form. That form provided, ECF 64-4 at 3 (original emphasis):

> Should this employee be medically released [to] return to work *after* the replacement process has been completed, we will begin the interactive process to identify an alternate M&T Bank position. Please describe below those comparable positions in your division / department in which this employee will be placed, if he / she is released within the next ninety (90) days[.]

It is unclear from the Form whether the "next ninety (90) days" are measured from "*after* the replacement process has been completed" or after the completion of the Replacement Request Form. *Id.* However, M&T's Corporate Programs Manager, Melissa Thompson, who oversaw the replacement process, clarified its meaning. Counsel for EEOC asked her: "And when we talk about within the 90 days, are we talking about from the date that [the employees are] notified that they need to return to work or their position would be replaced?" ECF 70-14 at 5: 8-11. She replied: "No, it's 90 days from the date that the manager executes the document." That is, it is measured from the date that the form is "complete[d], submit[ted], and sign[ed]." *Id.* at 5:12-15.

Thompson testified that she did not "know whether a replacement form was ever submitted in connection with replacing Ms. McCollin's job[.]" *Id.* at 5:19-21. Although Bartolotta did not recall whether she executed a Replacement Request Form, she explained that "[t]here would have to be a requisition done" in order to replace McCollin. ECF 66-14 at 19: 3-5. She later described another email as "the type of email that I would have gotten when I had an approval for a requisition." *Id.* at 21: 20-22.

M&T has not presented a copy of the completed, submitted, and signed Replacement Request Form. Nevertheless, on April 4, 2013, M&T sent McCollin a letter notifying her that her position had been filled. ECF 66-5 at 2. In so doing, M&T put McCollin on notice that the 90-day period had commenced. One hundred and nine days later, on July 22, 2013, McCollin faxed a Return to Work form to Burke. *Id.* at 12-13; ECF 66-21 at 2.

The alleged failure of Bartolotta to file the Replacement Request Form in a timely manner does not create evidence of pretext. Although M&T may have deviated from the letter of its policy, it certainly complied with its spirit by notifying McCollin that she would be replaced. The alleged failure of an M&T employee to file the proper paperwork perhaps an inference of carelessness, not pretext or discriminatory intent.

### 2. Failure To Give McCollin Preferred Consideration

As a "workforce restructure" applicant, McCollin was entitled to "preferred consideration" under M&T's Redeployment Policy. "Preferred consideration" means that a recruiter reviews the employee's application first and typically will interview the employee if she meets the minimum qualifications for the job. ECF 66-12 at 7: 6-10. However, according to M&T recruiter Angela Skowronski, if an internal employee "interview[s] multiple times or has come back and received negative interview feedback more than once," the recruiter may or may not "move that candidate forward again . . . depending on the interview feedback as well." ECF 66-11 at 15:7-14.

Plaintiff asserts that M&T did not provide McCollin with preferred consideration. ECF 70 at 23-24. Specifically, M&T declined to interview her for at least two positions because of "non-favorable" interview notes in her application profile. ECF 66-24 at 4-5; ECF 66-11 at 27:24 – 28:9.

Plaintiff argues that these notes are unduly subjective and illegitimate. ECF 70 at 23. Further, the EEOC contrasts M&T's decision not to advance McCollin with its decision to advance another employee, Daryl Blackwell, even though he also received "'non-favorable'" interview notes. *Id.* In response, M&T defends its policy and maintains that the EEOC cannot establish that Blackwell had "'non-favorable'" interview notes. ECF 72 at 23-24.

Even if M&T's use of interview notes is discretionary, that does not in and of itself create an inference of pretext or discriminatory intent. *Cf. Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons."). Moreover, the EEOC misplaced its reliance on M&T's advancement of Blackwell. When M&T advanced him for two interviews on July 1, 2013, he did not have "non-favorable" interview notes. ECF 63-20 at 17-21. Those notes were not entered until July 8 and July 23, 2013. *Id.*

### 3.      Failure To Hire

M&T maintains that it did not offer McCollin a new position because she was not the best qualified applicant for the positions for which she had applied. *See generally* ECF 66-1; ECF 72. In response, the EEOC maintains that M&T hired less qualified applicants in place of McCollin. ECF 70 at 26-37.

McCollin applied for seven positions before she was terminated on September 9, 2013.[17]

_____

[17] Although McCollin expressed interest in the Ingleside Branch Manager position, she never applied for the position. ECF 70-39 at 2.

ECF 63-34. M&T cancelled two of those positions: Highlandtown Branch Manager, and Work Specialist for the Harford Road Branch. ECF 66-20 at 14 (cancelling Highlandtown Branch Manager position); *id.* at 31 (canceling Harford position). The day before McCollin applied for the position of Belvedere Assistant Branch Manager, M&T offered the position to another applicant who accepted the position. ECF 66-24 at 3.

McCollin applied for the Brooklyn Park Shoppers Branch Manager on August 16, 2013, and was interviewed on September 13, 2013, by hiring manager Jim Henstrand. ECF 66-20 at 6. Henstrand stated that he would not recommend hiring McCollin for the position, ECF 66-20 at 40:

1. She showed very little energy or excitement about the position.
2. No observation coaching examples were able to be given
3. Likes more of the operational side than sales
4. Seemed like she just wanted a "job" not a career. Did not know much about the Brooklyn market.

The EEOC contends, without foundation, that these reasons are pretextual. ECF 70 at 32-33. Regardless, Henstrand's reasons for not recommending McCollin's hire are immaterial, as M&T decided to close the branch and never filled the position. ECF 66-23 at 10. Pivoting, EEOC argues that M&T should have hired McCollin to shut down the branch because of her experience closing down Mondawmin Mall. ECF 70 at 33-34. M&T instead reassigned Jackie Jackson, a branch manager, to a "temporary assignment" to assist in closing the store. ECF 66-15 at 9:11-12. According to Jackson, she was known at that time as the "branch closer." *Id.* at 9:13-14. But, the EEOC does not contend that McCollin was "demonstrably" more qualified than Jackson. *Heiko*, 434 F.3d at 249. Accordingly, there is no evidence of pretext.

As discussed below, M&T avers that McCollin was not interviewed for Highlandtown

Assistant Branch Manager due to an administrative error. *See* ECF 72 at 23. The position was ultimately offered to another candidate who had a bachelor's degree, five years of managerial experience, seven years of sales experience, and life and health insurance licenses. ECF 66-25 at 14:1-20. The candidate also received favorable interview feedback. *Id.* at 14:21-15:12. Even if McCollin were "slightly superior" to the hired candidate, the EEOC has not shown that McCollin was "demonstrably" better. *Heiko*, 434 F.3d at 249.

McCollin also applied for the position of Enhanced Due Diligence Investigator on August 3, 2013, but did not receive an interview. ECF 66-28 at 3. The parties dispute whether she was qualified. However, David Arcara, the recruiter responsible for the position, stated that "[a]t that time, M&T was only hiring individuals with three years of compliance or investigative experience or familiarity working for the Bank Secrecy Act or in Anti-money laundering[.]" ECF 66-28, ¶ 4; *see also* ECF 66-32 at 7:14-16 ("An individual that possessed three years of compliance or investigative experience or familiarity working with" the Bank Secrecy Act or anti-money laundering).[18]

The EEOC maintains that McCollin possessed the requisite experience, as her job duties included investigating potential fraud. ECF 70 at 36-37; *see also* ECF 70-7 at 9-10. However,

---

[18] According to M&T's job posting, the "Basic Qualifications" for the position were "Bachelors' degree or the equivalent in work experience with 3+ years experience in an audit or risk management function, 4+ years experience in a compliance related position, or 6+ years banking experience. Management or supervisor experience preferred." ECF 63-3 at 14. However, Arcara, the recruiter for the position, later testified that they only interviewed applicants with compliance experience or experience with the Bank Secrecy Act or anti-money laundering. ECF 66-32 at 80:14 to 81:6.

during a deposition, McCollin stated that her compliance and anti-fraud experience was limited to contacting M&T's security department, "try[ing] to reach out to the customer or business owner to verify the check[,]" and utilizing a "Check Imaging System" to compare a potentially fraudulent check to checks that had cleared. ECF 70-7 at 9:14 to 10:14. This limited experience does not appear to constitute three years of compliance experience.

But, even if McCollin's experience inched her over the line from unqualified to minimally qualified, this minor discrepancy does not allow a reasonable trier of fact to conclude that the employer's explanation is "unworthy of credence." *Mereish*, 359 F.3d at 336 (internal citation omitted). To conclude otherwise, would risk "substituting the judgment of a court for that of the employer." *DeJarnette*, 133 F.3d at 298-99 (citation omitted).

### 4.        Failure To Extend McCollin's Period Of Redeployment Services

M&T maintains that McCollin was terminated because she did not obtain a new position after the first 30 days of the posting period. The EEOC maintains that M&T's failure to delay McCollin's termination date shows that M&T's explanation is merely pretextual. ECF 70 at 24.

The EEOC first highlights M&T's failure to consider McCollin for the Highland Assistant Branch Manager position. ECF 70 at 24-25. M&T recruiter Angela Skowronski was supposed to interview McCollin on September 4, 2013, but the interview did not proceed because McCollin was listed as "leave of absence" in M&T's system. ECF 70-26 at 2.  In Skowronski's Declaration, she explained that she mistakenly interpreted McCollin's "leave of absence" designation to mean that McCollin was still ineligible to return to work. ECF 66-24, ¶ 8. On September 5, 2013, M&T offered the position to another candidate. *Id.* The next day, Skowronski learned of her mistake.  *Id.*

According to the EEOC, Skowronski's explanation is "contrary to the record evidence." ECF 70 at 25. Thompson, M&T's Corporate Programs Manager, included the following note in McCollin's candidate form on August 9, 2013: "Candace McCollin's position was replaced while she was on leave of absence. Candace is eligible for preferencial [sic] consideration through November 11, 2013." ECF 70-30 at 4. The record does not, however, demonstrate that Skowronski saw Thompson's note. And, the existence of this note alone does not cast Skowronski's explanation into doubt.

Meanwhile, on August 30, 2013, McCollin sought to extend her termination date by one week, from September 5 to September 12, 2013. ECF 70-24 at 2. On September 4, 2013, defendant's career representative, Diane Robinson, emailed Thompson to request a delay for McCollin in light of Skowronski's error. ECF 70-25. Nevertheless, M&T did not delay McCollin's termination. As a result, the EEOC contends that M&T violated its own policy. ECF 70 at 25.

In an email dated September 6, 2013, Thompson explained: "As these employees are afforded only 90 days of redeployment assistance, we want to be sure that this time is not truncated or that there is an appearance that this time has been truncated. When the latter occurs, we may be required to extend the redeployment period beyond the 90 days . . . which creates an additional expense for the bank." ECF 70-22 at 2. However, the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent.'" *Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 203 (4th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)), *abrogated on other*

*grounds as recognized by Leake v. Ryan's Family Steakhouse*, 5 F. App'x 228, 232 (4th Cir. 2001).

In sum, the EEOC raised several different arguments for concluding that M&T's stated reasons for terminating McCollin were pretextual. To be sure, M&T did not rigidly comply with its own rules. It is possible that it may not have treated McCollin fairly. Nevertheless, taking all of the EEOC's arguments together, the EEOC has given no basis to doubt the veracity of the Bank's explanations or to infer that discrimination was the real reason for McCollin's termination.

## IV.     Conclusion

For the reasons stated above, I shall GRANT in part and DENY in part plaintiff's Motion for Summary Judgment (ECF 63), and I shall GRANT in part and DENY in part defendant's Cross-Motion for Summary Judgment. ECF 66.

An Order follows.


Date:   September 10, 2019               _____/s/_____
                                         Ellen L. Hollander
                                         United States District Judge